# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RAMDAS BHANDARI, M.D.,

       Plaintiff/Counter-defendant,

vs.                                  No. CIV 09-0932 JB/GBW

VHA SOUTHWEST COMMUNITY
HEALTH CORPORATION d/b/a
COMMUNITY HOSPITAL CORPORATION
and ARTESIA GENERAL HOSPITAL,

       Defendants/Counter-claimants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary Judgment on Defendants' Liability for Breach of Contract, filed January 5, 2011 (Doc. 112)("Motion"). The Court held a hearing on February 2, 2011. The primary issues are: (i) whether there is a genuine issue of material fact whether Plaintiff/Counter-Defendant Ramdas Bhandari, M.D. resigned from his employment; (ii) whether section 3.2 of the Physician Employment Agreement (Ramdas Bhandari, M.D.), filed January 5, 2011 (Doc. 112-1)("Agreement") between R. Bhandari and Defendant Artesia General Hospital ("AGH") is ambiguous as a matter of law; and (iii) whether, if the Agreement is ambiguous, the Court can interpret its ambiguous provisions or language as a matter of law. There is no genuine issue of material fact whether R. Bhandari resigned from his employment. Section 3.2 is ambiguous, however, because it is reasonably susceptible to two different meanings. Because section 3.2 is ambiguous, and because the evidence of the circumstances surrounding the execution of the agreement is susceptible of conflicting inferences, a jury must assign meaning to the unclear terms. The Court will therefore grant the Motion in part

and deny the Motion in part.[1]  The Court will deny R. Bhandari's request that it grant summary

judgment finding the Defendants liable for breach of the Agreement.  Because the Court finds that

there is no genuine issue of material fact whether R. Bhandari resigned from his employment,

however, the Court will grant summary judgment finding that R. Bhandari was terminated.

## FACTUAL BACKGROUND

The Defendants recruited and hired R. Bhandari to provide general, orthopedic surgery

services to Artesia and the surrounding communities that AGH serviced.  See, e.g., Defendants'

Response to Plaintiff's Motion for Summary Judgment on Defendants' Liability for Breach of

Contract at 5, filed January 19, 2011 (Doc. 125)("Response")(setting forth this fact); Plaintiff's

---

[1] "A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  R. Bhandari has asked the Court to "grant summary judgment finding Defendants liable for breach of contract."  Motion at 18.  The Court believes that implicit in R. Bhandari's request is a request that the Court find that R. Bhandari did not resign, that section 3.2 is not ambiguous, and that, even if section 3.2 is ambiguous, the Court should, as a matter of law, adopt R. Bhandari's interpretation of the section.  Because the Court finds that a jury must assign meaning to the unclear terms in section 3.2, the Court does not grant all the relief that R. Bhandari requests -- specifically, it does not grant R. Bhandari's request that it find the Defendants' liable for breach of contract.  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact -- including an item of damages or other relief -- that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).  Because the Court finds that there is no genuine issue of fact whether R. Bhandari resigned, although the Court denies R. Bhandari's request that it find the Defendants liable for breach of contract, the Court will enter an order finding that it will treat the assertion that R. Bhandari was terminated as established in this case, because whether R. Bhandari resigned is not genuinely in dispute.  The Defendants did not accept that R. Bhandari was terminated for purposes of R. Bhandari's Motion only.  The Defendants instead vigorously contested whether R. Bhandari was terminated.  The Court does not believe that the cost of determining whether this particular factual dispute may be eliminated is greater than the cost of resolving the dispute at trial.  The Court instead believes that the cost of eliminating this particular factual dispute at this point is less than the cost of resolving the dispute at trial.  The Court does not believe that it should refrain from ordering that this fact, which is not genuinely in dispute, be treated as established.  The Court does not believe that it is better to leave open this fact and does not believe that the related facts set forth at trial would better illuminate this fact.  The parties fully briefed this fact and argued this fact at the hearing.  The Court therefore will enter an order finding that it will treat as established that R. Bhandari was terminated.

Reply in Support of his Motion for Summary Judgment [Doc. 112] Filed January 5, 2011, filed

January 28, 2011 (Doc. 133)("Reply")(not controverting this fact).[2]  AGH and R. Bhandari entered

into a Physician Employment Agreement on March 16, 2005.  See, e.g., Agreement at ; Deposition

of Kenneth Randall at 64:5-15 (taken December 7, 210), filed January 5, 2011 (Doc. 112-2); Motion

¶ 1, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact); Response at 5 (setting

forth this fact); Reply at 3 (not controverting this fact).  In exchange for a base salary of $500,000.00

a year -- plus quarterly bonuses -- R. Bhandari agreed to provide professional medical services

relating to general orthopedic surgery at AGH.  See, e.g., Agreement at 1-2; Response at 5 (setting

forth this fact); Reply at 3 (not controverting this fact).

---

[2] The Defendants set forth this asserted fact, and other asserted facts, in their Response.  In his Reply, R. Bhandari states:

> Rather than complying with this Court's rules and providing a numbered list of additional facts, D.N.M.LR-Civ. 56.1(b), Defendants provide four pages of monologue . . . .  Rather than putting new facts at issue, this "counter-statement" confirms what . . . Bhandari put forward in his Motion . . . .  These alleged facts do not otherwise appear relevant to the issues at hand.

Reply at 3.  D.N.M.LR-Civ. 56.1(b) states:

> The memorandum in support of the motion must initially set out a concise statement of all material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.

> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Court agrees that R. Bhandari has not controverted the facts that the Defendants set forth in their Response, the Court deems these facts admitted. See D.N.M.LR-CIV. 56.1(b).

On its first page, under "Premises," the Agreement provides:

Hospital has agreed to employ Physician to provide professional medical services to satisfy its charitable purposes in providing access to quality professional medical care to the community. . . .   Hospital has determined to provide a physician practicing in the specialty of General Orthopedic Surgery . . . to staff a surgical practice located adjacent to its location in Artesia, New Mexico.

Agreement at 1.  See Motion ¶ 3, at 3-4 (setting forth this fact); Response at 3-4 (not controverting this fact).  The Agreement required R. Bhandari to provide such services "exclusively" to AGH's patients, and to devote his "full, entire, and undivided professional time and attention to the practice of medicine/surgery" for AGH.  Agreement at 2, 4.  See Response at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  R. Bhandari agreed to use his "best efforts" in performing his duties under the Agreement.  Agreement at 2.  See Response at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  In addition to providing patient care, the Agreement required R. Bhandari to promote AGH's professional practice and to meet professional standards of quality in his practice.  See, e.g., Agreement at 3; Response at 5 (setting forth this fact); Reply at 3 (not controverting this fact).

AGH is a wholly controlled entity of CHC.  See, e.g., Deposition of David Butler[3] at 41:3-15 (taken December 14, 2010), filed January 5, 2011 (Doc. 112-4); Motion ¶ 2, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact).  AGH's Chief Executive Officer Kenneth Randall is an employee of Defendant VHA Southwest Community Health Corporation d/b/a Community Hospital Corporation ("CHC"); he made the decision to terminate the Agreement, and CHC employees handled the termination.  See, e.g., Randall Depo. at 7:21-8:17, 134:15-21, 167:10-13, 344:22-345:10; Motion ¶ 2, at 3 (setting forth this fact); Response at 3-4 (not controverting this

---

[3] Butler is CHC's senior vice president and general counsel.  See Butler Depo. at 8:1-11.

-4-

fact).  Claude Camp, a CHC employee, negotiated the Agreement with R. Bhandari.  See, e.g., Deposition of Claude Camp at 34:12-23 (dated December 22, 2010), filed January 5, 2011 (Doc. 112-3); Motion ¶ 2, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact).

A fellow AGH physician, Dr. Joseph Salgado testified that R. Bhandari was unavailable at times when other doctors at AGH attempted to refer patients to him.  See Deposition of Joseph Salgado, M.D. at 16:1-17, 20:24-21:8, 25:22-26:23, 39:20-24 (taken December 8, 2010), filed January 19, 2011 (Doc. 125-4); Response at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  According to Salgado, R. Bhandari was "unavailable at times."  Salgado Depo. at 110:18-21.  See Response at 5 (asserting that Salgado testified that R. Bhandari was "unavailable at all times")(emphasis added); Reply at 3 (not controverting this fact).  When R. Bhandari was unavailable, orthopedic patients were sent from AGH's emergency room to Roswell, New Mexico or Carlsbad, New Mexico for fracture care and follow-up.  See, e.g., Salgado Depo. at 111:8-13 ("[I]n general . . . if [R. Bhandari] wasn't available . . . we would have to send somebody to either Roswell or Carlsbad for fracture care or follow-up."); Deposition of Jorge Abalos, M.D. at 76:6-13 (taken December 8, 2010), filed January 19, 2011 (Doc. 125-5); Response at 5-6 (setting forth this fact); Reply at 3 (not controverting this fact).  Randall testified that R. Bhandari did not follow up on referrals that were sent to him.  See Deposition of Kenneth Randall at 104:10-12 (taken December 7, 2010), filed January 19, 2011 (Doc. 125-6); Response at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  AGH's Medical Executive Committee ("MEC") conducted a review of R. Bhandari's performance.  See Response at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  MEC minutes reflect that, on January 18, 2006, Salgado informed members of the MEC that members of AGH's medical staff had approached him regarding Bhandari's unavailability.

> Dr. Salgado stat[ed] that since Dr. Bhandari lives out of town, he is often not available when a patient needs attention in the Emergency Room.  Dr. Salgado stated members of the Medical Staff have stated they will take their concerns regarding Dr. Bhandari to the Artesia Special Hospital District Board and the Governing Board if matters are not addressed.  The physicians feel too much money has been spent on Dr. Bhandari for him not to be available.  Dr. Salgado stated Medical Staff members have also approached him regarding referring patients to Dr. Bhandari and Dr. Bhandari refusing to see them. . . .   The members of the Medical Executive Committee agreed to call a special meeting on January 19th at 12:00 pm . . . to discuss matters of concern.  Dr. Salgado stated Dr. Bhandari has refused to treat children and sports injury patients . . . .  Dr. Alaniz stated Dr. Bhandari is refusing to treat indigent patients.

Medical Executive Committee Minutes at 4 (taken January 18, 2006), filed January 19, 2011 (Doc. 125-7).  See Randall Depo. at 127:17-25 (stating that the minutes were kept in the ordinary course of business and they were done at or about the time of the events they represent and that it is the ordinary business of the hospital to keep such documents); Response at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  Dr. Abalos, a member of the MEC, testified that he called R. Bhandari regarding consults, but R. Bhandari could not see the patients.  See Abalos Depo. at 12:24-13:7; Response at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  This happened more than a dozen times in response to Abalos' inquiries regarding consults.  See Abalos Depo. at 13:1-7; Response at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  A memorandum that Abalos prepared shows that a random sample of Hospital Emergency Department ("ED") patients from ED logs revealed that R. Bhandari did not treat at least twelve orthopedic patients.  Artesia General Hospital Memorandum at 1-2, filed January 19, 2011 (Doc. 125-8); Abalos Depo. at 26:8-18; Response at 6-7 (setting forth this fact); Reply at 3 (not controverting this fact).  In preparing the memorandum, Abalos spoke to approximately eleven physicians.  See Abalos Depo. at 26:8-27:14; Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  The memorandum notes that several other physicians described R. Bhandari as being rude to

patients and offering no help when called.  <u>See</u> Memorandum at 1-2; Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).

The CEO of AGH stated that its goal as a community hospital is to see patients in the community and that the purpose of having an orthopedic surgeon, such as R. Bhandari, is for the surgeon to see orthopedic patients at AGH.  <u>See, e.g.</u>, Randall Depo. at 24:19-22; Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  Randall testified that R. Bhandari was "not focused on developing a practice," and "did not attempt to develop a practice."  Randall Depo. at 198:11-13, 294:13-21.  <u>See</u> Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  Camp testified that he had conversations with R. Bhandari about increasing patient volumes and building his orthopedic practice.  <u>See</u> Deposition of Claude E. Camp, III, at 81:7-82:8 (taken December 22, 2010), filed January 19, 2011 (Doc. 125-1).  Randall testified that R. Bhandari saw few orthopedic patients.  <u>See</u> Randall Depo. 25:6-25; Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  Randall testified that, in a period of approximately fifteen months, R. Bhandari performed approximately eighteen to nineteen surgeries.  <u>See, e.g.</u>, Randall Depo. at 25:22-25; Response at 7 (setting forth this fact); Reply at 3 (not controverting this fact).[4]

---

[4] In their Response, the Defendants also assert:

> By any standard, Dr. Bhandari's [sic] failed to perform under the Agreement and use his best efforts or work exclusively for the Hospital.  Moreover, Dr. Bhandari's maintaining of a residence in Florida and management of at least three rental properties in that state made it impossible for him to properly perform under the Agreement.

> Furthermore, Dr. Bhandari did not maintain a personal cell phone while at AGH, and his excessive use of his AGH-issued cell phone was materially detrimental to the hospital's patients and economic interests.  The phone records indicate that Dr. Bhandari was not focused on providing his professional services to

During his employment at AGH, R. Bhandari maintained a residence in Florida and managed at least three rental properties in Florida.  See, e.g., Deposition of Ramdas Bhandari, M.D., at 174:5-176:6 (taken December 6, 2010), filed January 19, 2011 (Doc. 125-2); Response at 7-8 (setting forth this fact); Reply at 3 (not controverting this fact).  R. Bhandari did not maintain a personal cellular telephone while at AGH; he frequently used his AGH-issued cellular telephone, and he used his AGH-issued cellular telephone for personal use to call Miami, Florida regarding management of several rental properties.  See, e.g., Bhandari Depo. at 173:9-176:7; Response at 8 (setting forth this fact); Reply at 3 (not controverting this fact).

On September 26, 2006, Randall called R. Bhandari into a meeting for the purpose of terminating his employment.  See, e.g., Randall Depo. at 343:25-344:10, 346:11-20; Motion ¶ 4, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  Randall and Butler began the meeting by telling R. Bhandari that he was terminated from employment.  See, e.g., Randall Depo. at 346:11-17; Motion ¶ 5, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  The Defendants contend that R. Bhandari responded by asking if he could resign and that the parties then engaged in negotiations regarding a separation agreement.  See, e.g., Randall Depo. at

_____

AGH.  Instead, Dr. Bhandari admitted that during business hours he used the AGH cell phone for personal use and to call Miami regarding management of several rental properties.

Response at 7-8 (internal citations omitted).  The Court will not accept all of these assertions, which contain legal argument or conclusions, and not factual assertions, as undisputed facts.  See Ruiz v. City of Brush, No. 09-0188, 2006 WL 1816454, at *4 (D. Colo. 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;][l]egal argument should be reserved for separate portions of the brief." (citation omitted)).  There are, however, facts in the statement that the Court can and will accept: (i) R. Bhandari maintains a residence in Florida; (ii) he managed at least three rental properties in Florida; (iii) he did not maintain a personal cellular telephone while at AGH; (iv) he used his AGH-issued cellular telephone a lot; and (v) he used his AGH cellular telephone for personal use to call Miami, Florida regarding management of several rental properties.

241:19-25, 346:18-19, 346:24-347:3; Motion ¶ 5, at 4 (setting forth this fact); Response at 3-4 (not

controverting this fact).  R. Bhandari testified that he did not resign.  See, e.g., Deposition of

Ramdas Bhandari, M.D., at 144:19-23 (taken December 6, 2010), filed January 5, 2011 (Doc. 112-

5); Motion ¶ 6, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  AGH has

a written policy that sets forth the procedure for when an employee elects to resign, in which case

the first step is that the employee "submits a letter of resignation."  Artesia General Hospital Human

Resources Policy #HR457, filed January 5, 2011 (Doc. 112-6).  See  Motion ¶ 7, at 4 (setting forth

this fact); Response at 3-4 (not controverting this fact).  Before the meeting on September 26, 2006,

the Defendants drafted a settlement agreement.  See, e.g., Butler Depo. at 64:18-95:9, Motion ¶ 8,

at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  The agreement stated:

> If Employee wishes to conclude the employment by resignation rather than being
> released by Employer, Employee may sign a resignation letter in the form attached
> hereto in addition to executing the signature page of this Agreement, and Employer
> will accept Employee's resignation.  Employee is offered the choice of resigning
> solely as a courtesy; and the benefits to be provided by Employer in exchange for
> execution of this Agreement shall not be diminished or increased based on whether
> Employee chooses to resign.

Separation Agreement with Release and Indemnification, filed January 5, 2011 (Doc. 112-7).  See

Motion ¶ 8, at 4-5 (setting forth this fact); Response at 3-4 (not controverting this fact).  The parties

did not agree on the separation agreement during the meeting, and R. Bhandari did not sign a

statement of resignation.  See, e.g., Randall Depo. at 241:19-25, 242:9-15, 254:18-255:6, 256:1-

257:13; Butler Depo. at 156:4-10; Motion ¶ 9, at 5 (setting forth this fact); Response at 3-4 (not

controverting this fact).  After the meeting, the Defendants sent R. Bhandari a letter stating that

AGH is "exercising its right, effective immediately, to terminate the [Agreement]."  Randall Depo.

at 79:13-80:16.  See Motion ¶ 10, at 5 (setting forth this fact); Response at 3-4 (not controverting

this fact).  The Defendants also sent R. Bhandari a revised draft of the separation agreement

containing the same language on resignation as in the first draft.  See Separation Agreement with Release and Indemnification, filed January 5, 2011 (Doc. 112-8); Butler Depo. at 109:9-16; Randall Depo. at 254:18-255:6; Motion ¶ 11, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  R. Bhandari ultimately rejected the separation agreement.  See, e.g., Randall Depo. at 241:19-25, 256:1-257:13; Motion ¶ 12, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  Randall testified that R. Bhandari rejected the separation agreement, and in response to a question regarding whether the Defendants would have let R. Bhandari resume his practice if he requested, Randall stated "[h]is employment would not be reinstated."  Randall Depo. at 256:1-257:13.  See Motion ¶ 13, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

The Agreement contains a section regarding termination, which states:

3.2    Termination for Cause.  Subject to Hospital's due process procedures, this Agreement may be terminated for cause by the non-defaulting party immediately and without notice at any time.  "Cause" means:

(a)    Material breach or default of either party hereunder, which shall remain uncured thirty (30) days after receipt of written notice of default from the non-defaulting party;

(b)    Willful failure of Physician to comply with reasonable directives of the Hospital's Medical Staff by-laws; or Hospital policies, standards and regulations established from time to time by the Hospital;

(c)    Excessive absenteeism (consistently exceeding guaranteed time off) of Physician, without prior written approval of Hospital;

. . . .

(k)    Physician taking any action or engaging in any activity that is materially detrimental to the lawful and/or economic interests of Hospital;

Agreement at 2-3.  See Motion ¶¶ 14, 21, 24, 28, at 6, 7, 8 (setting forth this fact); Response at 3-4 (not controverting this fact).

Randall decided to terminate the contract, because R. Bhandari did not provide the services that the Agreement required that he provide, and because he failed to provide the services one would expect from a physician in his capacity. See Randall Depo. at 78:24-79:8 ("I stated that Dr. Bhandari did not fulfill his contract by not seeing patients and devoting his full time to seeing patients."); id. at 167:10-13; id. at 197:17-198:18 (stating, in response to a question regarding whether there were any additional reasons for terminating Bhandari, that, "[w]e have a trend here of a physician over months who obviously was not focused on developing a practice. . . . So again, I'm dealing with an individual which is obviously not wanting to work."); id. at 207:10-23 (stating, in response to a question whether one of the reasons for R. Bhandari's termination for cause was his failure to follow hospital policy, that R. Bhandari's failure to provide the services one "would expect from a physician in his capacity, which . . . include[s] following up on consults, which . . . include[s] following up on ER requests, which . . . include[s] seeing patients as referred to you by the physicians from the ER . . . indicate[s] not following the medical staff or the hospital policies, guidelines, or expectations"); Deposition of Thaddeus Pope, Ph.D., at 73:18-74:25 (taken December 27, 2010), filed January 5, 2011 (Doc. 112-9)(stating that he believed that, in this case, Bhandari's termination was "an administrative decision, a business decision made by administration for financial reasons not for quality medical care reasons"); Deposition of Lisa Hill at 122-:23-123:1 (taken December 14, 2010), filed January 5, 2011 (Doc. 112-10)(stating that for part of what CHC and AGH ultimately terminated Bhandari was under-performance); Butler Depo. at 39:13-16 ("Q. What case are you talking about?  A.  Well, Ramdas Bhandari.  Q.  Okay.  And what was being investigated?  A.  His performance under the contract.").  Randall considered R. Bhandari to be in breach of contract for failure to provide services.  See Randall Depo. at 316:8-15 ("**Q** Other than your claim that Dr. Bhandari failed to provide services contracted for, are you alleging he did

anything else to breach his contract?  **A That's the primary breach.  Q** Okay.  What's the secondary breach?  **A Hmm, I would say that in legal terms that's probably about it.**")(bold in original).[5]

The Defendants did not give R. Bhandari any notice of the issues on which they based the termination and did not give R. Bhandari a chance to cure his allegedly improper behavior. See, e.g., Randall Depo. at 196:15-197:16; Motion ¶ 16, at 7 (setting forth this fact); Response at 3-4 (not controverting this fact).  The Defendants allege that they had cause to terminate the contract not only under ¶ 3.2(a), but also under ¶ 3.2(b), (c), and (k).  See, e.g., Defendant Artesia General

---

[5] In paragraph 15 of his Motion, R. Bhandari asserts: "Randall testified that he decided to terminate the Contract because . . . Bhandari did not provide the services the Contract required he provide. . . . Randall considered . . . Bhandari to be in breach of the contract for failure to provide services."  Motion ¶ 15, at 6-7.  In their Response, the Defendants "object to . . . Bhandari's characterization of deposition testimony in Fact No. 15.  Defendants believe that the only undisputed 'facts' in No. 15 are the deposition testimony itself, and the Defendants ask that the Court limit its reliance to the actual quoted deposition testimony."  Response at 3.  In his deposition, Randall testified that R. Bhandari failed to fulfill his contract by not seeing patients, by not devoting his full time to seeing patients, and by not providing services one would expect from a physician in his capacity.  See Randall Depo. at 78:24-79:8 ("I stated that Dr. Bhandari did not fulfill his contract by not seeing patients and devoting his full time to seeing patients."); id. at 167:10-13; id. at 197:17-198:18 (stating, in response to a question regarding whether there were any additional reasons for terminating Bhandari, that "[w]e have a trend here of a physician over months who obviously was not focused on developing a practice. . . .  So again, I'm dealing with an individual which is obviously not wanting to work."); Tr. at 207:10-23 (stating, in response to a question whether one of the reasons for R. Bhandari's termination for cause was his failure to follow hospital policy, that R. Bhandari's failure to provide the services one "would expect from a physician in his capacity, which . . . include[s] following up on consults, which . . . include[s] following up on ER requests, which . . . include[s] seeing patients as referred to you by the physicians from the ER . . . [His conduct] indicate[s] [he is] not following the medical staff or the hospital policies, guidelines, or expectations").  Randall's testimony supports R. Bhandari's asserted fact that Randall decided to terminate the contract, because R. Bhandari did not provide the services that the Agreement required which he provide, and because he failed to provide the services one would expect from a physician in his capacity.  The Court will therefore deem admitted R. Bhandari's assertion that Randall decided to terminate the contract, because R. Bhandari did not provide the services that the Agreement required that he provide, and because he failed to provide the services one would expect from a physician in his capacity.

Hospital's First Amended Answers and Objections to Plaintiff Ramdas Bhandari's First Set of Interrogatories, filed January 5, 2011 (Doc. 112-11); Motion ¶ 17, at 7 (setting forth this fact); Response at 3-4 (not controverting this fact).  R. Bhandari and Camp, the former CHC employee who was the CEO of AGH, negotiated the Agreement.  See, e.g., Camp. Depo. at 34:12-17; Randall Depo. at 134:15-21; Motion ¶ 18, at 7 (setting forth this fact); Response at 3-4 (not controverting this fact).

Regarding section 3.2 of the Agreement, Camp testified:

Q.     And then [section 3.2] goes on to list eleven other paragraphs, "B" through "L".  Would you consider at least some of the provisions listed in subparagraphs "B" through "L" as being material to the contract?

. . . .

A.     Yes, sir.

. . . .

Q.     So if a physician . . . was to have been in violation of those paragraphs "B" through "L" that section "A" would have kicked in and required written notice to be provided to him of that -- . . . and a cure period of 30 days; correct?

. . . .

A.     I mean, there is some of them there are no cure for.

. . . .

A.     . . . That would be -- I think notice should be given for excessive absenteeism; willful misconduct of physician resulting in damages to the hospital, I would not give notice for.

. . . .

A.     Because it could potentially pose a danger to the patients and staff.

. . . .

Q.      And your definition there, what you are thinking of as defining willful misconduct . . . .

A.      Well, if the physician got mad and drove his car through the emergency room, which has happened.

Q.      So committing harm?

A.      Yeah.  I'm not -- you know, certain things would lend to immediate and certain things would not lend to immediate . . . -- basically, if it's a threat to harming of staff or patients or other medial staff, then it would be an immediate.

. . . .

Q.      But otherwise, if it is not "D" described in that way or defined in that way, that the other things associated with "D", "C", "K", those might require notice.

A.      Correct.

Q.      Those actually do require notice.

A.      Correct.

Camp Depo. at 74:11-77:10.[6]

Bhandari testified:

**Q.  You had the right to notice in writing delivered to you; is that correct?**

A.  Right to notice in writing if there was any kind of problem in this contract, any kind of revision, any kind of change, or anything else.  It had to be in writing.

. . . .

_____

[6] In his Motion, R. Bhandari asserts: "Camp testified that he understood that ¶ 3.2(a) subsumed all the other subdivisions of ¶ 3.2, such that thirty-days' notice of a breach is required prior to termination unless . . . R. Bhandari took an action that was causing the immediate physical harm to [the] Defendants." Motion at 7 (citing Camp. Depo. at 74:11-77:10).  The Defendants state that Bhandari's asserted fact does not "accurately summarize . . . Camp's deposition testimony.  At no time during his deposition did . . . Camp testify that Section 3.2(a) subsumed all of the other subdivisions of Section 3.2."  Response at 4 (citing Camp. Depo. at 78:2-8).  The Court will treat Camp's accurately stated testimony as an admitted fact.

**Q.  All right.  So the investigation itself is not evidence of bad faith, true?**

A.  The investigation, if you have decided that an employee has something going on which is not correct, you have to give notice to that employee, I believe in good faith and fair dealing before you start an investigation so that they are aware of what is going on.

**Q.  Well, how will you know if they're doing anything wrong so you can give them notice unless you can investigate it?**

A.   If you give them notice, then first of all, it gives them a chance to correct whatever is going on.  And if something wrong is done, yes, it should be brought forth.  And you should tell them you are doing it.  It's an open thing.

Bhandari Depo. at 136:11-16, 141:23-142:4 (bold in original).[7]

The Defendants assert that the policy upon which they depend for "cause" for R. Bhandari's termination under ¶ 3.2(b) is "AGH's rules and regulations regarding his company-issued cell phone," Answers to Interrogatories at 2; see Motion ¶ 22, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact), but it is not clear that AGH has a written cellular telephone policy, see, e.g. Randall Depo. at 171:21-172:12 (stating that he does not know whether there is a written policy at AGH that deals with use of a company-issued cellular telephone, and that he did not look at the issue before he terminated Bhandari); id. at 207:10-23 (stating that one of the reasons that Randall gave for R. Bhandari's termination was his "failure to . . . provide the services you would expect from a physician in his capacity, which . . . include[s] following up on consults, . . . following up on ER requests, . . . seeing patients . . . referred . . . by the physicians from the ER or other similar

---

[7] In his Motion, R. Bhandari asserts that "he understood the contract entitled him to notice of any alleged breach."  Motion at 7 (citing Bhandari Depo. at 136:11-16, 141:22-142:12).  The Defendants object to Bhandari's asserted fact, stating that his asserted fact "does not accurately summarize his deposition testimony.  See Response at 4 (citing Bhandari Depo. at 136:11-16, 141:23-142:2).  The Court will treat R. Bhandari's testimony as the asserted fact.

examples" that indicate R. Bhandari's failure to follow the medical staff or the hospital policies, guidelines, or expectations").  <u>See</u> Motion ¶ 22, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact).  Before terminating the contract, the Defendants did not tell R. Bhandari that they thought his cellular telephone usage violated any cellular telephone policy.  <u>See, e.g.</u>, Randall Depo. at 173:18-24; Motion ¶ 23, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact).

At the time the Defendants terminated the Agreement, R. Bhandari had unused, accrued paid time off due to him and Randall had approved R. Bhandari's prior use of time off.  <u>See, e.g.</u>, Randall Depo. at 209:25-210:16, 335:6-9; Motion ¶ 25, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact).  The Defendants did not include ¶ 3.2(c) in the termination letter.  <u>See, e.g.</u>, Randall Depo. at 209:25-210:16 (acknowledging that 3.2(c) is not in the termination letter); Motion ¶ 26, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact).  Regarding R. Bhandari's alleged violation of ¶ 3.2(c), Hill stated: "If I recall correctly, this had more to do with the fact that . . . Bhandari . . . was not always in the office -- was frequently not in the office when people might expect him to be in the office."  Hill Depo. at 73:20-24.  <u>See</u> Motion ¶ 27, at 8 (setting forth this fact); Response at 3-4 (not controverting this fact).

The Defendants have stated that the action on which they rely to justify termination under ¶ 3.2(k) is "Bhandari's work, or lack thereof, at AGH was materially detrimental to the economic interests of AGH."  Answers to Interrogatories at 2.  <u>See</u> Randall Depo. at 214:21-215:3 (stating, in response to a question asking whether R. Bhandari took action detrimental to the economic interest of the hospital, that R. Bhandari did, because he did not see patients); Motion ¶ 29, at 9 (setting forth this fact); Response at 3-4 (not controverting this fact).

## PROCEDURAL BACKGROUND

On July 12, 2010, R. Bhandari filed his Second Amended Complaint for Fraudulent and/or Negligent Misrepresentation; Constructive Fraud; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Wrongful Discharge in Violation of Public Policy; Outrageous Conduct; Defamation; False Light Invasion of Privacy; and Intentional Infliction of Emotional Distress.  See Doc. 35.  On July 27, 2010, the Defendants filed their First Amended Answer and Counterclaim, alleging causes of action for breach of contract, conversion/theft, defamation, and fraud.  See Doc. 44.

On January 5, 2011, R. Bhandari filed the Plaintiff's Motion for Summary Judgment on Defendants' Liability for Breach of Contract.  See Doc. 112.  In his motion, R. Bhandari argues that he did not resign from his employment.  He further argues that the Defendants breached the Agreement by refusing to give him notice and an opportunity to cure.  He argues that the Defendants' asserted bases for termination fall squarely within the scope of section 3.2(a) of the Agreement.  He further argues that the Defendants' argument that they could avoid notice and the right to cure by deeming the breach immaterial is absurd and incorrect.  R. Bhandari argues that the parties intended that all terminations for cause would be subject to the notice and cure provisions contained in section 3.2(a).  R. Bhandari further contends that the Defendants' allegations do not show breaches of section 3.2(b), (c), or (k).  R. Bhandari asks that Court to grant summary judgment finding the Defendants liable for breach of contract.

On January 19, 2011, the Defendants filed their Response to Plaintiff's Motion for Summary Judgment on Defendants' Liability for Breach of Contract.  See Doc. 125.  In their Response, the Defendants argue that the plain language of the Agreement does not support R. Bhandari's motion. They contend that R. Bhandari has not pled reformation and thus is not entitled to reformation.

They contend that, even if R. Bhandari pled reformation, the evidence in the summary judgment record does not establish reformation as a matter of law.  They further assert that R. Bhandari's reformation argument, even if accepted, would not establish liability under the entire Agreement. They assert that there is an issue of fact whether R. Bhandari resigned his employment at AGH and that there are fact issues whether R. Bhandari violated sections 3.2(b) and 3.2(k).

On January 28, 2011, R. Bhandari filed the Plaintiff's Reply in Support of His Motion for Summary Judgment [Doc. 112] Filed January 5, 2011.  See Doc. 133.  In his Reply, R. Bhandari asserts that, "[b]ecause the underlying reasons on which Defendants rely for justification constituted material breach, Defendants were required to . . . give thirty days' [sic] notice and chance to cure before termination."  Reply at 4.  R. Bhandari asserts that the parties' intent confirms his interpretation of the Agreement.  R. Bhandari further asserts that the Defendants are liable for damages for the entire term of the contract and that there is not a genuine issue of fact regarding whether he resigned.  R. Bhandari contends that the Defendants did not have cause to terminate R. Bhandari under sections 3.2(b), (c), or (k).

At the hearing, both parties represented to the Court that all the Court would hear at a Mark V hearing[8] would be testimony from Camp and Bhandari.  See Transcript of Hearing at 41:6-25 (taken February 2, 2011)(Court, Burris)("THE COURT: So . . . if I don't buy your construction of the contract . . . then you want that Mark V hearing to put on Mr. Camp and Dr. Bhandari?  MR. BURRIS: Well yes, Your Honor.");[9] Tr. at 43:21-44:2 (Court)("THE COURT: . . . I think Mr.

---

[8] According to the Supreme Court of New Mexico in Mark V. Inc v.. Mellekas, 114 N.M. 728, 845 P.3d 1232 (1993), a district court may take extrinsic evidence to determine whether a contract is ambiguous. See 114 N.M. at 781-82, 845 P.3d at 1235-36.

[9] The Court's citations to the transcript refer to the court reporter's original, unedited version. The final transcript may contain slightly different page and/or line numbers.

Bur[ris] is saying . . . Judge . . . you can find that both of these are reasonable constructions and then you can have your Mark V hearing, but nothing's going to change.   You have all the testimony . . .  Is that where you are as well."); Tr. at 44:2-10 (Lovett)("MS. LOVETT: I think so, Your Honor, although I would ask to just even if it's until the end of the day to be certain that we have enough of Mr. Camp's testimony . . . to put in context his position on the negotiation.").

> THE COURT:  All right.  Fair enough.  If I don't hear from anybody what I'm hearing is that [the parties are saying that they] really don't need a Mark V hearing . . . you're in as good a position now as you will be down the road with the one caveat  that Ms. Lovett has that she may want to supplement it with some additional testimony.  Is that fair Ms. Lovett.
>
> MS. LOVETT:  That's fair, Your Honor.

Tr. at 44:11-18 (Court, Lovett).  R. Bhandari's counsel did not object to the Court's statement.  The Defendants never supplemented the record with additional testimony.  At the hearing, the Court also discussed the reformation issue with R. Bhandari.

> THE COURT:  Let me ask you on this issue of reformation and you're the attorney you can advocate what you want.  But it doesn't seem to me that what you're really asking for is reformation, and I don't think you pled that, and so I'm concerned with whether that's here, but it seems to me that that's not really what you're wanting is the reformation.  What you're wanting the Court to do is to adopt your construction of the contract.
>
> MR. BURRIS:  I think that's fair, Your Honor.

Tr. at 45:6-14 (Court, Burris).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to

support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891

(10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986)("Of course, a party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the [record],

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact.")(internal quotation marks omitted). Once the movant meets this burden, rule 56(e)

requires the non-moving party to designate specific facts showing that there is a genuine issue for

trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal

quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in

its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set

out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). It is not enough for

the party opposing a properly supported motion for summary judgment to "rest on mere allegations

or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See

Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States,

622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment

motion is made, the opposing party may not rest on the allegations contained in his complaint, but

must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor

of the non-moving party and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any

issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

"Rule 56 provides for summary judgment motions on particular issues or claims . . . ."

O'Toole v. Northrop Grumman Corp., 305 F.3d 1222, 1227 (10th Cir. 2002).  Rule 56 states "[a]

party may move for summary judgment, identifying each claim or defense -- or the part of each

claim or defense -- on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  As the Advisory

Committee Notes for the 2010 amendments to rule 56 state:

> The first sentence is added to make clear at the beginning that summary judgment
> may be requested not only as to an entire case but also as to a claim, defense, or part
> of a claim or defense.  This subdivision caption adopts the common phrase "partial
> summary judgment" to describe disposition of less than the whole action, whether
> or not the order grants all the relief requested by the motion.

 Fed. R. Civ. P. 56 Advisory Committee Notes for 2010 amendments.  "If the court does not grant

all the relief requested by the motion, it may enter an order stating any material fact -- including an

item of damages or relief -- that is not genuinely in dispute and treating the fact as established in the

case."  Fed. R. Civ. P. 56(g).

> Subdivision (g) applies when the court does not grant all the relief requested
> by a motion for summary judgment.  It becomes relevant only after the court has
> applied the summary-judgment standard carried forward in subdivision (a) to each
> claim, defense, or part of a claim or defense, identified by the motion.  Once that
> duty is discharged, the court may decide whether to apply the summary-judgment
> standard to dispose of a material fact that is not genuinely in dispute.  The court must
> take care that this determination does not interfere with a party's ability to accept a
> fact for purposes of the motion only.  A nonmovant, for example, may feel confident
> that a genuine dispute as to one or a few facts will defeat the motion, and prefer to

avoid the cost of detailed response to all facts stated by the movant.  This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.  Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established.  The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments.

## RELEVANT NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

"Generally, the goal of contract interpretation is to ascertain the intentions of the contracting parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. 207, 218, 46 P.3d 668, 679 (2002)(quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. 698, 702, 12 P.3d 960, 964 (2000)(internal quotation marks omitted); Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 630, 916 P.2d 822, 830 (1996))).  "The court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. at 218-19, 46 P.3d at 679-80 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. at 702, 12 P.3d at 964; CC Housing Corp. v. Ryder Truck Rental, Inc., 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987))(alterations and internal quotation marks omitted).  "Absent ambiguity, provisions of a contract need only be applied, rather than construed or interpreted."  Richardson v. Farmers Ins. Co. of Am., 112 N.M. 73, 74, 811 P.2d 571, 572 (1991)(citing McKinney v. Davis, 84 N.M. 352, 503 P.2d 332 (1972)).

In New Mexico, a court may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear."  Mark V, Inc. v. Mellekas,

114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic

evidence to make a preliminary finding on the question of ambiguity.").  In <u>Mark V, Inc. v.</u>

<u>Mellekas</u>, the Supreme Court of New Mexico summarized the law in New Mexico concerning the

interpretation of "ambiguous or unclear language in written agreements:"

> An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity.  <u>C.R. Anthony</u>, 112 N.M. [504,] 509 n. 2, 817 P.2d [817,] 243 n. 2 [(1991)].  The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court.  <u>Levenson v. Mobley</u>, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987).  The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear.  <u>C.R. Anthony</u>, 112 N.M. at 508-09, 817 P.2d at 242-43.  If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. <u>Id</u>. at 510, 817 P.2d at 244.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists.  <u>Vickers v. North Am. Land Dev., Inc.</u>, 94 N.M. 65, 68, 607 P.2d 603, 606 (1980).  At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder, <u>C.R. Anthony</u>, 112 N.M. at 510, 817 P.2d at 244.

> Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.  <u>Segura v. Molycorp, Inc.</u>, 97 N.M. 13, 18, 636 P.2d 284, 289 (1981).  However, in the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation.  <u>C.R. Anthony</u>, 112 N.M. at 510 n. 5, 817 P.2d at 244 n. 5.  The factual issues, if any, presented by an ambiguity must be resolved by the jury (or by the judge as fact finder in the case of a bench trial) with the benefit of a full evidentiary hearing prior to deciding breach and damages.  <u>Id</u>. at 510, 817 P.2d at 244.  In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent.  <u>American Bank of Commerce v. M & G Builders, Ltd.</u>, 92 N.M. 250, 252, 586 P.2d 1079, 1081 (1978).  Evidence may be presented to the fact finder to aid in the interpretation of the agreement, but no evidence should be received when its purpose or effect is to contradict or vary the agreement's terms. <u>Maine v. Garvin</u>, 76 N.M. 546, 550-51, 417 P.2d 40, 43 (1966); <u>see</u> <u>also</u> <u>C.R. Anthony</u>, 112 N.M. at 509, 817 P.2d at 243.

114 N.M. at 781-82, 845 P.2d at 1235-36.

As this Court stated in <u>Great American Insurance Co. of New York v. W. States Fire</u>

<u>Protection Co.</u>, 730 F. Supp. 2d 1308 (D.N.M. 2009)(Browning, J.):

> In <u>Mark V, Inc. v. Mellekas</u>, the Supreme Court of New Mexico summarized the circumstances under which it is appropriate for a district court to construe a contract as a matter of law, and when a district court should find that a contract is ambiguous and leave construction of the contract to a jury.  According to the Supreme Court of New Mexico in <u>Mark V, Inc. v. Mellekas</u>, a district court may take extrinsic evidence to determine whether a contract is ambiguous, and "if the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." <u>Id.</u>, 845 P.2d at 1235 (citations omitted).

730 F. Supp. 2d at 1314 n.1.

<u>ANALYSIS</u>

There is not a genuine issue of material fact whether R. Bhandari resigned from his employment, because, taking the evidence in the light most favorable to the Defendants, although R. Bhandari expressed interest in resignation and although there were discussions about resignation, the evidence does not show that R. Bhandari ever resigned.  Section 3.2 of the agreement is ambiguous, because, given the language of section 3.2 and the extrinsic evidence of the circumstances surrounding the execution of the agreement, the agreement is reasonably and fairly susceptible of different constructions.  The Court will therefore grant in part and deny in part R. Bhandari's Motion.

**I.      THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER R. BHANDARI RESIGNED FROM HIS EMPLOYMENT.**

R. Bhandari argues that the Defendants' action in sending the termination letter after the meeting and the parties' lack of agreement on the separation agreement shows that, "regardless of whatever was said during the [m]eeting, at its conclusion . . . R. Bhandari was still in the position

of having been terminated from employment." Motion at 11. R. Bhandari argues that his termination remained effective unless R. Bhandari subsequently agreed to resign in writing. He contends that he did not subsequently resign. He contends that he did not accept the separation agreement and that his rejection of the separation agreement did not reinstate his employment, which shows that his termination was not withdrawn while the parties considered the separation agreement.

The Defendants argue that there is an issue of fact whether R. Bhandari resigned from his employment at AGH. They argue that both Randall and Butler testified that, at the meeting, R. Bhandari stated that he preferred to resign. They contend that R. Bhandari negotiated a separation agreement with Butler and Randall, and that Butler testified that, at the end of the negotiations, he thought that AGH and R. Bhandari had reached a separation agreement.

Taking the facts in the light most favorable to the Defendants, there is not a genuine issue of fact whether R. Bhandari resigned. On September 26, 2006, Randall called Dr. R. Bhandari into a meeting for the purpose of terminating his employment. See, e.g., Randall Depo. at 343:25-344:10, 346:11-20; Motion ¶ 4, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). Randall began the meeting by telling R. Bhandari that he was terminated from employment. See, e.g., Randall Depo. at 346:11-17; Motion ¶ 5, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). The Defendants contend that R. Bhandari responded by asking if he could resign and that the parties then engaged in negotiations regarding a separation agreement. See, e.g., Randall Depo. at 241:19-25, 346:18-19, 346:24-347:3; Motion ¶ 5, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). R. Bhandari testified that he did not resign. See, e.g., Bhandari Depo. at 144:19-23; Motion ¶ 6, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). AGH has a written policy that sets forth the procedure for when an employee elects to resign, in which the first step is that the employee "submits a letter of

resignation."  Artesia General Hospital Human Resources Policy #HR457.  See  Motion ¶ 7, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  Before the meeting on September 26, 2006, the Defendants drafted a settlement agreement.  See, e.g., Butler Depo. at 64:18-95:9, Motion ¶ 8, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  The agreement stated:

> If Employee wishes to conclude the employment by resignation rather than being released by Employer, Employee may sign a resignation letter in the form attached hereto in addition to executing the signature page of this Agreement, and Employer will accept Employee's resignation.  Employee is offered the choice of resigning solely as a courtesy; and the benefits to be provided by Employer in exchange for execution of this Agreement shall not be diminished or increased based on whether Employee chooses to resign.

Separation Agreement with Release and Indemnification.  See Motion ¶ 8, at 4-5 (setting forth this fact); Response at 3-4 (not controverting this fact).  The Defendants did not agree on the separation agreement during the meeting, and R. Bhandari did not sign any statement of resignation.  See, e.g., Randall Depo. at 241:19-25, 242:9-15, 254:18-255:6, 256:1-257:13; Butler Depo. at 156:4-10; Motion ¶ 9, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  After the meeting, the Defendants sent R. Bhandari a letter stating that AGH is "exercising its right, effective immediately, to terminate the [Contract]."  Randall Depo. at 79:13-80:16.  See Motion ¶ 10, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  After the meeting, the Defendants sent R. Bhandari a revised draft of the separation agreement containing the same language on resignation as in the first draft.  See Separation Agreement with Release and Indemnification (Doc. 112-8);  Butler Depo. at 109:9-16; Randall Depo. at 254:18-255:6; Motion ¶ 11, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  R. Bhandari ultimately rejected the separation agreement.  See, e.g., Randall Depo. at 241:19-25, 256:1-257:13; Motion ¶ 12, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).  Randall

testified that R. Bhandari rejected the separation agreement, and in response to a question regarding whether the Defendants would let R. Bhandari resume his practice if he requested, Randall stated "[h]is employment would not be reinstated."  Randall Depo. at 256:1-257:13.  See Motion ¶ 13, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

At the meeting, R. Bhandari expressed an interest in resignation, and the parties engaged in negotiations over a separation agreement.  The parties, however, did not agree on the separation agreement during the meeting.  The proposed separation agreement stated that, if R. Bhandari wished to resign, he could sign a resignation letter and execute the signature page of the separation agreement.  Although in their Response, the Defendants assert that Butler thought that AGH and Bhandari reached a separation agreement at the end of the negotiations, the undisputed facts establish that, although R. Bhandari expressed interest in resignation, he never took the necessary steps to resign, because he did not sign a resignation letter or execute the signature page of the separation agreement.  Ultimately, although R. Bhandari expressed interest in resignation, he never resigned, and his termination remained in place.  The Court therefore finds that there is no genuine issue of fact whether R. Bhandari resigned.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (stating that there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party)(quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. at 448; Vitkus v. Beatrice Co., 11 F.3d at 1539); Vitkus v. Beatrice Co., 11 F.3d at 1539 (stating that a mere "scintilla" of evidence will not avoid summary judgment).

## II.    SECTION 3.2 OF THE AGREEMENT IS AMBIGUOUS.

The Defendants argue that ambiguity is not an issue in R. Bhandari's Motion and that, thus, the Court should not have to look at any extrinsic evidence to determine the meaning of section 3.2. R. Bhandari argues that the parties' intent is relevant to contract interpretation -- that a court should

consider extrinsic evidence to determine whether the terms in the agreement are ambiguous.  In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico stated that courts are "no longer restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous."  114 N.M. at 781, 845 P.2d at 1235.  R. Bhandari discussed the parties' intent in his Motion and attached evidence that he deemed relevant to the parties' intent.  Regardless whether R. Bhandari explicitly discussed whether the agreement was ambiguous in his Motion, the Court believes it should, under New Mexico law, determine whether section 3.2 is ambiguous. See C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 508-09, 817 P.2d 238, 241-42 (1991)(stating that the process of contract interpretation "often turns upon whether the court determines that the contract is ambiguous").  In determining whether section 3.2 is ambiguous, the Court may consider extrinsic evidence.

R. Bhandari argues that the only logical and consistent interpretation of the contract is either that: (i) every termination for cause because of a breach of the contract required notice and a right to cure; or (ii) the contract could not be terminated for cause because of an immaterial breach under any circumstances.  R. Bhandari argues that the record shows that the parties "understood notice and right to cure would apply except in cases of immediate, physical harm."  Reply at 1.

The Defendants argue that the only reasonable interpretation of subsection 3.2(a) is that it applies to any breach of the agreement that does not fall under any of the other definitions of "cause."  Response at 10.  The Defendants argue that, for any other subsection of 3.2, AGH has the right to terminate the agreement immediately and without notice.

The Agreement states:

3.2     Termination for Cause.  Subject to Hospital's due process procedures, this

-29-

Agreement may be terminated for cause by the non-defaulting party immediately and without notice at any time.  "Cause" means:

> (a)    Material breach or default of either party hereunder, which shall remain uncured thirty (30) days after receipt of written notice of default from the non-defaulting party;
>
> (b)    Willful failure of Physician to comply with reasonable directives of the Hospital's Medical Staff by-laws; or Hospital policies, standards and regulations established from time to time by the Hospital;
>
> (c)    Excessive absenteeism (consistently exceeding guaranteed time off) of Physician, without prior written approval of Hospital;
>
> . . . .
>
> (k)    Physician taken any action or engaging in any activity that is materially detrimental to the lawful and/or economic interests of Hospital;

Agreement at 2-3.[10]  See Motion ¶¶ 14, 21, 24, 28, at 6, 7, 8 (setting forth this fact); Response at 3-4 (not controverting this fact).  A court may consider extrinsic evidence of the circumstances surrounding execution of the agreement in determining whether the agreement's language is unclear. See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235; C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508-09, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (citation and footnote omitted)).

The parties have represented that all the evidence they would present in a Mark V hearing --

_____

[10] Although AGH's due process procedures are at issue in the Defendants' Motion for Partial Summary Judgment and Supporting Memorandum, filed January 5, 2011 (Doc. 113), AGH's due process procedures are not at issue in R. Bhandari's Motion, see Tr. at 5:10-11 (Burris)("There is some question, Your Honor -- I mean, we kind of get into questions later . . . as to the due process, but that's certainly not part of what we're arguing in our motion here.").  The Court therefore will not address the due process procedures in this Memorandum Opinion and Order.

Camp's testimony and R. Bhandari's testimony -- is before the Court. The Court thus does not need to hold a Mark V hearing, and may determine based on the record before it whether an ambiguity exists. R. Bhandari and Camp negotiated the contract. See, e.g., Camp. Depo. at 34:12-17; Randall Depo. at 134:15-21; Motion ¶ 18, at 7 (setting forth this fact); Response at 3-4 (not controverting this fact). Camp testified that, as one of the people who helped negotiate the contract, he understood the words material breach, in subsection (a), to mean a significant violation of one of the terms of the contract. See Camp Depo. at 37:2-15. Camp testified that some of the subsections of 3.2 would support immediate termination and that certain things would not support immediate termination. See Camp. Depo. at 78:2-8. He testified that some of the provisions would not require notice, such as willful misconduct of the physician resulting in damages to the hospital -- for example, a physician driving his car through the emergency room -- but that termination for "other things" falling under other subsections in section 3.2 would require notice. See Camp Depo. at 75:23-77:10. R. Bhandari testified that he had the right to notice in writing "if there was any kind of problem in this contract," and that AGH had to give notice to the employee if the employee "ha[d] something going on which [wa]s not correct . . . before [the hospital] start[ed] an investigation" so that the employee would have a chance to correct it. Bhandari Depo. at 136:11-16, 141:22-142:12.

The parties assert that section 3.2's language supports their respective interpretations. The Court finds, however, that section 3.2 is reasonably susceptible to two different meanings. On the one hand, subsection (a) is the only subsection that contains language regarding notice and an opportunity to cure; all the other subsections fall under the general heading, which states that the Agreement may be terminated for cause immediately and without notice at any time. Furthermore, Camp testified that some of the subsections would support immediate termination and would not require notice. Section 3.2 could thus reasonably be interpreted as allowing AGH to terminate

without notice and without an opportunity to cure under subsections (b) through (l), and providing that subsection (a) applies to a breach of the Agreement that does not fall into one of the other subsections.  On the other hand, section 3.2's language may be read such that subsection (a) applies in the case of an alleged contractual breach and that the other subsections apply to allegations falling outside an alleged breach of the Agreement.  Subsection (a) is not the last subsection, which, if it were, might suggest that it is a catch-all subsection.  Moreover, subsection (a) does not contain language that it applies only if one of the other subsections does not apply, thus suggesting that a doctor's actions might fall into more than one subsection; accordingly, to find subsection (a) operates one way and the other subsections operate another way could create some divergent results depending on what subsection the hospital invokes when the physician's conduct remains the same. Furthermore, Camp testified that, although termination for a physician's willful misconduct would not require notice, termination for other things falling under other subsections would require notice. R. Bhandari testified that he had a right to notice in writing if there was any kind of problem in the contract and that the hospital had to give notice to the employee before starting an investigation so the employee could have a chance to correct the problem.  The Defendants contend that R. Bhandari's testimony does not concern the interpretation of the agreement, because he does not discuss the meaning of any particular phrase, and that the evidence thus does not shed light on the meaning of section 3.2.

A district court "can properly admit extrinsic evidence for the purpose of determining the parties' intended meanings," such as evidence of the "circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance."  City of Sunland Park v. Harris News, Inc., 138 N.M. 588, 594, 124 P.2d 566, 572 (Ct. App. 2005)(citations omitted).  "A party's statement of unilateral subjective intent, without more, is insufficient to

establish ambiguity in light of clear contractual language." <u>Dantonio v. Crowder</u>, No. 32,3640, 2010 WL 5898876, at *6 (N.M. Ct. App. Sept. 9, 2010)(citation omitted).  As the Court has previously discussed, section 3.2's language is not clear, as the language is reasonably susceptible to two differing interpretations.  Furthermore, R. Bhandari's testimony is not a statement of unilateral subjective intent.  R. Bhandari's testimony relates to more than merely the intent in his own mind. Unlike <u>Dantonio v. Crowder</u>, where there was no evidence that the witness ever communicated his understanding of the agreement, in this case, there is evidence that: (i) R. Bhandari and Camp negotiated the Agreement; (ii) during these negotiations, R. Bhandari and Camp discussed the provisions of the Agreement and specifically section 3.2; and (iii) Camp modified the template agreement, including section 3.2, as a result of the negotiations.  <u>See</u> Camp Depo. at 34:15-17, 77:20-24 (stating that he was "involved in the negotiation of th[e] [Agreement" and that, based on the negotiations and discussions, he "modified the template that we used"); Electronic Mail Transmission from R. Bhandari to Chip Camp (dated December 30, 2004), filed January 24, 2011 (Doc. 129-13)(stating that R. Bhandari needed "the following modifications in the contract," one of which was that "Paragraph 3.2 . . . be modified as follows: a. Material Breech [sic] -- which will remain uncured THIRTY DAYS instead of 5 days as it is now.  k. 'A good faith determination by hospital that physician is not providing adequate patient care etc.' should be removed from contract"); Electronic Mail Transmission from Chip Camp to R. Bhandari (dated January 7, 2005), filed January 24, 2011 (Doc. 129-13)(stating that he would "agree to: modification of 3.2(a) to 60 days" and "removal of 3.2(k) in its entirety").  Their understandings of section 3.2, attained through their negotiations regarding the Agreement and section 3.2, and discussions of the Agreement and section 3.2, is thus evidence relating to the circumstances surrounding the making of the Agreement. Because R. Bhandari's testimony relates to his understanding of the contract that he negotiated, and

the provisions of the contract that he negotiated, the Court thus finds that it is evidence relating to the meaning of the Agreement.  One can therefore reasonably interpret section 3.2 as requiring notice and an opportunity to cure before termination for any breach of the Agreement.  Because section 3.2 is "reasonably and fairly susceptible of different constructions," the Court finds that section 3.2 is ambiguous.  Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  See City of Sunland Park v. Harris News, Inc., 138 N.M. at 593-94, 124 P.3d at 571-72 (finding that a portion of the agreement was ambiguous when it was reasonably susceptible to two different meanings).

## III.   THE COURT CANNOT DETERMINE THE MEANING OF THE AMBIGUOUS PROVISION AS A MATTER OF LAW.

Under New Mexico law, "[o]nce the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  If an ambiguity exists and "the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).

> However, in the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation.

Mark V, Inc. v. Mellekas, 114 N.M. at 782, 845 P.2d at 1236 (citation omitted).

Both parties have represented that R. Bhandari's testimony and Camp's testimony is the only extrinsic evidence of the facts and circumstances surrounding execution of the agreement that they will present at a Mark V hearing.  See Tr. at 41:6-25 (Court, Burris)("THE COURT: So . . . if I don't

-34-

buy your construction of the contract . . . then you want that Mark V hearing to put on Mr. Camp and Dr. Bhandari?  MR. BURRIS: Well yes, Your Honor."); Tr. at 43:21-44:2 (Court)("THE COURT: . . . I think Mr. Bur[ris] is saying . . . Judge . . . you can find that both of these are reasonable constructions and then you can have your Mark V hearing, but nothing's going to change. You have all the testimony . . . .  Is that where you are as well."); Tr. at 44:2-10 (Lovett)("MS. LOVETT: I think so, Your Honor, although I would ask to just even if it's until the end of the day to be certain that we have enough of Mr. Camp's testimony . . . to put in context his position on the negotiation.").  R. Bhandari and Camp negotiated the Agreement that R. Bhandari executed. Because they discussed the proposed Agreement's provisions, including section 3.2, during the negotiations, and because Camp modified the template agreement, including section 3.2, as a result of their discussions, their understanding of section 3.2 is evidence of the facts and circumstances surrounding making of the Agreement.  The Court cannot resolve the ambiguity in section 3.2 as a matter of law, because the parties have offered evidence of the facts and circumstances surrounding execution of the agreement, and because, as the Court has discussed, the extrinsic evidence is susceptible to conflicting inferences regarding the section 3.2's meaning.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  If a contract is ambiguous, extrinsic evidence is admissible to "aid in interpreting the parties' expressions."  C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508, 817 P.2d at 242 (citing Hill v. Hart, 23 N.M. 226, 232, 167 P. 710, 711 (1917)("[W]here the terms of a contract are . . . uncertain, evidence . . . of the facts and circumstances surrounding the parties is admissible . . . .  The principle that parol evidence is not admissible to vary the terms of a written instrument is not infringed when the evidence is used . . . [to] ascertain[ ] . . . doubtful expressions['] [meaning] . . . ."); Fancher v. Bd. of Comm'rs, 28 N.M. 179, 207, 210 P. 237, 248 (1922)(stating that, in determining severability of terms of a contract, the

operative question is the parties' intent, and where the terms of the contract clearly indicate the intent, the inquiry is at an end; otherwise, resort may be had to the nature of the subject matter of the contract).  This situation is not one, however, where the Court may use the extrinsic evidence to interpret the ambiguities in section 3.2, because the extrinsic evidence itself is susceptible to conflicting inferences.  See Mark V, Inc. v. Mellekas, 114 N.M. at 782, 845 P.2d at 1236 ("At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." (citation omitted)).  Because an ambiguity exists, and because the parties offer evidence of the circumstances surrounding the execution of the Agreement which is susceptible to conflicting inferences, a jury must resolve the meaning of section 3.2.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  The Court will therefore deny R. Bhandari's motion for summary judgment on the Defendants' liability for breach of contract.

**IT IS ORDERED** that the Plaintiff's Motion for Summary judgment on Defendants' Liability for Breach of Contract, filed January 5, 2011 (Doc. 112) is granted in part and denied in part.  The Court concludes as a matter of law that Plaintiff Ramdas Bhandari, M.D. was terminated and did not resign.  The Court also concludes that section 3.2 of the Physician Employment Agreement is ambiguous.  The Court otherwise denies the Motion.

_____
UNITED STATES DISTRICT JUDGE

-36-

*Counsel:*

Gregory L. Denes
Juno Beach, Florida

-- and --

Michelle L. Gomez
Brownstein Hyatt Farber Schreck, LLP
Denver, Colorado

-- and --

Eric R. Burris
Adam E. Lyons
Brownstein Hyatt Farber Schreck, P.C.
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Matthew P. Holt
Blaine T. Mynatt
Brad Springer
Holt, Babington & Mynatt
Las Cruces, New Mexico

> *Attorneys for Counter Defendant*

William C. Madison
Madison, Harbour & Mroz, P.A.
Albuquerque, New Mexico

-- and --

Mary Olga-Lovett
Paul J. Brown
Greenberg Traurig, LLP
Houston, Texas

> *Attorneys for the Defendants*