# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RAMDAS BHANDARI, M.D.,

       Plaintiff/Counter-defendant,

vs.                                        No. CIV 09-0932 JB/GBW

VHA SOUTHWEST COMMUNITY
HEALTH CORPORATION d/b/a
COMMUNITY HOSPITAL CORPORATION
and ARTESIA GENERAL HOSPITAL,

       Defendants/Counter-claimants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Partial Summary Judgment and Supporting Memorandum, filed January 5, 2011 (Doc. 113)("Motion"). The Court held a hearing on February 2, 2011. The primary issues are: (i) whether the provision in the Physician Employment Agreement (Ramdas Bhandari, M.D.), filed January 5, 2011 (Doc. 113-1)("Agreement") regarding due process procedures is ambiguous, and, if it is, whether the Court may determine the meaning of the provision as a matter of law; (ii) whether Plaintiff Ramdas Bhandari, M.D., sufficiently pled reformation such that he can seek reformation of the Agreement, and, if he did not sufficiently plead reformation, whether the Court should allow him to amend his pleadings at this stage to seek reformation of the Agreement; (iii) whether the Court should grant summary judgment on R. Bhandari's request for damages under section 1.1 of the Agreement; (iv) whether there are genuine issues of fact precluding summary judgment on R. Bhandari's implied-covenant-of-good-faith-and-fair-dealing claim; (v) whether there are genuine issues of fact precluding summary judgment on R. Bhandari's claim for fraudulent or negligent misrepresentation;

(vi) whether there are genuine issues of fact precluding summary judgment on R. Bhandari's constructive-fraud claim; (vii) whether there are issues of fact precluding summary judgment on R. Bhandari's invasion-of-privacy claim; and (viii) whether there are issues of fact precluding summary judgment on R. Bhandari's intentional-infliction-of-emotional-distress claim.  The Court will grant the Defendants' Motion in part and deny the Motion in part.  The Court finds that the phrase "subject to Hospital's due process procedures" is ambiguous as a matter of law, because, given the language and the extrinsic evidence, the provision is reasonably and fairly susceptible of different constructions.  Because the extrinsic evidence is susceptible to conflicting inferences, the Court cannot determine the meaning of the provision as a matter of law, and will therefore deny the Defendants' request that it grant summary judgment on this aspect of R. Bhandari's breach-of-contract claim.  The Court will deny the Defendants' request that it grant summary judgment on R. Bhandari's reformation claim, because there is a genuine issue of fact whether there was a mutual mistake.  The Court will grant summary judgment on R. Bhandari's request for damages under section 1.1 of the Agreement, because there is no sufficient evidence that these damages are subject to reasonable ascertainment.  The Court will not grant summary judgment on R. Bhandari's implied-covenant-of-good-faith-and-fair-dealing claim, because it has held that a jury must determine the meaning of the due-process-procedures provision, and, if a jury finds that the due-process-procedures provision provided R. Bhandari with notice and a meaningful opportunity to cure, there is evidence that the Defendants denied R. Bhandari of the benefits of the Agreement, because they did not give him notice and an opportunity to cure his alleged problems before they terminated him. The Court will not grant summary judgment on R. Bhandari's negligent misrepresentation claim based on Claude Camp III's representations regarding due process or based on the representation regarding local competition in a brochure R. Bhandari received, but it will grant summary judgment

on the other bases of R. Bhandari's fraudulent and/or negligent misrepresentation claim, because there are not issues of fact on which the claim should proceed on these bases. The Court will grant summary judgment on R. Bhandari's constructive fraud claim, because constructive fraud requires a breach of a legal or equitable duty, and there is no evidence on which a fact-finder could reasonably find that the Defendants had superior knowledge and thus a duty to disclose. Because there is no evidence on which a jury could reasonably find that the Defendants intentionally or knowingly appropriated R. Bhandari's name or likeness for their benefit, the Court will grant summary judgment on R. Bhandari's claim for invasion of privacy based on use of his likeness, because his claim fails as a matter of law. The Court will grant summary judgment on R. Bhandari's intentional-infliction-of-emotional-distress claim, because there is not sufficient evidence on which a jury could reasonably find that the Defendants' conduct was extreme and outrageous, or that R. Bhandari suffered extreme and severe emotional distress. The Court will grant summary judgment on R. Bhandari's request for punitive damages for his breach-of-contract claim and tort claims.

## **FACTUAL BACKGROUND**

The Agreement governed R. Bhandari's employment at Defendant Artesia General Hospital ("AGH"). E.g., Physician Employment Agreement (Ramdas Bhandari, M.D.), filed January 5, 2011 (Doc. 113-1)("Agreement"); Motion ¶ 1, at 8 (setting forth this fact); Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment [Doc. 113] Filed January 5, 2011 at 2, filed January 24, 2011 (Doc. 129)("Response")(not controverting this fact). Under this Agreement, R. Bhandari agreed to "render professional medical services in the specialty of Orthopedic Surgery to patients of [AGH]." Agreement at 2. See Motion ¶ 1, at 8 (setting forth this fact); Response at 2 (not controverting this fact). The Agreement further provided that R. Bhandari would "maintain regular office/work hours and productivity standards in accordance with Hospital

policies." Agreement at 2.  See Motion ¶ 1, at 8 (setting forth this fact); Response at 2 (not controverting this fact).  Additionally, R. Bhandari agreed that he would "provide professional medical services exclusively to [AGH] patients." Agreement at 3.  See Motion ¶ 1, at 8 (setting forth this fact); Response at 2 (not controverting this fact).

The Agreement commenced on August 24, 2005 and its term was for two years; pursuant to the Agreement's language that it would automatically renew for a one year term on the "anniversary date" unless either party gave ninety-day notice of their intent not to renew an additional year was added to the term, causing the Agreement's term to run through August 23, 2008.  Agreement at 5.  See Deposition of Ramdas Bhandari, M.D., filed February 24, 2011 (Doc. 129-1); Affidavit of Dr. Ramdas Bhandari in Support of Opposition to Defendants' Partial Motion for Summary Judgment [Doc. 113] ¶ 2, at 1 (sworn on January 20, 2011), filed January 24, 2011 (Doc. 129-2)(stating that the Defendants did not provide him with any notice of intent not to renew his contract of employment before May 26, 2006); Motion ¶ 2, at 8 (setting forth that the term of the Agreement was two years); Response ¶ 2, at 2 (controverting the Defendants' asserted fact to the extent that, pursuant to the Agreement's language, an additional year was added to the term).  Notwithstanding the term that the Agreement set forth, AGH had the right to terminate the Agreement "for cause." Agreement at 5.  See  Motion ¶ 2, at 8 (setting forth this fact); Response at 2 (not controverting this fact).  The Agreement stated that the following events, among others, constitute "cause:" (i) material breach, (ii) excessive absenteeism; and (iii) physician taking "any action or engaging in any activity that is materially detrimental to the lawful and/or economic interests of [AGH]." Agreement at 5-6.  See Motion ¶ 2, at 8 (setting forth this fact); Response at 2 (not controverting this fact).

New Mexico law governs the Agreement.  See Agreement at 13; Motion ¶ 3, at 8 (setting

forth this fact); Response at 2 (not controverting this fact).   The Agreement also contains an

integration cause, which states:

> This Agreement, including attached Exhibit "A", sets forth the entire understanding
> between the parties with respect to the subject matter hereof and cannot be amended
> except by a writing signed by both parties.  No waiver of any term or provision of
> this Agreement shall be deemed to be a waiver of any subsequent breach of such a
> term or provision of this Agreement.  This Agreement supersedes and replaces in
> their entirety any and all other employment agreements, oral or written, if any,
> between the parties hereto.

Agreement at 13.  See Motion ¶ 3, at 8-9 (setting forth this fact); Response at 2 (not controverting

this fact).

R. Bhandari did not read his Agreement before signing it; R. Bhandari alleges, however, that,

to confirm the Agreement's contents, he read his wife's -- Dr. Chitra Bhandari's -- agreement, which

the parties intended to be substantively identical to his Agreement.  See, e.g., R. Bhandari Depo. at

80:8-81:8, 82:22-25; Deposition of Claude E. Camp, III at 44:5-14 (taken December 22, 2010), filed

January 24, 2011 (Doc. 129-3); Motion ¶ 4, at 9 (setting forth that R. Bhandari did not read the

Agreement before signing it); Response ¶ 4, at 2 (not controverting that R. Bhandari did not read

the Agreement before signing it, but stating that, to confirm the Agreement's contents, R. Bhandari

read his wife's agreement, which the parties intended to be substantively identical to his

Agreement).

Under the "Termination for Cause" heading, the Agreement states: "Subject to Hospital's

due process procedures, this Agreement may be terminated for cause by the non-defaulting party

immediately   and   without   notice   at   any   time."      Agreement   at   5.[1]      Due   process

_____

[1] The Defendants assert: "The only 'due process' procedures for physicians with privileges
at AGH are set forth in AGH's Fair Hearing Plan and Medical Staff Bylaws."  Motion at 9 (citing
Declaration of Kenneth Randall ¶ 4, at 1 (executed January 5, 2010), filed January 5, 2011 (Doc.
113-3); Fair Hearing Plan, filed January 5, 2011 (Doc. 113-4); Medical Staff Bylaws, filed January

5, 2011 (Doc. 113-5)).  R. Bhandari argues that Randall's affidavit is not competent evidence, because it is not notarized and states only conclusions, as Randall was not a party to the negotiations regarding the Agreement, was not employed by Defendants when it was negotiated, and has no understanding of the parties' intents.  See Response at 9.  Randall's declaration was signed and dated, and states that, "under penalty of perjury under the laws of the United States of America . . . the foregoing is true and correct and that this Declaration was executed on January 5, 2010."  Randall Decl. ¶ 9, at 2.  In Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567 (10th Cir. 1994), the United States Court of Appeals for the Tenth Circuit noted:

> Both below and on appeal the defendants have objected to consideration of the unsworn statement of Henderson as not being in proper affidavit form under Rule 56. However, 28 U.S.C. § 1746 provides that where any rule, regulation, order, etc. requires any matter to be supported by a sworn declaration, or the like, an unsworn declaration, certificate, verification or statement in writing, subscribed as true under penalty of perjury, in statutory form, may support the matter asserted.  We have recognized that such an unsworn statement made in compliance with the statute may be submitted in lieu of affidavits in summary judgment proceedings.  Thomas v. United States Department of Energy, 719 F.2d 342, 344 n. 3 (10th Cir. 1983).

41 F.3d at 569 n.1.  Section 1746 of Title 28 of the United States Code states:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
>> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
>>
>> (Signature)".
>>
>> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
>>
>> (Signature)".

28 U.S.C. § 1746.  Randall's declaration is in compliance with 28 U.S.C. § 1746, because it is a sworn declaration, which declares under penalty of perjury under the laws of the United States that the information in the declaration is true and correct, and because it states the date of execution. Furthermore, Randall is AGH's Chief Executive Officer, see Randall Depo. at 7:21-8:17, 134:15-21, 167:10-13, 344:22-345:10, and, as such, he has personal knowledge of AGH's policies. The Court thus finds that Randall's declaration is competent evidence.

In his Response, R. Bhandari further argues that, in addition to the two policies the Defendants mention, the Defendants had another policy under which Bhandari was entitled to due process -- the Individual Abuse and Neglect policy.  In his deposition, Camp testified that the Artesia General Hospital Human Resources Policy #HR449/RI-12 Admin (Individual Abuse and Neglect, filed January 20, 2011 (Doc. 127-7)("Individual Abuse and Neglect Policy") states that neglect may include failure to provide appropriate medical care to the patient, and that he understood the policy's discussion regarding reporting, which included a statement that a supervisor must investigate and gather all relevant facts, to mean that a supervisor needs to make sure that an allegation of abuse or neglect is correct, and investigated by interviewing the people involved, including speaking to the person accused of neglect.  See Camp Depo. at 46:18-47:10, 51:2-56:12. R. Bhandari argues that this policy applies and sets forth due-process procedures to which he was entitled.  R. Bhandari asserts that the policy applies, because the patient neglect includes refusing to see patients.  In support of this assertion, R. Bhandari cites to Dr. Joseph Salgado's and Randall's depositions.  In his deposition, Dr. Salgado testified that he recalled discussing R. Bhandari's lack of availability only within the medical staff.  See Deposition of Joseph Salgado, M.D. at 26:20-27:20 (taken December 8, 2010), filed January 24, 2011 (Doc. 129-5).  Randall testified:

> **Q** Was one of the reasons to terminate him for cause his failure to follow hospital policy:
>
> . . . .
>
> THE WITNESS: The failure not to provide services that you would expect from a physician in his capacity, which does include following up on consults, which does include following up on ER requests, which does include seeing patients as referred to you by the physicians from the ER or other similar examples do indicate not following the medical staff or the hospital policies, guidelines, or expectations.
>
> **Q** (BY MR. DENES) Is there a specific policy that Dr. Bhandari failed to follow?
>
> **A Dr. Bhandari did not give appropriate response to patients call to in the emergency room.**
>
> **Q** And that would be neglecting patients?
>
> THE WITNESS: That would be providing professional services as requested by your peers for your service.

-7-

---

**Q** (BY MR. DENES) And that would be neglecting a patient that you had been called to see, right?

**A To me that is just complete nonperformance.  You can define it a lot of different ways, I would imagine.**

**Q** Well, can you define it as neglecting a patient.

. . . .

**A That could be one way that you could define it.**

Randall Depo. at 207:10-208:24.  The Individual Abuse and Neglect policy states that neglect includes a "failure to provide appropriate medical care to meet the physical, spiritual and/or mental health needs of the patient."  Individual Abuse and Neglect Policy at 1.  The policy states that the law requires health practitioners report any suspected abuse, neglect, or misappropriation, and sets forth reporting procedures, including investigations.  See Individual Abuse and Neglect Policy at 5.  Camp testified that this policy has to do with "the actual or the accused negligence and abuse of a patient," and that "[a]part from any issue of abuse or neglect, [the policy] would [not] . . . apply to the termination" of an AGH employee.  Camp Depo. at 84:20-85:22.  Although Randall stated that one of the ways a person could define a lack of appropriate response to referrals from the emergency room is neglecting a patient, there is no evidence in the record that there was an allegation that R. Bhandari abused or neglected a patient, and there is no evidence that anyone reported suspected abuse or neglect on R. Bhandari's part.  R. Bhandari has controverted the Defendants' assertion that the only due-process procedures are in the Fair Hearing Plan and in the Medical Staff Bylaws, because the Individual Abuse and Neglect Policy also sets forth due-process procedures, and the Court will therefore alter the Defendants' asserted fact to include the due process procedures in the Individual Abuse and Neglect Policy.  The evidence in the record, however, does not support R. Bhandari's assertion that the Individual Abuse and Neglect Policy is applicable in this case, because there is no evidence that anyone accused R. Bhandari of patient abuse or neglect, and reported him as a result of these suspicions, which would have initiated the due-process procedures.

In his Response, R. Bhandari also disputes the Defendant's assertion, stating:

Mr. Randall did not work for Defendants prior to June 2006 and has admitted he has no knowledge of the parties' intent or discussions regarding the Contract and that he believes the "due process" phrase is "ambiguous."  The persons who negotiated the Contract both testified that due process has meaning within the Contract.  Chief of Staff Dr. Salgado and AGH Board Member David Morrison both testified that "due process" has meaning within the medical community.  In addition, the general understanding in the medical industry is that the language of "due process" required application of the procedures in AGH's fair hearing plan.

procedures for physicians with privileges are set forth in AGH's Fair Hearing Plan, the Medical Staff Bylaws, and the Individual Abuse and Neglect Policy.  See Randall Decl. ¶ 4, at 1; Human Resources Policy #HR449/RI-12 Admin (Individual Abuse and Neglect).

In his Deposition, Randall testified that the term due process is not well defined, that he began working at AGH in June 2006, that he was not involved in negotiating the Agreement, and that he did not have any knowledge of what the parties intended and what they said to each other in the negotiations.  See Randall Depo. at 13:4-6, 76:15-22, 78:4-23.  Camp testified that he understood the phrase "subject to due process procedures" to mean that, "in both the medical staff and human resources policies and practices and regulations, there are processes to go through depending on the type of violation by the individual, be it, you know, employed or non-employed." Camp Depo. at 36:13-37:7.  Camp testified that he believes there may be instances in which there would be immediate revocation of privileges, which would be set forth in the Bylaws, but that, as a general rule, there should be a process of modification and correction.  See Camp Depo. at 37:8-38:6.  R. Bhandari testified that he thought that his contract set forth due-process protections. See R. Bhandari Depo. at 118:9-119:22.

---

Response at 2-3 (citing Randall Depo. at 13:4-6, 76:15-22, 78:12-23; Camp Depo. at 36:10-38:6; R. Bhandari Depo. at 118:9-119:22; Salgado Depo. at 11:8-15:8, 33:12-15, 114:18-115:17; Deposition of David Morrison at 8:13-20, 11:2-7, 12:25-13:5 (taken December 8, 2010), filed January 24, 2011 (Doc. 129-6); Deposition of Mark A. Levine at 41:20-42:13, 43:25-44:13, 80:7-18 (taken December 20, 2010), filed January 24, 2011 (Doc. 129-7)).

The Court will not consider R. Bhandari's arguments regarding whether the provision regarding due-process procedures is ambiguous at this point; instead, it will address these arguments in its legal analysis.  See Ruiz v. City of Brush, No. 09-0188, 2006 WL 1816454, at *4 (D. Colo. 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;][l]egal argument should be reserved for separate portions of the brief." (citation omitted)).  There are, however, facts in the statement that the Court will accept, such as Camp's, Randall's, R. Bhandari's, Levine's, Morrison's, and Salgado's testimony regarding due-process procedures.

Salgado testified that, to him, due process meant that you give a person the means to defend themselves in the event that something arises about which the person's colleagues or peers are concerned, and that a person accused would have to know that they were accused and have to have an opportunity to respond.  See Salgado Depo. at 11:8-12:4.  Morrison testified that he was on AGH's governing board, that his sense of the words due process would include a notion that a person accused would have a meaningful opportunity to respond to the accusation, and that he had been employed in the medical community about twelve years.  See Morrison Depo. at 8:13-20, 11:2-17, 12:25-13:5.  Levine testified that several codes of ethics govern the behavior of hospitals, such as the American Heart Association ("AHA") code of ethics, the Joint Commission of Accreditation of Health Care Facilities ("Joint Commission"), which holds hospitals to standards of ethical behaviors, and a series of multi-stakeholder approaches that outline responsibilities for all stakeholders in healthcare, and that he believes that hospitals have an ethical and legal obligation to follow processes that require due process.  See Levine at 43:25-44:13.

R. Bhandari has produced the copies of the Medical Staff Bylaws and Fair Hearing Plan that he received when he arrived at AGH.  See Medical Staff Bylaws, Rules and Regulations, filed January 5, 2011 (Doc. 113-6).[2]

---

[2] The Defendants assert that R. Bhadari "has produced the copies of these documents that he received when he arrived at AGH."  Motion ¶ 6, at 9 (citing Medical Staff Bylaws, Rules and Regulations).  In his Response, R. Bhandari asserts that the Defendants "have not authenticated the documents on which they rely for their Fact No. 6 and they are, therefore, not admissible evidence for summary judgment."  Response ¶ 6, at 4 (footnote omitted).  In the Defendants' Reply Brief in Support of Motion for Partial Summary Judgment, filed January 28, 2011 (Doc. 132)("Reply"), the Defendants contend that R. Bhandari produced the documents in discovery in this litigation and that they are therefore per se authentic.  See Reply at 3.  The Defendants further assert that, because R. Bhandari relies on the exhibit in his response, it is disingenuous to suggest that the documents should be excluded from the summary judgment record.  See Reply at 3 (citing Response at 20). Rule 901 of the Federal Rules of Evidence states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support

The Fair Hearing Plan sets forth certain procedural review guarantees for physicians with privileges at AGH; it states that "[t]he Medical Staff Bylaws set forth the recommendations and actions that entitle a Practitioner to the procedures set forth in the Fair Hearing Plan." Fair Hearing Plan at 1. See Motion ¶ 7, at 9 (setting forth this fact); Response at 4 (not controverting this fact).

---

a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901. In E.E.O.C. v. Wal-Mart Stores, Inc., 07-0300 JAP/LFG, 2009 WL 3028981, at *2 (D.N.M. Sep. 8, 2009), the Honorable James A. Parker, Senior United States District Judge, noted:

> "While the party opposing summary judgment need not produce evidence in the form that would be admissible at trial, the content or substance of the evidence must be admissible." Law Company, Inc. v. Mohawk Construction and Supply Co., 577 F.3d 1164, 2009 WL 2488140 (10th Cir. 2009). In Law Company, Inc., the Tenth Circuit noted:
>
> > We do not require an affidavit to authenticate every document submitted for consideration at summary judgment. Rather, documents produced during discovery that are on the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rule of Evidence 901. Accordingly, the district court abused its discretion when it refused to consider numerous letters, facsimiles, and memoranda attached to Mohawk's opposition that were printed on Law letterhead and produced by Law.
>
> 577 F.3d 1164, 2009 WL 2488140 at *4 (internal citations omitted).

2009 WL 3028981, at *2. The district court found that "Plaintiff's Exhibits 11-15 and 17-21 are documents Wal-Mart produced during discovery and are thus authentic per se for purposes of Rule 901." 2009 WL 3028981, at * 2. Even without authentication through an affidavit or deposition, a document may be authenticated by circumstantial evidence which suggests the document is what it purports to be. See Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1423 (10th Cir. 1991)(finding that "there was sufficient circumstantial evidence to support [an exhibit's] authenticity" when the document was prepared on letterhead and was provided during discovery by a former defendant in the case). The Court believes that circumstantial evidence suggests that these documents are what they purport to be and will thus consider them in its opinion. R. Bhandari produced these documents in response to requests for production of documents. He produced the documents along with a letter, which was on the letterhead of Brownstein, Hyatt, Farber, and Schreck, and which stated that the responsive documents were enclosed. Because these documents were produced during discovery in response to a request for documents and under a letter on letterhead, the Court finds there is sufficient circumstantial evidence to support the documents' authenticity.

Article VI of the Medical Staff Bylaws set out a physician's rights to the procedural rights set forth in the Fair Hearing Plan; in particular, a physician is entitled to these procedural rights only if the physician receives an "adverse" recommendation or action.  Medical Staff Bylaws, Section 6.2.  See Motion ¶ 8, at 9 (setting forth this fact); Response at 4 (not controverting this fact).  The following actions are defined as "adverse" under the Medical Staff Bylaws: (i) denial of appointment or reappointment; (ii) suspension or termination of appointment; (iii) denial of requested clinical privileges; (iv) restriction, reduction, suspension, or revocation of clinical privileges; (v) mandatory consultation requirement.  Medical Staff Bylaws, Section 6.2A.  See Motion ¶ 8, at 9 (setting forth this fact); Response at 4 (not controverting this fact).  The Medical Staff Bylaws further state that the "termination of appointment in accord with the terms of the Practitioner's contract with AGH" is not an adverse action that would entitle a physician to the procedural rights set forth in the Fair Hearing Plan.  Medical Staff Bylaws Section 6.2A2.  See Motion ¶ 8, at 9 (setting forth this fact); Response at 4 (not controverting this fact).

The Fair Hearing Plan, Bylaws, and Individual Abuse and Neglect Policy are documents which might govern, depending on the circumstances, the termination of a staff physician's privileges or a person's employment at AGH.  See Randall Decl. ¶ 5, at 2.[3]  AGH Employees are

_____

[3] The Defendants assert: "There are no other employment documents at AGH [-- other than the Fair Hearing Plan or Medical Staff Bylaws --] either now or before . . . that would govern the termination of a staff physician's privileges or anyone's employment at AGH."  Motion ¶ 9, at 10 (citing Randall Decl. ¶ 5, at 2).  In his Response, R. Bhandari states: "Defendants had a written policy requiring an investigation, which specifically would include speaking to the person accused, in a case of patient neglect."  Response ¶ 9, at 4 (citing Response at 3).  As the Court has previously discussed, the Individual Abuse and Neglect Policy sets forth due-process procedures that may apply to a physician's termination.  R. Bhandari has thus controverted the Defendants' assertion in that another policy might govern a physician's termination as well as the Fair Hearing Plan and Medical Staff Bylaws, and the Court will modify the Defendants' asserted fact to include the Individual Abuse and Neglect Policy.

either at-will employees or have specific employment contracts.  See, e.g., Randall Decl. ¶ 5, at 2; Motion ¶ 10, at 10 (setting forth this fact); Response at 4 (not controverting this fact).

The Preamble to the Code of Ethics on the American Medical Association states that "[t]he following Principles adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician."  AMA/American Medical Association's Code of Medical Ethics, Preamble, filed January 5, 2011 (Doc. 113-9).  See Motion ¶ 26, at 12 (setting forth this fact); Response at 5 (not controverting this fact).  AGH is not subject to any of the standards that the Joint Commission promulgates.  See, e.g., Randall Decl. ¶ 3, at 1; Motion ¶ 11, at 10 (setting forth this fact); Response at 4 (not controverting this fact).  The Joint Commission is a voluntary organization, and a hospital such as AGH has to elect to be accredited by the Joint Commission review and standards; AGH has not elected to do so.  See, e.g., Randall Decl. ¶ 3, at 1;  Motion ¶ 11, at 10 (setting forth this fact); Response at 4 (not controverting this fact).

R. Bhandari does not know whether AGH is Joint Commission accredited.  See, e.g., R. Bhandari Depo. at 143:8-144:12; Motion ¶ 12, at 10 (setting forth this fact); Response at 4 (not controverting this fact).  R. Bhandari visited AGH two times before he executed the Agreement. See, e.g., R. Bhandari Depo. at 77:8-10; Motion ¶ 13, at 10 (setting forth this fact); Response at 4 (not controverting this fact).  AGH employed R. Bhandari from August 24, 2005 to September 26, 2006. See, e.g., Monitor Employee Status Report, filed January 5, 2011 (Doc. 113-7); AGH Human Resources Personnel Action Form (effective date August 24, 2005), filed January 5, 2011 (Doc. 113-7); AGH Human Resources Personnel Action Form (effective date September 26, 2006), filed January 5, 2011 (Doc. 113-7); Motion ¶ 14, at 10 (setting forth this fact); Response at 4 (not controverting this fact).  R. Bhandari received a Carson Kolb Brochure which forms the basis of the

allegations in his Second Amendment Complaint, ¶ 11.  See, e.g., Artesia General Hospital

Presented by Carson Kolb, filed January 5, 2011 (Doc. 113-8).[4]

Before coming to AGH, R. Bhandari knew that AGH was a thirty-four-bed hospital.  See,

e.g., R. Bhandari Depo. at 47:10-16; Motion ¶ 16, at 10 (setting forth this fact); Response at 4 (not

controverting this fact).  While working in Miami before his employment at AGH, R. Bhandari

never made more than $800,000.00 per year.  See, e.g., R. Bhandari Depo. at 43:23-25; Motion ¶

17, at 10 (setting forth this fact); Response at 4 (not controverting this fact).  While working in

Miami before his employment, R. Bhandari worked in hospitals having a pool of close to 1,000

beds.  See, e.g., R. Bhandari Depo. at 48:13-17; Motion ¶ 18, at 11 (setting forth this fact); Response

at 4 (not controverting this fact).  R. Bhandari believed that the community welcomed him upon his

_____

[4] The Defendants assert: "Attached hereto as Exhibit H is the Carson Kolb Brochure that Dr.
Bhandari received and which forms the basis of the allegations in his Second Amended Complaint,
¶ 11." Motion ¶ 15, at 10.  In his Response, R. Bhandari states: "As discussed below, see Argument
§ II, infra, Dr. R. Bhandari relies on additional evidence in support of his claims."  Response ¶ 15,
at 4.  Section II of R. Bhandari's Response contains his arguments regarding his misrepresentation
claims.  D.N.M.LR-Civ. 56.1(b) states:

> The memorandum in support of the motion must initially set out a concise statement
> of all material facts as to which movant contends no genuine issue exists.  The facts
> must be numbered and must refer with particularity to those portions of the record
> upon which movant relies.

> A memorandum in opposition to the motion must contain a concise statement of the
> material facts as to which the party contends a genuine issue does exist.  Each fact
> in dispute must be numbered, must refer with particularity to those portions of the
> record upon which the opposing party relies, and must state the number of the
> movant's fact that is disputed.  All material facts set forth in the statement of the
> movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because R. Bhandari has directed the Court's attention solely to
argumentation, and has not directed the Court's attention to evidence in the record which controverts
the Defendants' assertion, the Court will deem the Defendants' assertion admitted.  See D.N.M.LR-
Civ. 56.1(b).

arrival in Artesia, New Mexico.  See, e.g., R. Bhandari Depo. at 51:5-18; Motion ¶ 19, at 11 (setting forth this fact); Response at 4 (not controverting this fact).  R. Bhandari received a one to three call coverage at AGH.  See, e.g., R. Bhandari Depo. at 52:12-16; Motion ¶ 20, at 11 (setting forth this fact); Response at 4 (not controverting this fact).  After October 2005, R. Bhandari practiced medicine in a private setting at AGH.  See, e.g., R. Bhandari Depo. at 53:8-54:19; Motion ¶ 21, at 11 (setting forth this fact); Response at 4 (not controverting this fact).  During R. Bhandari's employment at AGH, the closest place anyone could perform orthopedic surgeries was Roswell, New Mexico.  See, e.g., R. Bhandari Depo. at 56:13-58:23; Motion ¶ 22, at 11 (setting forth this fact); Response at 4 (not controverting this fact).  Roswell is at least forty miles away from Artesia. See, e.g., R. Bhandari Depo. at 57:23-24; Motion ¶ 23, at 11 (setting forth this fact); Response at 4 (not controverting this fact).

Randall decided to terminate R. Bhandari's Agreement only after he reviewed R. Bhandari's contract and conducted an investigation into R. Bhandari's work at AGH.  See Randall Decl. ¶ 6, at 2.  Randall spoke with five AGH physicians about R. Bhandari's performance and willingness to respond to requests for referrals.  See Randall Decl. ¶ 6, at 2.  Randall also discussed the matter with in-house counsel for Defendant VHA Southwest Community Health Corporation d/b/a Community Hospital Corporation ("CHC"), David Butler.  See Randall Decl. ¶ 6, at 2.  Randall asked Butler to conduct his own legal investigation of Bhandari's contract and of AGH's legal rights under the contract.  See Randall Decl. ¶ 6, at 2.  Eventually, Randall concluded that there was adequate cause to terminate R. Bhandari's agreement.  See Randall Decl. ¶ 6, at 2.[5]

---

[5] The Defendants assert:

The decision to terminate Dr. Bhandari's agreement was made only after Mr. Randall reviewed Dr. Bhandari's contract and conducted an investigation into Dr. Bhandari's

work at AGH.  *See* Randall Decl., at ¶ 6.  Mr. Randall had spoke with the following doctors at AGH about Dr. Bhandari's performance and willingness to respond to requests for referrals: Dr. Khan, Dr. Salgado, Dr. Simpean, Dr. Moreno, and Dr. Ramoso.  *Id*.  He also discussed the matter with in-house counsel for VHA Southwest Community Health Corporation d/b/a Community Hospital Corporation, David Butler.  *Id.*  In fact, Mr. Randall asked Mr. Butler to conduct his own legal investigation of Dr. Bhandari's contract and the legal rights of AGH under that contract.  *Id.*  Eventually, Mr. Randall concluded that there was adequate cause to terminate Dr. Bhandari's agreement.  *Id.*

Motion ¶ 24, at 11.  In his Response, R. Bhandari states:

> Defendants terminated the Contract for financial reasons, not for the reasons they claimed.  Doc. 112-9 [Pope Dep.] at 73:18-74:25.  They created the evidence they used to support termination.  Doc. 127-6 [Randall Dep.] at 186:6-13.  They relied on unsubstantiated hearsay.  Deposition of Jorge Abalos, dated Dec. 8, 2010, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit 8**, at 26:2-31:17; Ex. 127-6 [Randall Dep.] at 179:19-80:23; Doc. 112-2 [Randall Dep.] at 196:15-97:16.  They ignored the substantive problems their legal counsel identified in their various theories.  Doc. 127-9 [Hill email](attached to the depositions as dep. ex. 26) (discussing the problems in each of the theories for termination); Doc. 127-10 [Hill Dep.] at 63:21-64:1 (authenticating dep. ex. 26).

Response at 4 (footnote omitted)(bold in original).  Thaddeus Pope, Ph.D., testified that his understanding of what occurred in this case was that the decision to terminate R. Bhandari was an administrative, business, decision made for financial reasons and not for quality of medical care reasons.  See Deposition of Thaddeus Pope, Ph.D., at 74:4-25 (taken December 27, 2010), filed January 5, 2011 (Doc. 112-9).  This testimony does not controvert the Defendants' assertion that Randall decided to terminate R. Bhandari's Agreement only after conducting an investigation into R. Bhandari's work.  Randall testified that he asked Abalos to document concerns about R. Bhandari.  See Randall Depo. at 186:6-13.  Abalos testified that he wrote a document compiling responses from physicians regarding his questions about their concerns about R. Bhandari.  See Deposition of Jorge Abalos, M.D. at (taken December 8, 2010), filed January 24, 2011 (Doc. 129-8).  Randall testified that he did not make an effort to verify the information that Abalos provided to him and that the document was one of the basis for R. Bhandari's termination.  See Randall Depo. at 180:10-23.  This testimony does not controvert the Defendants' asserted facts; instead, it bolsters the Defendants' assertions that Randall conducted an investigation into R. Bhandari's work at AGH.

Randall also testified that he did not give notice of the termination meeting to R. Bhandari before the meeting.  See Randall Depo. at 196:15-19.  The electronic mail transmission from Lisa Hill sets forth several provisions of the Agreement that R. Bhandari may have breached, but identifies weaknesses with these arguments, and sets forth several potential reasons for termination for cause, but identifies several assumptions regarding these reasons for termination for cause.  See

Butler and Randall personally met with R. Bhandari for hours on September 26, 2010, his last day of employment.  See Randall Decl. ¶ 7, at 2.  Among other things, the parties discussed a proposed separation agreement with R. Bhandari; R. Bhandari testified that Randall told him that, if he did not sign the separation agreement, the Defendants would sue him for the money that they paid him.  See Randall Decl. ¶ 7, at 2; Bhandari Depo. at 177:4-8.  Under the separation agreement, R. Bhandari would be allowed to resign and be given a neutral recommendation by AGH.  See Randall Decl. ¶ 7, at 2; R. Bhandari Depo. at 183:1-8.[6]

---

Electronic Mail Transmission from Lisa Hill to Shirley Lopez and Laurie Breedlove at 1 (dated August 29, 2006), filed January 20, 2011 (Doc. 127-9).  This evidence does not controvert the Defendants' assertion that the decision to terminate R. Bhandari's agreement was made after Randall reviewed the Agreement and conducted an investigation into R. Bhandari's work at AGH; instead, this evidence confirms this asserted fact.  The Court will therefore deem the Defendants' asserted fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[6] The Defendants assert:

Mr. Butler and Mr. Randall personally met with Dr. Ramdas Bhandari for hours on September 2[6], 2010, his last day of employment.  Id. at 7.  Among other things, the parties discussed a proposed separation agreement with Dr. Bhandari.  Id.  Under this agreement, Dr. Bhandari would be allowed to resign and be given a neutral recommendation by AGH.  Id.; see also Bhandari Depo. at pg. 183, lns. 1-8.

Motion ¶ 25, at 11.  In his Response, R. Bhandari asserts:

Defendants spent days or weeks planning for the termination, but gave Dr. R. Bhandari no notice.  Doc. 112-2 [Randall Dep.] at 134:15-35:1.  Defendants brought legal counsel to the termination, but did not and would not allow Dr. R. Bhandari to do the same.  Doc. 127-6 [Randall Dep.] at 236:24-38:11.  They conducted the meeting in the presence of Dr. R. Bhandari's wife, in a manner designed to increase emotional harm so as to bring about resignation.  Doc. 127-11 ["Talking Points for termination interview with Drs. Bhandari"] (attached to depositions as dep. ex. 28) (noting that both Dr. R. Bhandari and his wife were going to be terminated and threatening to sue Dr. R. Bhandari if he would not resign); Doc. 127-12 [Butler Dep.] at 112:25-13:8 (authenticating dep. ex. 28); Ex. Doc. 127-5 [R. Bhandari Dep.] at 163:16-64:3, 168:7-16, 170:10-19, 171:19-72:2; Doc. 127-13 [C. Bhandari Dep.] at

Following his termination, R. Bhandari experienced sleeplessness.  See R. Bhandari Depo. at 149:8-12.  He wanted to cry, but did not, because he thought that, being a man, he should not cry.  See R. Bhandari Depo. at 149:18-150:1.   R. Bhandari: (i) was devastated; (ii) did not seek counseling outside of his house, but he spoke to his wife, a mental health professional; (iii) did not seek medication for his emotional distress; (iv) did not take any sleeping medication; (v) did not go outside his home for approximately a week, because he was scared to go outside; and (vi) did not

---

126:12-18, 138:16-139:4; 139:9-140:24, 142:3-10.  They refused to let Dr. R. Bhandari see their "evidence" and refused to hear any explanations he offered.  Doc. 112-2 [Randall Dep.] at 197:2-16.  They threatened Dr. R. Bhandari with a lawsuit if he would not immediately resign from employment.  Ex. 1 [Bhandari Dep.] at 176:8-77:8.  Defendants then changed the locks on Dr. R. Bhandari's office, escorted him off of their premises and told him that if he returned he would be arrested.  Id. at 184:4-16, 185:5-86:8.

Response at 4-5.  In his deposition, Randall testified that he did not give R. Bhandari notice, that he had legal counsel at the meeting, that he did not present R. Bhandari with the information that he had concerning what R. Bhandari had done or not done, and that he did not give him the reasons for his termination, and that he did not give him the ability to respond to the allegations.  See Randall Depo. at 134:24-135, 236:24-238:11, 197:2-16.  The Talking Points Memorandum gives talking points for the termination interview with both R. Bhandari and C. Bhandari, and states that, if R. Bhandari rejects the "separation agreement, the hospital will seek to recover all damages it has incurred as the result of your breach of the employment agreement."  Talking Points Memorandum at 1.  R. Bhandari testified that, during the meeting, Randall stated: "You have to sign those [separation] agreements.  And if you don't sign those agreements today, we'll sue you for every penny that you have got that we paid you.  Every penny that we paid you from us is going to get back to us."  Bhandari Depo. at 177:4-8.  He also testified that the Defendants changed the locks on his office door, that the Chief Financial Officer helped R. Bhandari pack his equipment into his car, and that the CFO "brought us to -- escorted us out of the premises."  Bhandari Depo. at 184:4-16, 185:5-8.  None of this evidence controverts the Defendants' assertion that Butler and Randall personally met with R. Bhandari for hours on September 26, 2010.  The Court will therefore deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).  This evidence does not controvert that the parties discussed a proposed separation agreement; it merely characterizes the discussion in a different manner.  The Court will therefore deem this asserted fact admitted, but will note R. Bhandari's characterization of the discussion.  See D.N.M.LR-Civ. 56.1(b).  This evidence also does not controvert that, under the separation agreement, R. Bhandari would be allowed to resign and be given a neutral recommendation from AGH.  The Court will therefore deem this fact admitted. See D.N.M.LR-Civ. 56.1(b).

contact any physician to discuss his purported emotional distress.  See R. Bhandari Depo. at 148:23-

150:8.[7]

_____

[7] The Defendants assert:

> With respect to emotional distress, Dr. Bhandari experienced sleeplessness.  *See*
> Bhandari Depo. at pg. 149, lns. 8-12.  He tried to, but did not cry.  *Id*. at pg. 149, lns.
> 22-23.  Dr. Bhandari: (1) did not seek counseling; (2) did not seek medication for his
> emotional distress; (3) did not take any sleeping medication; and (4) did not contact
> any physician to discuss his purported emotional distress.  *Id*. at pg. 149, ln. 13 - pg.
> 150, ln. 6.

Motion ¶ 27, at 12.  In his Response, R. Bhandari asserts:

> Dr. R. Bhandari was "devastated" by Defendants' action and received counseling
> thereafter from his wife, a licensed psychiatrist. Id. 148:16-49:7. He became afraid
> to leave his home and did not leave his home for a week after the termination.  Id.
> at 150:9-51:6.  He also testified that he had physical symptoms in crying and
> sleeplessness. Id. at 148:8-12, 149:18-25.

Response ¶ 27, at 5.  In his deposition, R. Bhandari testified:

> **Q.     Were you treated for your emotional distress?**
> . . . .
> A.     Well, I don't know what you call treatment.  Both my wife and myself were
> devastated, actually.
>
> **Q.     And your wife is a mental health professional, true?**
>
> A.     Right.
>
> **Q.     So did you seek counseling?**
>
> A.     Well, I don't know if I started counseling.  All I can tell you is we talked to
> each other about it.  She comforted me; I comforted her.
>
> **Q.     Okay.  Did you seek counseling?**
>
> A.     Did I seek counseling outside of my house?  No.
>
> **Q.     Did you seek any sort of medication to assist you with depression or any
> other mental disorder?**

R. Bhandari's orthopedic clinic never experienced a net profit during his tenure at AGH; in

--------

A.      No.  I did not take any.  But I was unable to sleep at night.  I was just, like, sleepless.

**Q.      Did you take any sleeping medicine?**

A.      No.

**Q.      Did you consult a family physician for any physical symptoms of your emotional distress?**

A.      No.

**Q.      Other than sleeplessness; do you think you had any physical symptoms of emotional distress?**

A.      I was -- we were crying.  We were -- I didn't -- I always used to try to not cry.  But my wife used to cry.  And being a man, I used to say . . . we shouldn't cry.  So I never cried.  But I think it was a horrible time for both of us.  We were just, like -- I couldn't believe that this had happened.

. . . .

**Q.      Okay.  So we covered lack of sleep and wanting to cry but not crying. Anything else that was a physical manifestation of your severe emotional distress.**

. . . .

A.      I became scared to go out of my house. . . . For some time I was sort of -- stayed at home, didn't go anywhere for a week or so.  Subsequently, I became fearful of signing any contract with anybody, because now I thought that this was something that -- after I had done so much in preparation on this contract and still made -- you know, still this played out, so . . . .

Depo. at 148:8-150:25.  R. Bhandari controverted the Defendants' assertion that he did not receive counseling, because he testified that he did not seek counseling outside his house, but that he talked to his wife, who is a mental health professional.  R. Bhandari's testimony does not, however, controvert the rest of the Defendants' assertions.  The Court will therefore deem the Defendants' assertion admitted, with the exception of the Defendants' assertion that R. Bhandari did not receive counseling, because R. Bhandari spoke to his wife, a mental health professional.  See D.N.M.LR-Civ. 56.1(b).

fact, the clinic lost money.  See Randall Decl. ¶ 8, at 2.[8]

---

[8] The Defendants assert: "Dr. Bhandari's orthopedic clinic never experienced a net profit during his tenure at AGH.  In fact, the clinic lost money."  Motion ¶ 28, at 12 (citing Randall Decl. ¶ 8, at 2).  In his Response, R. Bhandari states:

> At termination, Dr. R. Bhandari he [sic] had been in practice, effectively, for ten months. Deposition of Claude Camp, dated Sept. 25, 2008, taken in Dr. C. Bhandari v. AGH et al, Fifth Judicial District Court, State of New Mexico Docket No. CV-2007-611 ("1st Camp Dep."), a true and correct copy of which is attached hereto as **Exhibit 9**, at 23:14-25:15; Ex. 3 [Camp Dep.] at 20:17-21:7 (authenticating prior testimony).  The record shows that the practice would have needed between eighteen months and two years to reach capacity. Id.; deposition of John Hess, dated Dec. 27, 2010, a true and correct copy of which is attached hereto as **Exhibit 10**, at 36:18-37:10.  Mr. Camp testified that it was a reasonable assumption that Dr. R. Bhandari's share of the fully developed clinic's profits would come to $500,000 per year. Tr. dated Jan. 11, 2010 in Dr. C. Bhandari v. AGH et al, Fifth Judicial District Court, State of New Mexico Docket No. CV-2007-611, a true and correct copy of the relevant portions of which is attached hereto as **Exhibit 11**, at 12:8-13:2. Dr. R. Bhandari opened at least 218 patient files while at Defendants' hospital. Ex. 2 [Bhandari Aff.] at ¶ 5.

Response ¶ 28, at 5-6.  In their Reply, the Defendants assert that Camp's deposition, taken in C. Bhandari's New Mexico state court case, is inadmissible hearsay.  See Reply at 3.  The Tenth Circuit has recognized that a court can consider only admissible evidence in determining whether it should grant summary judgment.  See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir.1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment. Hearsay testimony cannot be considered because [a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." (internal quotations and citations omitted)).  The United States Court of Appeals for the Second Circuit has addressed a similar situation in Patterson v. County of Oneida, N.Y., 375 F.3d 206, 222 (2d Cir. 2004).  The Second Circuit noted:

> Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay.  See generally Fed.R.Evid. 801(c).  It is not admissible at a subsequent trial under the exception for "former testimony" unless the declarant is unavailable and the party against whom it is offered at the subsequent trial "had an opportunity and similar motive" at the prior hearing "to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

> . . . .

> Patterson proffered no evidence of any bias on the part of Middaugh.  Nor did he point to sufficient evidence to show bias toward him on the part of Chapple.  Neither

Patterson himself nor any of the third-party witnesses whose sworn statements he submitted stated that Chapple had ever used racially offensive language. Rather, Patterson proffered excerpts from the hearing testimony of former Department corrections officer Kevin Kulesa in <u>Brown-v-Middaugh</u> for the proposition that "Chapple has exhibited a tolerance for racist behavior" (Patterson brief on appeal at 10). This proffer suffered two flaws. First, the Kulesa testimony proffered by Patterson was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay and was neither reaffirmed in an affidavit by Kulesa stating, for example, that he would give the same testimony at a trial of Patterson's claims, nor supported by any showing that that prior testimony would be admissible under Fed.R.Evid. 804(b)(1) if offered by Patterson at trial.

375 F.3d at 219-20, 222. In <u>Biggers on Behalf of Key v. S. Ry. Co.</u>, 820 F. Supp. 1409, 1415 (N.D. Ga. 1993), the United States District Court for the Northern District of Georgia stated:

Duluth also objects to the plaintiff's exhibit containing testimony by Peter Grivas that Mr. Grivas gave as a witness in a workers' compensation hearing related to the plaintiff. Duluth contends that Mr. Grivas' testimony is hearsay and that defendant Duluth was not involved in the case from which the testimony arose. Rule 56(c) does not provide for the Court's consideration of prior testimony in summary judgment motions, unless the testimony is in the form of deposition or affidavit. Therefore, the Court must determine if the evidence would otherwise be admissible at trial. <u>See, Cash Inn of Dade, Inc. v. Metropolitan Dade Co.</u>, 938 F.2d 1239 (11th Cir.1991).

Rule 804(b)(1) provides that prior testimony is not hearsay if the declarant is unavailable as a witness and if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by cross-examination. Fed.R.Evid. 804(b)(1). Plaintiff has not produced any evidence that Mr. Grivas was unavailable for a deposition. Additionally, defendant Duluth did not have an opportunity to cross-examine Mr. Grivas at the time he gave the prior testimony. The Court accordingly strikes his testimony.

820 F. Supp. at 1415. <u>See</u> <u>Mountain Highlands, LLC v. Hendricks</u>, No. CIV 08-0239 JB/ACT, 2009 WL 2426197, at *16-17 (D.N.M. 2009)(discussing the admissibility of a deposition and rule 804(b)(1)); <u>Wallace v. City of Tarpon Springs</u>, No. 8:05-CV-979-T-EAJ, 2007 WL 128839 (M.D. Fla. Jan. 12, 2007)(stating that, because the plaintiffs failed to show that the witness was an unavailable witness, because the issue in the suit before the court was not at issue in the prior case, because the plaintiff in the prior action was different from the plaintiff in the action before the court, and because the two actions did not involve the same subject matter, the court would strike the plaintiffs' references in their response to the witness' deposition from a former case). The Court finds that Camp's deposition from a previous state court lawsuit is hearsay, as it is being offered for the truth of the matter asserted -- that R. Bhandari's practice would have needed eighteen months

R. Bhandari does not seek rescission under his misrepresentation claims.  See, e.g., Second Amended Complaint for Fraudulent and/or Negligent Misrepresentation; Constructive Fraud; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Wrongful Discharge in Violation of Public Policy; Outrageous Conduct; Defamation; False Light Invasion of Privacy; and Intentional Infliction of Emotional Distress ¶¶ 43-44, at 13, filed July 12, 2010 (Doc. 35)("SAC"); Response ¶ 1, at 6 (setting forth this fact); Reply at 2-4 (not controverting this fact). In his deposition, R. Bhandari testified that he believes that a paragraph in the Agreement -- paragraph 3.2(k) -- is missing from the termination-for-cause section of his Agreement.  See Bhandari Depo. at 120:6-121:2; Response ¶ 2, at 6 (setting forth this fact); Reply at 2-4 (not

---

to two years to reach capacity and that it is reasonable to assume that R. Bhandari's share of the fully developed clinic's profits would come to $500,000.00 a year.  The Court finds that the deposition is not admissible under rule 804(b)(1), because R. Bhandari has not demonstrated that Camp will be unavailable at trial, or that he is offering it against a party who had an opportunity and similar motive to develop the testimony in cross-examination.  Because Camp's deposition testimony from the previous state court lawsuit is hearsay, the Court cannot properly consider this evidence at summary judgment.

     R. Bhandari also offers John Hess' testimony to dispute the Defendants' assertions.  In his deposition, Hess testified that he made "some assumptions" in forming his opinion regarding doctors' revenues, such as assumptions

> about what ramp up would be; and based on our experience usually the first year is pretty, you know, is really a ramping up time sometimes on into part of the second year.  So, we assumed a 18-month ramp up that the volumes would start very low and then build up and reach what would be sort of the normal level by the end of that 18th month.

Deposition of John "Jack" Hess at 34:5-37:10 (taken December 27, 2010), filed December 24, 2011 (Doc. 129-10).  In his affidavit, R. Bhandari asserts that he opened 218 patient files while working for AGH.  See Bhandari Aff. ¶ 5, at 2.  Neither Hess' testimony nor R. Bhandari's testimony controverts the Defendants' assertion that R. Bhandari's orthopedic clinic did not experience a net profit during his tenure nor that it lost money.  The Court will therefore deem the Defendants' assertion admitted. See D.N.M.LR-Civ. 56.1(b).

controverting this fact).  Paragraph 3.2(k) of Dr. Chitra Bhandari's agreement contains the language

that R. Bhandari alleges was omitted from his Agreement.  See, e.g., Physician Employment

Agreement (Chitra Bhandari, M.D.), filed January 24, 2011 (Doc. 129-12); Camp Depo. at 12-17;

Response ¶ 3, at 6 (setting forth this fact); Reply at 2-4 (not controverting this fact).  In his SAC,

R. Bhandari alleges that the parties agreed that his Agreement would contain a provision stating that,

should AGH cancel the contract for items other than a physician's loss of licensure, loss of

privileges, loss of life, illegal activities, or incapacity to perform activities, AGH will pay out the

remaining balance under the Agreement and that the Defendants included that provision in C.

Bhandari's agreement, but inadvertently failed to place it in R. Bhandari's Agreement.  See, e.g.,

SAC ¶ 18, at 7; Response ¶ 4, at 6 (setting forth this fact); Reply at 2-4 (not controverting this fact).

In his deposition, R. Bhandari answered several questions about the allegations in his SAC regarding

paragraph 3.2(k) and his understanding of due process.  See, e.g., Bhandari Depo. at 78:8-84:9,

118:6-121:2; Response ¶ 5, at 6 (setting forth this fact); Reply at 2-4 (not controverting this fact).

> The Agreement provides:
>
> Subject to the Hospital's due process procedures, this Agreement may be terminated
> for cause by the non-defaulting party immediately and without notice at any time.
> "Cause" means:
>
> (a) Material breach or default of either party hereunder, which shall remain uncured
> thirty (30) days after receipt of written notice of default from the non-defaulting
> party;

Agreement at 5.  See Response ¶ 6, at 7 (setting forth this fact); Reply at 2-4 (not controverting this

fact).  In his SAC, R. Bhandari pled that the Defendants' misrepresentations were of

> their operating ethically and professional, their affording due process to their
> employees, that AGH was financially sound, that AGH was operated not-for-profit,
> that their was a significant patient base available, that there was no local orthopedic
> surgeon competition, that AGH had a sufficient and professionally-trained staff, that
> Dr. Ramdas Bhandari would be given all promised employment benefits, and that

AGH had appropriate and sanitary facilities.

SAC ¶ 37, at 12.  See Response ¶ 12, at 8 (setting forth this fact); Reply at 2-4 (not controverting this fact).  Three orthopedic surgeons from Roswell would take cases from Artesia to a private surgical center in Roswell.  See, e.g., Bhandari Depo. at 56:18-57:5; Response ¶ 13, at 8 (setting forth this fact); Reply at 2-4 (not controverting this fact).  R. Bhandari alleges that the Defendants have not identified any deposition or interrogatory question where they asked R. Bhandari who made the misrepresentations regarding due process.  See, e.g., Motion; Response ¶ 7, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).  Joe Schiel, one of the persons who made alleged misrepresentations to R. Bhandari, was the chairman of the AGH Governing board.  See, e.g., Bhandari Depo. at 127:12-16; Response ¶ 8, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).  The Defendants offered the Agreement to R. Bhandari through Camp, who was their agent.  See, e.g., Camp Depo. at 34:12-23; Response ¶ 9, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).

The Defendants' promise that the Agreement was not subject to summary termination was important to R. Bhandari's decision to work for the Defendants.  See, e.g., Bhandari Depo. at 12:23-13:3, 119:11-4; Response ¶ 10, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).  The Agreement states that it was terminable only "[s]ubject to the Hospital's due process procedures," and R. Bhandari negotiated for language requiring thirty days' notice before termination for cause and to remove Defendants' right to terminate upon a unilateral "good faith determination."  Agreement at 5.  See Electronic Mail Transmission from Chip Camp to R. Bhandari (dated January 7, 2005), filed January 24, 2011 (Doc. 129-13); Electronic Mail Transmission from R. Bhandari to Chip Camp (dated December 30, 2004), filed January 24, 2011 (Doc .129-13); Camp Depo. at 45:12-22 (authenticating document); Response ¶ 10, at 7 (setting forth this fact); Reply at

-25-

2-4 (not controverting this fact).  R. Bhandari alleges that the Defendants did not tell him that they read the due-process procedures provision to mean that they could terminate the Contract without notice and without any due process.  <u>See, e.g.</u>, R. Bhandari Aff. ¶ 2, at 1; Response ¶ 10, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).  The Defendants did not provide R. Bhandari with a copy of the Medical Staff Bylaws or the Fair Hearing Plan until he began his employment.  <u>See</u> Motion ¶ 6, at 3 (stating that AGH provided R. Bhandari with the Medical Staff Bylaws and Fair Hearing Plan, and citing to a November 11, 2005 letter containing selected portions of the Bylaws and Fair Hearing Plan); Response ¶ 10, at 7-8 (setting forth this fact); Reply at 2-4 (not controverting this fact).

R. Bhandari states that the Defendants continued to use R. Bhandari's name and likeness on a billboard and a patient guide advertising their services until 2007.  <u>See, e.g.</u>, Bhandari Aff. ¶ 4, at 1-2; Response ¶ 11, at 8 (setting forth this fact); Reply at 2-4 (not controverting this fact).

## PROCEDURAL HISTORY

On July 12, 2010, R. Bhandari filed his Second Amended Complaint for Fraudulent and/or Negligent Misrepresentation; Constructive Fraud; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Wrongful Discharge in Violation of Public Policy; Outrageous Conduct; Defamation; False Light Invasion of Privacy; and Intentional Infliction of Emotional Distress.  <u>See</u> Doc. 35.  On July 27, 2010, the Defendants filed their First Amended Answer and Counterclaim, in which the Defendants allege causes of action for breach of contract, conversion/theft, defamation, and fraud.  <u>See</u> Doc. 44.

On January 5, 2011, the Defendants filed Defendants' Motion for Partial Summary Judgment and Supporting Memorandum.  <u>See</u> Doc. 113.  In their Motion, the Defendants argue that the Court should dismiss R. Bhandari's claim for fraudulent and/or negligent misrepresentation, because the

election-of-remedies doctrine bars R. Bhandari's fraud-based claims, because R. Bhandari cannot

assert fraud-based claims that rewrite the Agreement's terms, and because R. Bhandari cannot prove

the required elements of fraudulent and/or negligent misrepresentation as a matter of law.  The

Defendants argue that the Court should dismiss R. Bhandari's constructive fraud claim, because he

has failed to identify a legal or equitable duty that gives rise to a claim of constructive fraud, and

because he has failed to raise an issue of material fact showing a breach of any legal or equitable

duty.  The Defendants argue that the Court should limit R. Bhandari's claim for breach of contract,

because there is no contractual duty for a peer review hearing or any other due-process procedures,

because R. Bhandari's attempt to create a new term in his contract fails as a matter of law, and

because R. Bhandari is not entitled to damages that he did not earn.  The Defendants argue that the

Court should dismiss R. Bhandari's claim for breach of the implied covenant of good faith and fair

dealing, because there is no tort liability with a written contract, and because R. Bhandari cannot

expand the Agreement through this claim.  The Defendants assert that the Court should dismiss R.

Bhandari's claim for wrongful discharge, because the tort does not apply when there is an express

employment contract, and because there is no evidence that the Defendants violated any public

policy.  The Defendants argue that the Court should dismiss R. Bhandari's claim for defamation,

because there is no evidence of any defamatory statement published by the Defendants, and because

there are no defamation damages.  The Defendants further argue that the Court should dismiss R.

Bhandari's claims for false light invasion of privacy, intentional infliction of emotional distress, and

punitive damages.

On January 24, 2011, R. Bhandari filed the Plaintiff's Response in Opposition to Defendants'

Motion for Partial Summary Judgment [Doc. 133] Filed January 5, 2011.  See Doc. 129.  In his

Response, R. Bhandari stated:

> [I]n order to place before the Court only those issues that Dr. R. Bhandari expects
> to place before the jury, Dr. R. Bhandari voluntarily limits his claim under the
> covenant of good faith and fair dealing to Defendants' failure to provide due process
> and withdraws his claims for wrongful discharge and defamation.

Response at 1 n.1.  R. Bhandari argues that his contract claims should proceed.  He asserts that the

parties dispute the meaning of the contractual promise of due process.  He contends that he is

entitled to reformation of the contract to include an accidentally omitted term.  He further contends

that he is entitled to recover his reasonable expectation damages.  R. Bhandari contends that the

record supports a claim under the implied covenant of good faith and fair dealing, and that the

Defendants' breaches of the implied covenant are linked to contractual terms.  R. Bhandari further

contends that the record establishes his misrepresentation claims.   He asserts that his

misrepresentation claims do not duplicate his contract claim and that the election of remedies

doctrine is not applicable.  He also asserts that the Agreement's integration clause does not preclude

his claim.  He argues that there is a genuine issue of fact on the elements of his misrepresentation

claims.  R. Bhandari further argues that he has stated a claim in constructive fraud.  R. Bhandari

asserts that the facts of the record establish a claim for invasion of privacy and that the Defendants

are liable for intentional infliction of emotional distress.  R. Bhandari further argues that he is

entitled to punitive damages for the Defendants' willful and wanton breach of contract.

On January 28, 2011, the Defendants filed Defendants' Reply Brief in Support of Motion

for Partial Summary Judgment.  See Doc. 132.  In their Reply, the Defendants argue that the due-

process rights listed in the Fair Hearing Plan and Bylaws do not apply.  They contend that R.

Bhandari fails to raise a fact issue as to his entitlement to profits.  They contend that R. Bhandari's

good-faith-and-fair-dealing claim and fraud-based claims fail as a matter of law, and that R.

Bhandari's evidence does not create an issue of fact on his invasion of privacy claim.  They argue

that R. Bhandari's intentional infliction of emotional distress claim fails, because there is no evidence of extreme and outrageous behavior in this case, and R. Bhandari has not raised an issue of fact whether he suffered severe emotional distress.  The Defendants further assert that there is no evidence to support a claim for punitive damages for breach of contract or any of R. Bhandari's other claims.

At the hearing, both parties represented to the Court that it has all the evidence it needs or would hear in a <u>Mark V</u> hearing[9] or at a trial, and that they wished the Court to determine the meaning of the contract as a matter of law.  <u>See</u> Transcript of Hearing at 87:2-13 (taken February 2, 2011)(Court, Brown, Mynatt, Burris)("Tr.").[10]

> THE COURT:  All right.  Let me let me just recap with everybody so I make sure I understand.  Nobody needs or wants a Mark V hearing or a trial on the construction of the contract?  Everybody's in agreement that I have -- whatever I have in front of me is sufficient for the Court to construe the  contract on all aspects of your motion there.  Correct Mr. Brown?
>
> MR. BROWN:  Yes, Your Honor.
>
> THE COURT:  You're in agreement with that Mr. Mynatt.
>
> MR. MYNATT:  Yes, Your Honor.
>
> THE COURT:  Mr. Burris?
>
> MR. BURRIS:  I am, Your Honor.

Tr. at 87:2-13 (Court, Brown, Mynatt, Burris).

---

[9]  According to the Supreme Court of New Mexico in <u>Mark V. Inc v. Mellekas</u>, 114 N.M. 728, 845 P.3d 1232 (1993), a district court may take extrinsic evidence to determine whether a contract is ambiguous. <u>See</u> 114 N.M. at 781-82, 845 P.3d at 1235-36.

[10]  The Court's citations to the transcript refer to the court reporter's original, unedited version. The final transcript may contain slightly different page and/or line numbers.

### LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for

the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may

be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

**RELEVANT NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION**

"Generally, the goal of contract interpretation is to ascertain the intentions of the contracting parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. 207, 218, 46 P.3d 668, 679 (2002)(quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. 698, 702, 12 P.3d 960, 964 (2000)(internal quotation marks omitted); Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 630, 916 P.2d 822, 830 (1996))).  "The court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. at 218-19, 46 P.3d at 679-80 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 129 N.M. at 702, 12 P.3d at 964; CC Housing Corp. v. Ryder Truck Rental, Inc., 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987))(alterations and internal quotation marks omitted).  "Absent ambiguity, provisions of a contract need only be applied, rather than construed or interpreted."  Richardson v. Farmers Ins. Co. of Am., 112 N.M. 73, 74, 811 P.2d

571, 572 (1991)(citing McKinney v. Davis, 84 N.M. 352, 503 P.2d 332 (1972)).

In New Mexico, a court may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."). In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico summarized the law in New Mexico concerning the interpretation of "ambiguous or unclear language in written agreements:"

> An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. C.R. Anthony[v. Loretto Mall Partners], 112 N.M. [504,] 509 n. 2, 817 P.2d [817,] 243 n. 2 [(1991)]. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder, C.R. Anthony, 112 N.M. at 510, 817 P.2d at 244.
>
> Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact. Segura v. Molycorp, Inc., 97 N.M. 13, 18, 636 P.2d 284, 289 (1981). However, in the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation. C.R. Anthony, 112 N.M. at 510 n.5, 817 P.2d at 244 n.5. The factual issues, if any, presented by an ambiguity must be resolved by the jury (or by the judge as fact finder in the case of a bench trial) with the benefit of a full evidentiary hearing prior to deciding breach and damages. Id. at 510, 817 P.2d at 244. In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent. American Bank of Commerce v. M & G

-33-

Builders, Ltd., 92 N.M. 250, 252, 586 P.2d 1079, 1081 (1978). Evidence may be presented to the fact finder to aid in the interpretation of the agreement, but no evidence should be received when its purpose or effect is to contradict or vary the agreement's terms. Maine v. Garvin, 76 N.M. 546, 550-51, 417 P.2d 40, 43 (1966); see also C.R. Anthony, 112 N.M. at 509, 817 P.2d at 243.

114 N.M. at 781-82, 845 P.2d at 1235-36.

As this Court stated in Great American Insurance Co. of New York v. W. States Fire

Protection Co., 730 F. Supp. 2d 1308 (D.N.M. 2009)(Browning, J.):

In Mark V, Inc. v. Mellekas, the Supreme Court of New Mexico summarized the circumstances under which it is appropriate for a district court to construe a contract as a matter of law, and when a district court should find that a contract is ambiguous and leave construction of the contract to a jury. According to the Supreme Court of New Mexico in Mark V, Inc. v. Mellekas, a district court may take extrinsic evidence to determine whether a contract is ambiguous, and "if the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." Id., 845 P.2d at 1235 (citations omitted).

730 F. Supp. 2d at 1314 n.1.

## RELEVANT NEW MEXICO LAW REGARDING REFORMATION

"An instrument may be reformed if (1) there has been mutual mistake, or (2) a mistake by one party accompanied by fraud or other inequitable conduct by the other party." Kimberly, Inc. v. Hays, 88 N.M. 140, 143-44, 537 P.2d 1402, 1405-06 (1975)(citing Wright v. Brem, 81 N.M. 410, 467 P.2d 736 (1970); Morris v. Merchant, 77 N.M. 411, 423 P.2d 606 (1967)). "For a mistake to be mutual and common to both parties, it must appear that both parties have done what neither intended." Cargill v. Sherrod, 96 N.M. 431, 433, 631 P.2d 726, 728 (1981)(citing Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc., 84 N.M. 524, 505 P.2d 867 (Ct. App. 1972)). "The party seeking to reform a writing must prove by clear and convincing evidence that a mutual mistake occurred." Twin Forks Ranch, Inc. v. Brooks, 125 N.M. 674, 677, 964 P.2d 838, 841 (Ct. App.

-34-

1998)(citing <u>Butler v. Butler</u>, 80 N.M. 36, 38, 450 P.2d 922, 924 (1969); <u>Wright v. Brem</u>, 81 N.M.

410, 411, 467 P.2d 736, 737 (Ct. App. 1970)).  "For evidence to be clear and convincing, it must

instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the

fact finder's mind is left with an abiding conviction that the evidence is true."  <u>In re Sedillo</u>, 84 N.M.

10, 12, 498 P.2d 1353, 1355 (1972).

> As the Court of Appeals of New Mexico stated in <u>Twin Forks Ranch, Inc. v. Brooks</u>:
>
> According to the Restatement (Second) of Contracts § 155 (1981) [hereinafter Restatement]:
>
>> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.
>
> Reformation is the remedy for errors in the written expression of an otherwise existing agreement.  But, before a court may reform a writing,
>
>> the proof must not only establish that the written agreement was not the agreement intended by the parties, but also what was the agreement contemplated by them at the time it was executed. . . . [P]laintiff 'must not only show clearly and beyond doubt that there has been a mistake, but he must also be able to show with equal clearness and certainty the exact and precise form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties.'
>
> 13 Samuel Williston, <u>A Treatise on the Law of Contracts</u> § 1548, at 124-25 (3d ed.1970) (citations and footnotes omitted) [hereinafter Williston on Contracts].

125 N.M. at 677-78, 964 P.2d at 841-42 (brackets in original).

> "The terms of the intended agreement must be apparent at the time the parties entered into

the contract."  <u>In re Crowder</u>, No. 7-96-10336 ML, 2008 WL 5157861, at *4 (Bankr. D.N.M. Aug.

29, 2008)(citing <u>State ex rel. State Highway and Transp. Dept. v. Garley</u>, 111 N.M. 383, 387, 806

-35-

P.2d 32, 36 (1991)("The comment makes it clear that 'the erroneous belief must relate to the facts as they exist at the time of the making of the contract.")(quoting <u>Restatement (Second) of Contracts</u> § 151, comment a. (1979))).

In determining whether there was a mutual mistake, "[e]xtrinsic evidence is admissible to establish that [the agreement] did not express the true agreement of the parties, even if the inconsistency cannot be detected on the face of the [agreement] and becomes clear only in light of surrounding circumstances." <u>Twin Forks Ranch, Inc. v. Brooks</u>, 120 N.M. at 835, 907 P.2d at 1016 (citing <u>Mark V, Inc., v. Mellekas</u>, 114 N.M. at 781, 845 P.2d at 1235 (1993)(remaining citations omitted)).

### RELEVANT NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." <u>Watson Truck & Supply Co., Inc. v. Males</u>, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990)(citations omitted). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." <u>Watson Truck & Supply Co. v. Males</u>, 111 N.M. at 60, 801 P.2d at 642 (internal quotation marks omitted). The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract." <u>Watson Truck & Supply Co. v. Males</u>, 111 N.M. at 60, 801 P.2d at 642.

New Mexico has recognized a cause of action for breach of the covenant of good faith and fair dealing sounding in contract. <u>See</u> <u>Bourgeous v. Horizon Healthcare Corp.</u>, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994). The Supreme Court of New Mexico also explained that tort recovery for

breach of the covenant of good faith and fair dealing would be permissible only where a special relationship existed, such as between insurer and insured.  See Bourgeous v. Horizon Healthcare Corp., 117 N.M. at 439, 872 P.2d at 857.  The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position."  Bourgeous v. Horizon Healthcare Corp., 117 N.M. at 439, 872 P.2d at 857 (internal quotation marks and citations omitted).  Similarly, the Court of Appeals of New Mexico held that "[t]he claim for breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists."  Heimann v. Kinder-Morgan CO2 Co., 140 N.M. 552, 558, 144 P.3d 111, 117 (Ct. App. 2006).

The Supreme Court of New Mexico has noted that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship."  Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 730, 749 P.2d 1105, 1109 (1988).  This limitation is because "there is no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing."  Sanchez v. The New Mexican, 106 N.M. 76, 78, 738 P.2d 1321, 1324 (1987)(emphasis in original)

## NEW MEXICO LAW REGARDING MISREPRESENTATION

The elements of fraud are

> that a representation was made as a statement of fact which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that the other party did in fact rely on it and was induced thereby to act to his injury or damage.

Prudential Ins. Co. of Am. v. Anaya, 78 N.M. 101, 104, 428 P.2d 640, 643 (1967).  See Williams v. Stewart, 137 N.M. 420, 429, 112 P.3d 281, 290 (Ct. App. 2005)("The elements of fraud include (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or

recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation.").

New Mexico follows the <u>Restatement (Second) of Torts</u> ("RST") with regard to what a plaintiff must prove to succeed on a negligent-misrepresentation claim.  <u>See First Interstate Bank of Gallup v. Foutz</u>, 107 N.M. 749, 750-51, 764 P.2d 1307, 1308-09 (1988)("Because New Mexico follows the tort of negligent misrepresentation as set forth in the Restatement, it is not unreasonable to conclude that we would also follow the damages as set forth therein."); <u>Stotlar v. Hester</u>, 92 N.M. 26, 29, 582 P.2d 403, 406 (Ct. App. 1978). The RST sets forth the cause of action as follows:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RST § 552 (1977). The New Mexico pattern jury instruction for negligent misrepresentation delineates the elements:

> A party is liable for damages caused by his negligent and material misrepresentation.
>
> A material misrepresentation is an untrue statement which a party intends the other party to rely on and upon which the other party did in fact rely.
>
> A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement was true.

UJI 13-1632 NMRA.

The thrust of both the RST and the pattern instruction is the same.  For a claimant to state a cause of action for negligent misrepresentation, he or she must establish five elements: (i) an untrue  statement, <u>see</u> NMRA UJI 13-1632, at 230 ("A material misrepresentation is an untrue statement . . . ."); RST § 552 ("One who . . . supplies false information"); (ii) made by one who has

no reasonable ground for believing the statement was true, see NMRA UJI 13-1632, at 230 ("A negligent misrepresentation is one where the speaker has no reasonable grounds for believing that the statement was true."); RST § 552 ("[I]f he fails to exercise reasonable care or competence in obtaining or communicating the information."); (iii) on which the speaker intends the listener to rely, see NMRA UJI 13-1632, at 230 ("A material misrepresentation is an untrue statement which a party intends the other party to rely on . . . ."); RST § 552 ("One who . . . supplies false information for the guidance of others in their business transactions . . . ."); (iv) and on which the listener relied, see NMRA UJI 13-1632, at 230 (". . . and upon which the other party did in fact rely."); RST § 552 (". . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . . ."); and (v) such reliance caused harm to the listener, see NMRA UJI 13-1632, at 230 ("A party is liable for damages caused by . . . ."); RST § 552 (". . . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information[.]").

Some cases from New Mexico courts have failed to enumerate injury or detriment as an element of a claim for negligent misrepresentation. See, e.g., Saylor v. Valles, 133 N.M. 432, 438, 63 P.3d 1152, 1158 (Ct. App. 2002)(listing four elements of negligent misrepresentation: (i) a material misrepresentation; (ii) reliance; (iii) the defendant's recklessness or knowledge of falsity; and (iv) intent to induce reliance)(citing Parker v. E.I. DuPont de Nemours & Co., 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct. App. 1995)).  The cases acknowledge, however, that "[p]rinciples of negligence govern the law of negligent misrepresentation." Saylor v. Valles, 133 N.M. at 438, 63 P.3d at 1158. See Ledbetter v. Webb, 103 N.M. 597, 602, 711 P.2d 874, 879 (1985)(distinguishing negligent misrepresentation from the intentional torts of fraud or deceit).  And it is well established that harm is one of the core elements of a claim of negligence.  See N.M. Pub. Schs. Ins. Auth. v. Arthur J. Gallagher & Co., 145 N.M. 316, 327-28, 198 P.3d 342, 353-54 (2008); Spurlin v. Paul

Brown Agency, Inc., 80 N.M. 306, 307, 454 P.2d 963, 964 (1969)("[T]here was no cause of action

for negligence until there had been a resulting injury.").

> New Mexico courts
>
> distinguish the elements of negligence and fraud as follows: (1) fraudulent
> misrepresentation requires an untrue statement, while negligent misrepresentation
> may involve a statement that is "literally true" but misleading; (2) fraudulent
> misrepresentation requires the defendant to make the statement recklessly or with
> knowledge that it is false, while negligent misrepresentation only requires a failure
> to exercise ordinary care in obtaining or communicating the statement; (3) fraudulent
> misrepresentation requires an intent to deceive, while negligent misrepresentation
> only requires an intent that the plaintiff receive and be influenced by the statement
> where it is reasonably foreseeable that the plaintiff would be harmed if the
> information conveyed was incorrect or misleading.  See UJI 13-1632, NMRA 1997
> (negligent misrepresentation); UJI 13-1633, NMRA 1997 (fraud); State ex rel.
> Nichols v. Safeco Ins. Co., 100 N.M. 440, 443 n.1, 671 P.2d 1151, 1154 n.1 (Ct.
> App.1983) (citing Restatement (Second) of Torts § 552 cmt. (a) (1977)).
>
> Finally, while negligent misrepresentation may be proven by a preponderance
> of the evidence, common-law fraud must be proven by clear and convincing
> evidence. See UJI 13-1633; Safeco, 100 N.M. at 443, 671 P.2d at 1154; Eoff v.
> Forrest, 109 N.M. 695, 699, 789 P.2d 1262, 1266 (1990).

Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. 549, 562, 953 P.2d 722, 735 (Ct. App.

1997).   See Ledbetter v. Webb, 103 N.M. at 602-03, 711 P.2d at 879-880 ("Negligent

misrepresentation is not, of course, a "lesser included" cause of action within a claim for deceit or

fraud." (citing Sims v. Craig, 96 N.M. 33, 627 P.2d 875 (1981)(stating that negligent

misrepresentation differs from tort of deceit in that basis for liability in latter is intent to mislead);

Maxey v. Quintana, 84 N.M. 38, 41-42, 499 P.2d 356, 359-60 (Ct. App.)(stating that negligent

misrepresentation is an action separate from tort of fraud or deceit), cert. denied sub nom Jack

Dailey Realty, Inc. v. Maxey, 84 N.M. 37, 499 P.2d 355 (1972); State ex rel. Conley Lott Nichols

Machinery Co. v. Safeco Ins. Co. of Am., 100 N.M. 440, 443, 671 P.2d 1151, 1154 (Ct. App.

1983)(stating that negligent misrepresentation and fraudulent misrepresentation differ as to scienter

-40-

and burden of proof)).

## NEW MEXICO LAW REGARDING CONSTRUCTIVE FRAUD

New Mexico courts recognize constructive fraud, "which is stated to be, generally, a breach of a legal or equitable duty irrespective of the moral guilt of the fraud feasor, and it is not necessary that actual dishonesty of purpose nor intent to deceive exist." Snell v. Cornehl, 81 N.M. 248, 249, 466 P.2d 94, 95 (1970)(citing In re Trigg, 46 N.M. 96, 121 P.2d 152 (1942)). "Constructive fraud may be established by circumstances." Snell v. Cornehl, 81 N.M. at 249, 466 P.2d at 95 (citing Frear v. Roberts, 51 N.M. 137, 179 P.2d 998 (1947)(other citations omitted). "A finding of constructive fraud need not be based upon a fiduciary relationship between the parties, as constructive fraud is defined as 'acts contrary to public policy, to sound morals, to the provisions of a statute, etc., however honest the intention with which they may have been performed.'" Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. 9, 13, 820 P.2d 1323, 1327 (1991)(citations omitted). "An action for constructive fraud is maintainable where there is a nondisclosure of material facts and the person charged with the constructive fraud had a duty to speak under existing circumstances." Barber's Super Markets, Inc. v. Stryker, 84 N.M. at 186, 500 P.2d 1304, 1309 (Ct. App. 1972)(citing Everett v. Gilliland, 141 P.2d 326, 330-331 (N.M. 1943)). "Whether a duty exists is generally a question of law for the trial court to decide." Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 12, 820 P.2d at 1326 (citation omitted). Superior knowledge will give rise to a duty to disclose. See Mountain Highlands, LLC v. Hendricks, 2009 WL 1300750, at *5 ("[S]uperior knowledge will give rise to a duty to disclose . . . ."). Superior knowledge can be knowledge peculiarly within a party's awareness. See Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 12-13, 820 P.2d at 1326-27.

## RELEVANT LAW REGARDING INVASION OF PRIVACY

New Mexico courts have recognized the tort of invasion of privacy, and have recognized that the tort is generally broken into four categories: (i) false light; (ii) intrusion; (iii) publication of private facts; and (iv) appropriation.  See Moore v. Sun Pub. Corp., 118 N.M. 375, 382, 881 P.2d 735, 742 (Ct. App. 1994); Andrews v. Stallings, 119 N.M. 478, 492, 892 P.2d 611, 625 (Ct. App. 1992).

"'False light invasion of privacy is 'a close cousin of defamation.'" Andrews v. Stallings, 119 N.M. at 492, 892 P.2d at 626 (citation omitted).  "The essence of this tort, a close cousin of defamation, is the placing of another 'in a false light in the public eye.'" Moore v. Sun Pub. Corp., 118 N.M. at 382, 881 P.2d at 742 (citation omitted).  "It is not, however, necessary to the action . . . that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Moore v. Sun Pub. Corp., 118 N.M. at 383, 881 P.2d at 743 (citing RST § 652E cmt. b, at 395).

New Mexico courts have described invasion of solitude as "invading someone's private space or solitude," and have given as examples such as "eavesdropping on a private conversation or peeping in a bedroom window." Fernandez-Wells v. Beauvais, 127 N.M. 487, 490, 983 P.2d 1006, 1009 (Ct. App. 1999).  "Intrusion into solitude appears to be based on the manner in which a defendant obtains information, and not what a defendant later does with the information, which is covered by the public-disclosure-of-private-facts branch." Fernandez-Wells v. Beauvais, 127 N.M. at 490, 983 P.2d  at 1009.

The elements of public disclosure of private facts are: (i) "public disclosure of private facts"; (ii) "disclosure which would be objectionable to a reasonable person"; and (iii) "a lack of legitimate

-42-

public interest in the information." <u>Fernandez-Wells v. Beauvais</u>, 127 N.M. at 489, 983 P.2d at 1008.

"Invasion of the 'right of publicity,' also known as 'appropriation,' consists of the exploitation of the plaintiff's name or likeness, usually for commercial gain, as in the unauthorized use of the plaintiff's name in an advertising endorsement for a product." <u>Moore v. Sun Pub. Corp.</u>, 118 N.M. at 383, 881 P.2d at 743 (citation omitted).

## <u>RELEVANT NEW MEXICO LAW REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

The following elements must be proven to establish a claim of intentional infliction of emotional distress: "[i] the conduct in question was extreme and outrageous; [ii] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [iii] the plaintiff's mental distress was extreme and severe; and [iv] there is a causal connection between the defendant's conduct and the claimant's mental distress." <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>,131 N.M. 607, 616, 41 P.3d 333, 342 (2001). For purposes of the tort of intentional infliction of emotional distress, New Mexico law adopts the RST's definition of extreme and outrageous conduct. See <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>,131 N.M. at 616, 41 P.3d at 342. According to the RST, extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RST § 46 cmt. d. <u>See</u> UJI 13-1628 NMRA ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person."). The RST § 46 states:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found

only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

RST § 46 cmt. d.

Extreme and "[s]evere emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 131 N.M. at 617, 41 P.3d at 343 (internal quotation marks and citations omitted). "The law intervenes only where the distress is so severe that no reasonable person could be expected to endure it." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 131 N.M. at 617, 41 P.3d at 343 (quoting RST § 46 cmt. j.). The extreme and severe emotional distress element of intentional infliction of emotional distress was not met, for example, where a plaintiff felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits. Trujillo v. N. Rio Arriba Elec. Coop., Inc., 131 N.M. at 617, 41 P.3d at 343.

## ANALYSIS

The Court will grant in part and deny in part the Defendants' Motion. The Court finds that the phrase "subject to Hospital's due process procedures" is ambiguous as a matter of law, because, given the language and the extrinsic evidence, the provision is reasonably and fairly susceptible of different constructions. Because the extrinsic evidence is susceptible to conflicting inferences, the Court cannot determine the meaning of the provision as a matter of law, and will therefore deny the Defendants' request that it grant summary judgment on this aspect of R. Bhandari's breach-of-contract claim. The Court will deny the Defendants' request that it grant summary judgment on R. Bhandari's reformation claim, because there is a genuine issue of fact whether there was a mutual mistake. The Court will grant summary judgment on R. Bhandari's request for damages under section 1.1 of the Agreement, because there is not sufficient evidence for which these damages may

be subject to reasonable ascertainment.  The Court will not grant summary judgment on R. Bhandari's implied-covenant-of-good-faith-and-fair-dealing claim, because it has held that a jury must determine the meaning of the due-process procedures provision, and, if a jury finds that the due-process procedures provision provided R. Bhandari with notice and a meaningful opportunity to cure, there is evidence that the Defendants denied R. Bhandari of the benefits of the Agreement, because they did not give him notice and an opportunity to cure his alleged problems before they terminated him.  The Court will not grant summary judgment on R. Bhandari's negligent-misrepresentation claim, based on Camp's representations regarding due process or based on the representation regarding local competition in the Carson Kolb brochure, but it will grant summary judgment on the other bases of R. Bhandari's fraudulent and negligent-misrepresentation claim, because there are not issues of fact on which the claim should proceed on these bases.  The Court will grant summary judgment on R. Bhandari's constructive-fraud claim, because constructive fraud requires a breach of a legal or equitable duty, and there is no evidence on which a fact-finder could reasonably find that the Defendants had superior knowledge and thus a duty to disclose.  Because there is no evidence on which a jury could reasonably find that the Defendants intentionally or knowingly appropriated R. Bhandari's name or likeness for their benefit, the Court will grant summary judgment on R. Bhandari's claim for invasion of privacy based on use of his likeness, because his claim fails as a matter of law.  The Court will grant summary judgment on R. Bhandari's intentional-infliction-of-emotional-distress claim, because there is not sufficient evidence on which a jury could reasonably find that the Defendants' conduct was extreme and outrageous, or that R. Bhandari suffered extreme and severe emotional distress.  The Court will grant summary judgment on R. Bhandari's request for punitive damages for his breach-of-contract claim and tort claims.

I.    THE PHRASE "SUBJECT TO HOSPITAL'S DUE PROCESS PROCEDURES" IS AMBIGUOUS AND THE COURT CANNOT DETERMINE THE MEANING OF THE PROVISION AS A MATTER OF LAW.

The Defendants argue that there is no contractual duty for a peer review hearing or any other due-process procedures.  They argue that the only due-process procedures for physicians with privileges at AGH are set forth in AGH's Fair Hearing Plan and Medical Staff Bylaws.  They argue that these documents explicitly state that the termination of the Agreement by AGH does not constitute an adverse decision that would entitle a physician to peer review or other due-process procedures.  The Defendants thus argue that no contractual due-process procedures apply in this case.

R. Bhandari argues that the Defendants' position that the only due-process procedures for physicians with privileges at AGH are in the Fair Hearing Plan and Medical Staff Bylaws is incorrect.  He argues that there are disputed issues of fact, precluding summary judgment, because Randall deems the Agreement ambiguous on due process, because Camp and R. Bhandari testified that due process has meaning in the contract, because Salgado and Morrison testified that due process has specialized meaning in the medical community, and because Levine opined that the Defendants' position is inconsistent with the medical industry's understandings of the term.  Furthermore, R. Bhandari asserts that the Defendants had at least one written policy under which R. Bhandari was entitled to due process -- their policy on patient neglect.

"Generally, the goal of contract interpretation is to ascertain the intentions of the contracting parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. at 218, 46 P.3d at 679 (citations omitted).  "The court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties."  Gallegos v. Pueblo of Tesuque, 132 N.M. at 218-19, 46 P.3d at 679-80 (citations omitted).  "Absent ambiguity,

-46-

provisions of a contract need only be applied, rather than construed or interpreted." <u>Richardson v.</u>

<u>Farmers Ins. Co. of Am.</u>, 112 N.M. at 74, 811 P.2d at 572 (citation omitted).

Under the "Termination for Cause" heading, the Agreement states: "Subject to Hospital's

due process procedures, this Agreement may be terminated for cause by the non-defaulting party

immediately and without notice at any time."  Agreement at 5.  The language in this section does

not appear ambiguous on its face -- it relates solely that the Agreement may be terminated for cause,

subject to AGH's due-process procedures.  The Defendants argue that no contractual due-process

procedures apply in this case, because AGH's Fair Hearing Plan and Medical Staff Bylaws do not

apply to these circumstances, because the policies explicitly state that termination of the Agreement

is not an adverse decision that would entitle a physician to peer review or other due-process

procedures.  Furthermore, as the Court has found, even though the Individual Abuse and Neglect

Policy also sets forth due-process procedures, those due process procedures do not apply in this case.

R. Bhandari argues that, under this interpretation, where the result is that no due-process procedures

apply, the due-process provision is meaningless.  He argues that this result is incorrect and that

extrinsic evidence shows that the due-process provision is ambiguous.

In New Mexico, a court may consider extrinsic evidence to determine "whether the meaning

of a term or expression contained in the agreement is actually unclear."  <u>Mark V, Inc. v. Mellekas</u>,

114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic

evidence to make a preliminary finding on the question of ambiguity."); <u>C.R. Anthony Co. v.</u>

<u>Loretto Mall Partners</u>, 112 N.M. at 508-09, 817 P.2d at 242-43 ("We hold today that in determining

whether a term or expression to which the parties have agreed is unclear, a court may hear evidence

of the circumstances surrounding the making of the contract and of any relevant usage of trade,

course of dealing, and course of performance." (citation and footnote omitted)).  In <u>Mark V, Inc. v.</u>

Mellekas, the Supreme Court of New Mexico summarized the law in New Mexico concerning the

interpretation of "ambiguous or unclear language in written agreements:"

> An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity. C.R. Anthony, 112 N.M. at 509 n.2, 817 P.2d at 243 n.2. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. Levenson v. Mobley, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder, C.R. Anthony, 112 N.M. at 510, 817 P.2d at 244.

114 N.M. at 781, 845 P.2d at 1235.

R. Bhandari has presented evidence of the circumstances surrounding the making of the

contract and evidence regarding what the phrase due process means in the medical context. The

parties have represented that all the evidence they would present in a Mark V hearing is before the

Court. The Court thus does not need to hold a Mark V hearing and may determine whether an

ambiguity exists based on the record before it. A district court "can properly admit extrinsic

evidence for the purpose of determining the parties' intended meanings," such as evidence of the

"circumstances surrounding the making of the contract and of any relevant usage of trade, course

of dealing, and course of performance." City of Sunland Park v. Harris News, Inc., 138 N.M. 588,

594, 124 P.2d 566, 572 (Ct. App. 2005)(citations omitted). "A party's statement of unilateral

subjective intent, without more, is insufficient to establish ambiguity in light of clear contractual

language." Dantonio v. Crowder, No. 32,3640, 2010 WL 5898876, at *6 (N.M. Ct. App. Sept. 9,

2010)(citation omitted).  R. Bhandari has presented R. Bhandari's testimony and Camp's testimony. There is evidence that R. Bhandari and Camp negotiated the Agreement, that during these negotiations, R. Bhandari and Camp discussed the provisions of the Agreement and specifically section 3.2, and that Camp modified the template Agreement, including section 3.2 as a result of the negotiations.  See Camp Depo. at 34:15-17, 77:20-24 (stating that he was "involved in the negotiation of th[e] [Agreement" and that, based on the negotiations and discussions, he "modified the template that we used"); Electronic Mail Transmission from Ramdas Bhandari to Chip Camp (stating that R. Bhandari needed "the following modifications in the contract," one of which was that "Paragraph 3.2 . . . be modified as follows: a. Material Breech [sic] -- which will remain uncured THIRTY DAYS instead of 5 days as it is now.  k. 'A good faith determination by hospital that physician is not providing adequate patient care etc.' should be removed from contract" (emphasis added)); Electronic Mail Transmission from Chip Camp to Ramdas Bhandari (stating that he would "agree to: modification of 3.2(a) to 60 days" and "removal of 3.2(k) in its entirety" (emphasis added)).  Although the parties have not directed the Court's attention to evidence that R. Bhandari and Camp discussed the phrase "due process procedures," Section 3.2 was an important part of the Agreement to R. Bhandari, and part of the negotiations was focused on the provisions in Section 3.2. See R. Bhandari Depo. at 119:11-14 ("**Q.  Yes.  And you just read to me from paragraph 3.2. The due process was very important to you going there, correct**?  A.  Right, due process." (bold in original)); R. Bhandari Depo. at 81:16-25 (stating that he negotiated the term of the Agreement, malpractice insurance, "a termination clause," and exclusion clause).  Their understandings of section 3.2, attained through their negotiations regarding the Agreement and section 3.2, and discussions of the Agreement and section 3.2, is thus evidence relating to the circumstances surrounding the making of the Agreement.  Because R. Bhandari's and Camp's testimony relate to

their understandings of the contract that they negotiated, and the provisions of the contract that they negotiated, the Court thus finds that their testimony is evidence relating to the meaning of section 3.2.  R. Bhandari has also offered testimony of various person in the medical profession as evidence of how the terms due process are used, and what they mean, in the medical context.  See City of Sunland Park v. Harris News, Inc., 138 N.M. at 594, 124 P.2d at 572.

Camp testified that he understands that "[s]ubject to hospital's due process procedures" means that, "in both the medical staff and human resources policies and practices and regulations, there are processes to go through depending on the type of violation by the individual, be it, you know, employed or non-employed."  Camp Depo. at 36:13-37:7.  Camp testified that he believes there may be instances by which there would be immediate revocation of privileges, which would be set forth in the Bylaws and would immediately terminate the Agreement, but that, as a general rule, there should be a process of modification and correction -- notice and a meaningful opportunity to respond to the charges.  See Camp Depo. at 37:8-38:6.

R. Bhandari testified that he thought that his contract set forth due-process protections. See R. Bhandari Depo. at 118:9-24 ("**Q. . . . Do you think that your contract [sets forth due process protections]?**  A. Absolutely, yes.  **Q. Show me where.**  A. . . . Right at the beginning it says, 'Subject' -- in 3.2, Termination for Cause.  'Subject to the hospital's due process procedures, this agreement' -- then it goes on to describe."  (bold in original)).

Salgado, who has been practicing medicine for ten years, testified that, based on his "experience in the medical industry," due process requires that you give a person the means to defend himself or herself in the event that something arises about which the person's colleagues or peers are concerned, and that a person accused would have to know that they were accused and have to have an opportunity to respond -- that "if something's going on then . . . somebody should be

-50-

given the chance at least, you know, hey, figure out what it is, and fix the problem."  Salgado Depo. at 11:8-12:4, 13:5-15:8.   Morrison, who was on AGH's governing board and who has been employed in the medical community approximately twelve years, testified that his sense of the words due process would include a notion that a person accused would have a meaningful opportunity to respond to the accusation.  See Morrison Depo. at 8:13-20, 11:2-17, 12:25-13:5. Levine testified that several codes of ethics govern the behavior of hospitals, such as the AHA code of ethics, the Joint Commission, which holds hospitals to standards of ethical behaviors, and a series of multi-stakeholder approaches that outline responsibilities for all stakeholders in healthcare, and that he believes that hospitals have an ethical and legal obligation to follow processes that require due process.  See Levine Depo. at 43:25-44:13.

The Court finds that section 3.2 is reasonably susceptible to two different meanings.  On the one hand, the phrase "[s]ubject to Hospital's due process procedures" could reasonably be read to mean the due-process procedures that AGH has set forth in its policies and bylaws.  Furthermore, Camp testified that he understands the phrase to mean the processes "in both the medical staff and human resources policies and practices and regulations," and that the determination of which processes apply depends on the individual's violation.  Camp Depo. at 36:13-37:7.  This provision could thus reasonably be interpreted as allowing termination subject to the due-process procedures set forth in the applicable policies and bylaws.[11]  On the other hand, Camp testified that he believes there may be instances by which there would be immediate revocation of privileges, which would be set forth in the Bylaws and would immediately terminate the Agreement, but that, as a general

---

[11] The only extrinsic evidence regarding due-process procedures that the Defendants have offered is evidence of their policies, none of which apply in this case.  The Defendants' interpretation generally relies on the plain language of the provision, and then pointing out the absence of any applicable due-process procedures for the conduct at issue here.

rule, there should be a process of modification and correction -- notice and a meaningful opportunity to respond to the charges.  See Camp Depo. at 37:8-38:6.  Furthermore, members of the medical community testified that due process means giving a person accused of a problem a meaningful opportunity to respond and attempt to fix the problem, and that hospitals have ethical and legal obligations to follow the processes that require due process.  See Salgado Depo. at 11:8-12:4, 13:5-15:8; Morrison Depo. at 8:13-20, 11:2-17, 12:25-13:5; Levine Depo. at 43:25-44:13.  Also, to adopt the Defendants' interpretation in the circumstances of this case empties the phrase "subject to hospital's due process procedures" of any meaning because it would never apply.  Courts are reluctant to construe statutes and contracts to not give any meaning to a phrase.  This provision could thus reasonably be interpreted as requiring notice and a meaningful opportunity to resolve alleged problems before termination.  Because the phrase due process is "reasonably and fairly susceptible of different constructions," the Court finds that the provision is ambiguous.  Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  See City of Sunland Park v. Harris News, Inc., 138 N.M. at 593-94, 124 P.3d at 571-72 (finding that a portion of the agreement was ambiguous when it was reasonably susceptible to two different meanings).

The Court cannot determine the meaning of the ambiguous provision as a matter of law. Under New Mexico law, "[o]nce the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  If an ambiguity exists and "the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).

However, in the event the parties do not offer evidence of the facts and

circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation.

Mark V, Inc. v. Mellekas, 114 N.M. at 782, 845 P.2d at 1236 (citation omitted).

Both parties have represented that the Court has all the extrinsic evidence they would present at a Mark V hearing.  The Court cannot resolve the ambiguity as a matter of law, because the parties have offered extrinsic evidence, and because, as the Court has discussed, the extrinsic evidence is susceptible to conflicting inferences regarding the provision's meaning.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  If a contract is ambiguous, extrinsic evidence is admissible to "aid in interpreting the parties' expressions."  C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 508, 817 P.2d at 242 (citing Hill v. Hart, 23 N.M. 226, 232, 167 P. 710, 711 (1917)("[W]here the terms of a contract are . . . uncertain, evidence . . . of the facts and circumstances surrounding the parties is admissible . . . .  The principle that parol evidence is not admissible to vary the terms of a written instrument is not infringed when the evidence is used . . . [to] ascertain[ ] . . . doubtful expressions['] [meaning] . . . ."); Fancher v. Bd. of Comm'rs, 28 N.M. 179, 207, 210 P. 237, 248 (1922)(stating that, in determining severability of terms of a contract, the operative question is the parties' intent, and where the terms of the contract clearly indicate the intent, the inquiry is at an end; otherwise, resort may be had to the nature of the subject matter of the contract).  This situation is not one, however, where the Court may use the extrinsic evidence to interpret the ambiguities in the provision, because the extrinsic evidence itself is susceptible to conflicting inferences.  See Mark V, Inc. v. Mellekas, 114 N.M. at 782, 845 P.2d at 1236 ("At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the

appropriate fact finder." (citation omitted)).  Because an ambiguity exists, and because the parties offer extrinsic evidence which is susceptible to conflicting inferences, a jury must resolve the meaning of section 3.2.  See Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted).  The Court will therefore deny the Defendants' request that it grant summary judgment on this aspect of R. Bhandari's breach-of-contract claim.

## II.   THE COURT DENIES THE REQUEST FOR SUMMARY JUDGMENT ON R. BHANDARI'S REQUEST FOR REFORMATION OF THE AGREEMENT.

The Defendants argue that R. Bhandari's contention that his Agreement should contain an additional term -- that AGH pay out the remaining balance due under the contract if it terminates the contract -- fails as a matter of law.  They argue that R. Bhandari has not pled any quasi-contractual actions, such as reformation, mutual mistake, or rescission, that would allow the Court to modify the Agreement.  They argue that, even if R. Bhandari had pled such causes of action, there is no evidence to support any such claim, because R. Bhandari did not read the Agreement before signing it, so he cannot now ask the Court to reform the Agreement to include the missing phrase.

R. Bhandari argues that he is entitled to reformation of the Agreement to include the accidentally omitted term.  He argues that, because he pled the omission of an essential term from his Agreement, it is formalistic irrelevancy to try to preclude this evidence by arguing that the Agreement lacks a reformation count.  He argues that the Defendants' long awareness of this issue distinguishes the present case from those where a issue is sprung at trial and the parties had no opportunity to explore it during discovery.  He argues that, to the extent that a formal reformation count is necessary to present his point, he requests leave to amend his complaint under rule 15(a)(2) of the Federal Rules of Civil Procedure.  He further argues that there is evidence to support his claim.  He asserts that the parties agreed that the language was to be included in the contract and that

the Agreement was supposed to be substantively identical to C. Bhandari's Agreement, whose Agreement contains this language.

The Court will allow R. Bhandari to seek reformation. The Court does not believe that R. Bhandari was required to plead reformation as a cause of action, because it is a remedy. Although R. Bhandari did not include reformation in his prayer for relief, the Court is reluctant to find that his SAC is not a sufficient basis upon which it may grant reformation. Even if the Court were to decide that the SAC does not give fair notice that R. Bhandari is seeking reformation, the Court would be inclined to give him leave to amend the pleading to do so. The Court will deny the Defendants' request that it grant summary judgment on R. Bhandari's reformation claim, because there is a genuine issue of fact whether there was a mutual mistake.

R. Bhandari did not plead reformation as a count in his SAC. In his general allegations, R. Bhandari asserted:

> The parties . . .  agreed that Dr. Ramdas Bhandari's Agreement would contain a provision stating that "should hospital cancel this contract for items other than physician's loss of licensure, loss of privileges, loss of life, illegal activities that jeopardize the hospital activities or incapacity to perform activities related to the practice, hospital will pay out the remaining balance due under the contract." Defendants included that provision in Dr. Chitra Bhandari's employment agreement, but inadvertently failed to place this provision in Dr. Ramdas Bhandari's Agreement.

SAC ¶ 18, at 7.

The Court of Appeals of New Mexico has noted that a "trial court's grant of reformation under the posture of the pleadings was in error" when the plaintiffs "did not plead for reformation of a deed in their complaint, and the pleadings were not amended at trial to conform to properly admissible evidence." Pacheco v. Martinez, 97 N.M. 37, 43, 636 P.2d 308, 314 (Ct. App. 1981). The Court of Appeals stated:

> Plaintiffs failed to plead facts at any time warranting reformation of any of plaintiffs'

> deeds.  The office of pleadings is to give the parties to the action fair notice of both
> claims and defenses and the grounds upon which they rest.  Seasons, Inc. v. Atwell,
> 86 N.M. 751, 527 P.2d 792 (1965).  Pleadings should be interpreted so as to do
> substantial justice.  Morrison v. Wyrsch, 93 N.M. 556, 603 P.2d 295 (1979).
> Reformation of an instrument is an extraordinary equitable remedy.  Lehrman v.
> Lehrman, 203 Or. 30, 278 P.2d 139 (1954).  The rules and policies of pleading are
> particularly applicable to bar grant of so drastic a remedy here.

97 N.M. at 43, 636 P.2d at 43.  Some courts not only require the pleading to mention reformation, but that the pleading set forth the reformation in a separate cause of action.  See Russell v. Reliance Ins. Co., 645 S.W.2d 166, 170 (Mo. App. 1982)("Where recovery is based upon a policy not issued, or upon language not used, fairness seems to demand that reformation be sought in a separate action or count.  It certainly is the better practice."  (citing Grossman Wrecking Co. v. Bituminous Cas. Corp., 518 S.W.2d 719 (Mo. App. 1974); Grossman Iron & Steel Co. v. Bituminous Cas. Corp., 558 S.W.2d 255 (Mo. App. 1977)).  R. Bhandari did not plead reformation as a cause of action in his SAC, or ask for reformation as a remedy, but in paragraph 18, he sets forth facts that might form the basis for reformation.  Some cases from other jurisdictions suggest that, because reformation is a remedy, the remedy is available despite a lack of a specific request in the pleadings.  See, e.g., LaSalle Bank, N.A. v. Reeves, 919 A.2d 738, 751 (Md. App. 2007)("For reformation to be granted, it is necessary under some authority that a specific request for equitable relief, or a plea for reformation be made, but under other authority the remedy is available despite the absence of a specific request in the pleadings." (citing 76 C.J.S. Reformation of Instruments § 77 (2006)); Bank One, N.A. v. Moore, No. 263919, 2006 WL 3335013, *5 (Mich. App. 2006)("Therefore, the trial court ordered plaintiff to include a request for reformation in its pleading.  In any event, an amendment was not strictly required since reformation is a remedy." (citing Holda v. Glick, 20

N.W.2d 248 (Mich. 1945)).[12]

The Court does not believe that R. Bhandari was required to plead reformation as a cause of action, because it is a remedy. While R. Bhandari pleads facts that set forth the elements for reformation, R. Bhandari does not mention reformation in his prayer for relief. See SAC at 23 (seeking only compensatory and punitive damages). The question is thus whether a person wanting reformation has to mention the word, somewhere in the body of the Complaint or in the prayer. After all, the Defendants must have been on notice sufficiently of this issue. If the Defendants were really concerned about this issue, they would have sent an interrogatory, or request for admission,

_____

[12] Reformation of a contract is an equitable remedy when there has been fraud or mistake. See In re Zante, Inc., No. 3:10-cv-00231-RCJ-RAM, 2010 WL 5477768, at *13(D. Nev. 2010)(stating that, under Nevada law, "[r]eformation of a contract is an appropriate equitable remedy in the case of fraud or mistake"); Rohm and Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., No. 10-CIV-10563-JLT, 2010 WL 5485824, at *7 (D. Mass. 2010)(stating that, under Massachusetts law, "[c]ontract reformation is an appropriate equitable remedy if fraud, mistake, accident, or illegality exists" (citation omitted)); Lunceford v. Houghtlin, 326 S.W.3d 53, 61 (Mo. App. 2010)("An action for the reformation of a written contract is an equity action."); Pacheco v. Martinez, 97 N.M. at 43, 636 P.2d at 314 ("Reformation of an instrument is an extraordinary equitable remedy."); 66 Am. Jur. 2d Reformation of Instruments § 1 ("'Reformation' is that remedy by means of which a written instrument is made or construed to express or conform to the real intention of the parties, when some error or mistake has been committed."). "Under the Erie [v. R. Co. v. Tompkins] doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996). The characterization of reformation as a remedy or a cause of action is one of state substantive law. See, e.g., Clark v. State Farm Mut. Auto. Ins. Co., 319 F.3d 1234 (10th Cir. 2003)(relying on Colorado law in stating that "reformation is an equitable remedy"); Amundsen v. Wright, 240 P.2d 16, (Okla. Civ. App. 2010)("Reformation is a remedy to 'conform a written contract to the parties' antecedent agreement' when the written contract 'differs from the antecedent expressions on which the parties based their agreement.'" (citation omitted)). Federal courts determine whether a complaint sufficiently pleads reformation, however, using federal law and the Federal Rules of Civil Procedure. See, e.g., Asbury Automotive Group LLC v. Chrysler Ins. Co., No. 01-3319, 2002 WL 15925, *2 (E.D. Pa. 2002)("Chrysler has moved to dismiss plaintiff's request for equitable reformation of the excess umbrella policy for failure to plead either fraud or mutual mistake with particularity as required under Federal Rule of Civil Procedure 9(b)."); Phillips Med. Capital, LLC v/ Med. Insights Diagnostics Ctr., Inc., 471 F. Supp. 2d 1035, 1041-42 (N.D. Cal. 2007)(using federal law regarding rule 12(b)(6) of the Federal Rules of Civil Procedure to determine whether the counter-claimants sufficiently alleged a claim for reformation).

or asked questions at 30(b)(6) deposition.[13]  Some courts may refuse to allow reformation if it is not mentioned in the pleading.  Cf., e.g., Logan v. Value City Dept. Stores, LLC, No. 4:08-CV-19 CAS, 2008 WL 1914168, at *3 (E.D. Mo. 2008)("Where a plaintiff fails to plead or pray for punitive damages, no award of such damages may be made."); Dental Health Assocs. v. Zangeneh, 825 N.Y.S.2d 505, 625 (N.Y. Sup. Ct. 2006)("The plaintiffs were not entitled to punitive damages, on the ground that punitive damages were not demanded in their pleadings."); Kneip v. UnitedBank-Victoria, 774 S.W.2d 757, 760 (Tex. App. 1989)("Before one is entitled to punitive damages, it is necessary to first allege, prove and secure jury findings on the existence and amount of actual damages." (citation omitted)).  R. Bhandari did not include reformation in his prayer for relief.  The Court is reluctant, however, to find that his SAC is not a sufficient basis upon which it may grant reformation.

The Court will allow R. Bhandari to seek reformation.  Even if, however, the Court were to decide that the SAC does not give fair notice that R. Bhandari is seeking reformation, the Court would be inclined to give him leave to amend the pleading to do so.  When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  See Fed. R. Civ. P. 15.  Rule 15(a)(2) provides that, after a responsive pleading has been filed: "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  When a scheduling order governs the pace of the case, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4)

---

[13] The Defendants asked several questions of R. Bhandari regarding his allegation of the missing paragraph in connection with questions regarding whether he read the Agreement.  See R. Bhandari Depo. at 74:24-76:6.

governs changes to the scheduling order.  See Bylin v. Billings, 568 F.3d 1224, 1230 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  The rule "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., No. Civ 02-1146, 2007 U.S. Dist. LEXIS 56492, at *3 (D.N.M. June 5, 2007)(Browning, J .).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Id.

The United States Court of Appeals for the Tenth Circuit has interpreted rule 16 as imposing a "good cause" standard to untimely motions to amend when a scheduling order governs the case. See Minter v. Prime Equipment Co., 451 F.3d 1196, 1205 n. 4 (10th Cir. 2006).  "This requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay."  Id.  The Tenth Circuit has not answered whether a motion to amend a complaint in a case governed by a rule 16 scheduling order must meet both the "good cause" standard of rule 16 and the 15(a)(2) amendment standard.  451 F.3d at 1205 n.4.  It recognized, however, that the standards are very similar, and the Defendants do not make any arguments in their response that go only to the "good cause" standard.  The Court will therefore analyze this motion primarily under the rule 15(a)(2), as the Tenth Circuit did in Minter v. Prime Equipment Co.  See 451 F.3d at 1205 n.4.

While a court should generally permit amendment when justice requires, denial of amendment is "justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993).  See Foman v. Davis, 371 U.S. 178, 182 (1962).  It is "well settled" in the Tenth Circuit "that untimeliness alone is a

sufficient reason to deny leave to amend, especially when the party filing the motion has no adequate explanation for the delay." Frank v. U.S. West, Inc., 3 F.3d at 1365-66 (internal citations omitted).  "[P]rejudice to the opposing party need not also be shown."  Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990).[14]  "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d at 1185 (quoting State Distributors, Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)).  Along the same vein, the Court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amended its complaint.

R. Bhandari has not offered a reason for his failure to seek amendment -- earlier or otherwise.  He apparently thought he did not need to seek amendment, because he had paragraph 18 or because it is a remedy.  At no time previously did he seek to amend his SAC to include reformation as a claim or to include reformation in his request for relief.  Again, he apparently did not think he needed to do so.  Moreover, the Defendants must have had some concern about R. Bhandari seeking reformation, because they filed this motion for summary judgment on the issue.

The discovery deadline passed on January 3, 2010.  See Order Modifying Scheduling Order, filed December 3, 2010 (Doc. 98).  The parties have already filed motions for summary judgment and motions in limine.  Discovery is closed.  The Pretrial Conference is set for March 30, 2011, and

---

[14] The Court notes that there is authority in the Tenth Circuit that seems to be to the contrary. See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir.1975)("Lateness does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that the distinction is between "delay" and "undue delay."  Minter v. Prime Equipment Co., 451 F.3d 1196, 1205-06 (10th Cir. 2006).  Delay is undue "when the party filing the motion has no adequate explanation for the delay."  Id. at 1206.

the trial, on a firm setting is set from May 23, 2011 to June 3, 2011.  While the Court might be reluctant to allow R. Bhandari to amend his pleadings if such amendment would mean reopening discovery, the Court is not convinced that more discovery is needed, or that amendment would prejudice the Defendants.  They had the opportunity to seek discovery regarding reformation, just as much as they had an opportunity to move for summary judgment.  The Defendants made a calculated decision to seek only a motion for summary judgment.  While the elements for reformation are different from the elements for breach of contract or misrepresentation under New Mexico law, the only thing that R. Bhandari needs to prove -- after he proves breach of contract or misrepresentation -- is that both parties have done what neither intended.

The Defendants have stated that they object to R. Bhandari's last-minute request to amend his pleadings following R. Bhandari's and Camp's depositions.  See Reply at 5 n.1. But they had paragraph 18 when they deposed R. Bhandari.  Indeed, the Defendants even asked R. Bhandari several questions in his deposition about the allegedly missing paragraph.  If they chose not to question Camp or thoroughly question R. Bhandari about that issue, that was their decision.

The Court will thus deny R. Bhandari's request to amend his SAC, because the Court finds that he has adequately plead reformation.  The Court also does not, however, believe amendment would prejudice the Defendants or that any amendment is necessary.

The Defendants argue that, even if R. Bhandari has plead reformation, there is no evidence to support a claim for reformation.  They argue that R. Bhandari did not read his Agreement prior to signing it, and cannot now ask the Court to reform the Agreement to include the missing term.

R. Bhandari argues that the parties agreed that the language was to be included in the Agreement and the Agreement was supposed to be substantively identical to that of C. Bhandari's agreement, which does contain this language.

"An instrument may be reformed if (1) there has been mutual mistake, or (2) a mistake by one party accompanied by fraud or other inequitable conduct by the other party."  Kimberly, Inc. v. Hays, 88 N.M. at 143-44, 537 P.2d at 1405-06 (citing Wright v. Brem, 81 N.M. 410, 467 P.2d 736 (1970); Morris v. Merchant, 77 N.M. 411, 423 P.2d 606 (1967)).  In his SAC, R. Bhandari alleges that the Defendants "inadvertently failed to place" the agreed upon provision in the Agreement. SAC ¶ 18, at 7.  R. Bhandari does not allege fraud or other inequitable conduct, instead relying on an inadvertent mistake.

"For a mistake to be mutual and common to both parties, it must appear that both parties have done what neither intended." Cargill v. Sherrod, 96 N.M. at 433, 631 P.2d at 728 (citing Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc., 84 N.M. 524, 505 P.2d 867).

As the Court of Appeals of New Mexico stated in Twin Forks Ranch, Inc. v. Brooks:

According to the Restatement (Second) of Contracts § 155 (1981) [hereinafter Restatement]:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Reformation is the remedy for errors in the written expression of an otherwise existing agreement. But, before a court may reform a writing,

> the proof must not only establish that the written agreement was not the agreement intended by the parties, but also what was the agreement contemplated by them at the time it was executed. . . . [P]laintiff 'must not only show clearly and beyond doubt that there has been a mistake, but he must also be able to show with equal clearness and certainty the exact and precise form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties.'

13 Samuel Williston, A Treatise on the Law of Contracts § 1548, at 124-25 (3d

ed.1970) (citations and footnotes omitted) [hereinafter Williston on Contracts ].

125 N.M. at 677-78, 964 P.2d at 841-42 (brackets in original).

"The terms of the intended agreement must be apparent at the time the parties entered into the contract." In re Crowder, 2008 WL 5157861, at *4 (citing State ex rel. State Highway and Transp. Dept. v. Garley, 111 N.M. at 387, 806 P.2d at 36 ("The comment makes it clear that 'the erroneous belief must relate to the facts as they exist at the time of the making of the contract." (quoting Restatement (Second) of Contracts § 151, cmt. a (1979))).

"Generally, a party who executes and enters into a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act of the contracting party." Smith v. Price's Creameries, Div. of Creamland Dairies, Inc., 98 N.M. 541, 545, 650 P.2d 825, 829 (1982)(citations omitted). "Each party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby." Smith v. Price's Creameries, Div. of Creamland Dairies, Inc., 98 N.M.at 545, 650 P.2d at 829 (citation omitted). Although R. Bhandari did not read his Agreement before signing it, he read C. Bhandari's agreement, whose contents were supposed to be substantively identical to his Agreement. See R. Bhandari Depo. at 80:8-81:8, 82:22-25; Camp Depo. at 44:5-14. In determining whether there was a mutual mistake, "[e]xtrinsic evidence is admissible to establish that [the agreement] did not express the true agreement of the parties." Twin Forks Ranch, Inc. v. Brooks, 120 N.M. at 835, 907 P.2d at 1016 (citing Mark V, Inc., v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235 (remaining citations omitted)). Camp testified that the R. Bhandari handled the negotiations of his Agreement and C. Bhandari's agreement, and that the two agreements should have been "substantively identical." Camp Depo. at 44:5-14. C. Bhandari's agreement contains the

provision that R. Bhandari alleges is missing in his Agreement. Although R. Bhandari's Agremeent contains the following terms, which are not present in C. Bhandari's agreement: (i) a $500.00 salary; (ii) a bonus provision regarding the clinic's profits; and (iii) an on-call schedule, see Physician Employment Agreement (Chitra Bhandari, M.D.), filed January 28, 2011 (Doc. 132-4), there is extrinsic evidence, in the form of Camp's testimony, that the parties intended to include the missing provision in R. Bhandari's Agreement. There is thus a genuine issue of fact whether there was a mutual mistake because "both parties have done what neither intended." Cargill v. Sherrod, 96 N.M. at 433, 631 P.2d at 728. The Court will thus deny the Defendants' request that it grant summary judgment on R. Bhandari's reformation claim.

## III. THE COURT WILL GRANT SUMMARY JUDGMENT ON R. BHANDARI'S REQUEST FOR DAMAGES UNDER SECTION 1.1 OF THE AGREEMENT.

The Defendants argue that R. Bhandari's request, under section 1.1 of the Agreement, for the value of 60% of the net profit that the clinic would have been expected to earn during the period remaining on his contract is improper as a matter of law, because there is no evidence that his clinic ever made a net profit during his employment, and there is no evidence that the clinic would have ever made a net profit. The Defendants argue that Court should thus grant summary judgment on this damages claim.

R. Bhandari argues that the Defendants' contention that he cannot recover a bonus because his practice did not show a profit in its first year is incorrect. R. Bhandari argues that New Mexico law allows recovery of expectation damages in a breach of contract case, as long as they are what the plaintiff could reasonably have expected to gain. R. Bhandari argues that it is undisputed that his business would undergo a start-up period before becoming profitable. R. Bhandari argues that Camp testified that $500,000.00 was a reasonable expectation, and thus he is entitled to seek

recovery of that amount.

Under New Mexico law, a plaintiff in a breach-of-contract action may recover damages which will restore the plaintiff "what was lost by [the defendant's] breach" and what the plaintiff "reasonably could have expected to gain." UJI 13-843 NMRA. The purpose of allowing damages for breach of contract is to restore to the injured party what was lost by the breach, and what he or she reasonably could have expected to gain had there not been a breach. See Allen v. Allen Title Co., 77 N.M. 796, 798, 427 P.2d 673, 675 (1967). Damages based on a "rough estimate" by a witness are insufficient to support a judgment. See Louis Lyster, Gen. Contractor v. Town of Las Vegas, 75 N.M. 427, 430, 405 P.2d 665, 667 (1965). Rather, damages must be of a kind and character susceptible of proof, and the amount of damages allowed must be subject to reasonable ascertainment and not based on speculation or guesswork. See Louis Lyster, Gen. Contractor v. Town of Las Vegas, 75 N.M. at 430, 405 P.2d at 668. "[R]ecovery for lost profits will be allowed as damages if causation is proved with reasonable certainty. . . . Even though the amount of damages need not be proven with mathematical certainty, neither can it be based on surmise, conjecture, or speculation." Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. 436, 446-47, 891 P.2d 1190, 1200-01 (1995).

There is not evidence in the record which sustains R. Bhandari's request for damages under section 1.1 of the Agreement. As the Court has found, Camp's deposition from a previous New Mexico state case is inadmissible hearsay. R. Bhandari's only remaining evidence regarding his damages under section 1.1 is Hess' testimony and his own testimony. Hess testified that, in forming his opinion regarding doctors' revenues, he made some assumptions, including an assumption that it generally takes approximately a year of ramp up time for a hospital to become profitable. R. Bhandari testified that he opened 218 patient files while working at AGH. An assumption that

-65-

hospitals generally become profitable after approximately a year is no more than a generalized rough estimate, and is not sufficient evidence that R. Bhandari's clinic would have become profitable, because the estimate does not relate to R. Bhandari's clinic. Furthermore, R. Bhandari's testimony regarding the number of patient files that he opened is not evidence that demonstrates his clinic would have become profitable. Indeed, the undisputed facts establish that R. Bhandari's orthopedic clinic never experienced a net profit during his tenure at AGH; in fact, the clinic lost money. Randall Decl. ¶ 8, at 2. Furthermore, there is evidence in the summary-judgment record that Randall testified that, in a period of approximately fifteen months, R. Bhandari performed approximately eighteen to nineteen surgeries, see Randall Depo. at 25:22-25, and that R. Bhandari testified that, in 2001 and in prior years, assuming that he was operating forty weeks a year, he could do anywhere from forty to two hundred and fifty cases a year, and "probably even a little bit more than that," R. Bhandari Depo. at 17:8-18. The available evidence suggests that R. Bhandari was not operating at full capacity for him, and he does not tell the Court how many surgeries it takes to be profitable. The term of the Agreement commenced on August 24, 2005. R. Bhandari was terminated on September 26, 2006. He had thus worked at AGH a little over a year at the time he was terminated. Thus, Hess' testimony that most hospitals take approximately a year to become profitable is not sufficient evidence that the clinic would have become profitable, because R. Bhandari had been working at AGH for over a year. Although R. Bhandari states that he opened 218 patient files, he does not provide information regarding how many patient files he would have had to open for the clinic to become profitable. Without a number as to how many files or surgeries are needed to be profitable, and where along that path after one year R. Bhandari was, Hess' testimony is not helpful. Until the Court knows how many files or surgeries it takes to be profitable, Hess' testimony is not helpful to determining if R. Bhandari was going to be profitable. In the end, Hess' testimony is a

part of the equation, but insufficient alone; it would leave the jury to speculate as to damages.  R. Bhandari's assertion that his clinic would have become profitable in a year is speculation, and there is not evidence upon which a fact-finder could reasonably find that his clinic would have become profitable, and what profits R. Bhandari would have earned.  See Chavez v. Aragon, 63 N.M. 46, 312 P.2d 805 (1957)(finding that the evidence was so unsatisfactory and deficient that it could not be the "basis of an award for future loss of profits" when the evidence was "insufficient to show [the plaintiff] had been operating at a profit"); Bevill Co., Inc. v. Sprint/United Mgmt. Co., 304 F. App'x 674, 679-80 (10th Cir. 2008)(stating that, under Colorado law, a start-up company may recover lost profits only if it can show lost profits with reasonable certainty); Edwards Family Ltd. P'shp v. Barlow, 915 F.2d 1564, at *9 (4th Cir. 1990)("Other cases support the proposition that there is no *per se* rule that start-up businesses cannot recover lost profits, if the fact that profits would have been earned, and their amount, can be proved with reasonable certainty." (citations omitted)). Moreover, even if the Court could get over the hump of lack of evidence for a reasonable jury to find likely profits, there is no evidence what these profits would be in the amount of damages.  The jury's award of a speculative amount would not be fairly grounded in the record before the Court.  Even if R. Bhandari has presented sufficient evidence from which a fact-finder could reasonably find that his clinic would have earned profits in the future, given the lack of any evidence about the amount of the profits, and given that Camp's deposition from the previous New Mexico state case is inadmissible hearsay, R. Bhandari has not directed the Court's attention to evidence from which a fact-finder could reasonably ascertain the amount of damages R. Bhandari suffered.  The Court will therefore grant summary judgment on R. Bhandari's request for damages under section 1.1 of the Agreement.

IV.    **THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON R. BHANDARI'S BREACH-OF-IMPLIED-COVENANT-OF-GOOD-FAITH-AND-FAIR-DEALING CLAIM.**

The Defendants argue that the Court should dismiss R. Bhandari's claim for breach of the implied covenant of good faith and fair dealing.  They argue that, under New Mexico law, tort remedies are not available for breach of the implied covenant in a written contract; only contract damages are available and that R. Bhandari cannot use this claim to broaden the terms of the Agreement.

R. Bhandari argues that the record supports his claim.  He argues that New Mexico law establishes the availability of recovery under the implied covenant in an employment contract.  He argues that he asserts the implied covenant as a contract claim, not a tort claim.  He asserts that his allegations that the Defendants breached the implied covenant by failing to give written notice or complying with due-process concepts of honesty and fairness are squarely rooted in the Agreement, which guarantees due process and notice.

R. Bhandari asserts that his breach-of-implied-covenant is a contract claim.  He is the master of his Complaint, and the Court will thus treat his claim as a contract claim.  R. Bhandari has limited his claim under the covenant of good faith and fair dealing to the Defendants' "failure to provide due process."  Response at 1 n.1.  The Court will therefore address only whether R. Bhandari's implied-covenant-of-good-faith-and-fair-deal claim, based on the Defendants' alleged failure to provide due process, will survive summary judgment.

"New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.3d at 1203 (citations omitted). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and

intentionally used the contract to the detriment of the other party."  Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.2d at 1203.  "Broadly stated, the covenant [of good faith and fair dealing] requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 111 N.M. at 60, 801 P.2d at 642 (internal quotation marks omitted).  "The implied covenant of good faith and fair dealing 'requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract.'"  Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.2d at 1203 (quoting Bourgeous v. Horizon Healthcare Corp., 117 N.M. at 438, 872 P.2d at 856).  "The implied covenant is aimed at making effective the agreement's promises. Thus, it is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party." Azar v. Prudential Ins. Co. of Am., 133 N.M. 669, 685, 68 P.3d 909, 925 (Ct. App. 2003).  "Courts have recognized that 'evasion of the spirit of the bargain . . . and interference with or failure to cooperate in the other party's performance' constitute bad faith and may 'violate the obligation of good faith in performance.'"  Sanders v. FedEx Ground Package Sys., Inc., 144 N.M. at 452, 188 P.2d at 1203 (quoting Restatement (Second) of Contracts § 205 cmt. d (1981)).

The Court has found that a jury must determine the meaning of the provision in the Agreement regarding due-process procedures -- whether it relates solely to AGH's existing written policies and bylaws, or whether it relates to a general requirement of notice and a meaningful opportunity to cure.  The Defendants did not give R. Bhandari notice and an opportunity to cure before his termination.  If a jury finds that the due-process procedures provision provided R. Bhandari with notice and a meaningful opportunity to cure, there is evidence that the Defendants denied R. Bhandari of the benefits of the Agreement, because they did not give him notice and an

opportunity to cure his alleged problems before they terminated him. The Court will therefore deny the Defendants' request that it grant summary judgment on R. Bhandari's implied-covenant-of-good-faith-and-fair-dealing claim.

**V.    THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON R. BHANDARI'S NEGLIGENT MISREPRESENTATION CLAIM, WHICH IS BASED UPON CAMP'S REPRESENTATIONS REGARDING DUE-PROCESS PROCEDURES OR THE REPRESENTATION REGARDING COMPETITION IN THE CARSON KOLB BROCHURE, BUT WILL GRANT SUMMARY JUDGMENT ON THE OTHER BASES OF R. BHANDARI'S MISREPRESENTATION CLAIM.**

The Defendants argue that the Court should dismiss R. Bhandari's claim for fraudulent and/or negligent misrepresentation. They assert that his claim is inconsistent with his breach-of-contract claim. They argue that the election-of-remedies doctrine is applicable. They contend that, even apart from this fundamental flaw, R. Bhandari cannot meet his summary-judgment burden of establishing actionable misrepresentation by the Defendants. They argue that, because the Agreement contains an integration clause, the representations are subjects that are already, or could have been, included in the agreement, and that R. Bhandari cannot bring a fraud claim instead of what should have been a breach-of-contract claim. They argue that R. Bhandari cannot, as a matter of law, demonstrate that he has evidence on all of the elements of a fraudulent or negligent-misrepresentation claim.

R. Bhandari argues that his fraud claims do not duplicate his contract claim. He states that, if the Defendants are correct that the Agreement did not require any due process, then they are guilty of fraud, because they represented that there would be due process, when they knew there would not be. He argues that the election-of-remedies doctrine is not applicable, because it only applies where the plaintiff seeks two, mutually exclusive, remedies for his or her claims, and in this case he does not seek rescission. He also argues that the integration clause does not preclude his

-70-

misrepresentation claim, because, under New Mexico law, a court cannot preclude one from seeking redress by a provision inserted in the contract by a party perpetrating a fraud, which is designed to "shut the mouth of the adverse party as to such fraudulent representations which led to the making of the contract." Response at 15 (citation omitted). R. Bhandari also argues that he reasonably relied on the misrepresentations, that the statements were not true, that he properly relied on the persons making representations, and that the record shows the Defendants' mens rea.

The Court will not grant summary judgment on R. Bhandari's misrepresentation claim on the basis of the doctrine of election of remedies. "In a diversity case, the doctrine of election of remedies is an element of state substantive law which we are bound to apply." McKinney v. Gannett Co., Inc., 817 F.2d 659, 671 (10th Cir. 1987)(citation omitted). New Mexico adheres to the election-of-remedies doctrine. See Three Rivers Land Co. v. Maddoux, 98 N.M. 690, 693, 652 P.2d 240, 243 (1982), overruled on other grounds by Universal Life Church v. Coxon, 105 N.M. 57, 728 P.2d 467 (1986). In Three Rivers Land Co. v. Maddoux, the Supreme Court of New Mexico explained the doctrine of election of remedies:

> [W]here two inconsistent or alternative rights or claims are presented to the choice of a party, by a person who manifests the clear intention that he should not enjoy both, then he must accept or reject one or the other; and so, in other words, that one cannot take a benefit under an instrument and then repudiate it.

98 N.M. at 693, 652 P.2d at 243 (quoting Peters v. Bain, 133 U.S. 670, 695 (1890))(internal quotation marks omitted). For example, it is "plainly inconsistent to permit a party seeking avoidance of a contract on grounds of fraud to retain the consideration received for entering into that contract which would have the effect of affirming that agreement." Branch v. Chamisa Development Corp. Ltd., 147 N.M. 397, 402, 223 P.3d 942, 947 (Ct. App. 2009). In Franciscan Hotel Co. v. Albuquerque Hotel Co., 24 P.2d 718 (N.M. 1933), the Supreme Court of New Mexico

stated that it "is generally held that the bringing of an action at law upon a contract, which action

does not proceed to a final determination on the merits, is no bar to a subsequent suit to reform the

contract and recover upon the contract as reformed."  24 P.2d at 719.  The Supreme Court stated:

> In Hillerich v. Franklin Ins. Co., 111 Ky. 255, 63 S.W. 592, 593, it was said: "The
> question, and the sole question is, whether the mere assertion of a claim upon the
> ground that it is covered and included in a contract as written is so inconsistent with
> a claim that the contract be so reformed as to include and cover such relief as to
> make it a conclusive election of the remedy, and bar the plaintiff of any right to seek
> relief upon the ground of mistake in the drawing of the written contract.  We think
> the weight of authority is against the conclusiveness of the election." See also,
> Segerstrom v. Holland Piano Mf'g. Co., 155 Minn. 50, 192 N. W. 191; Silber v.
> Gale, 38 Ohio App. 248, 175 N. E. 886; Spurr v. Home Insurance Co., 40 Minn. 424,
> 42 N. W. 206; Taylor v. Glens Falls Insurance Co., 44 Fla. 273, 32 So. 887; note, 49
> A. L. R. 1514, and cases therein cited.
>
> We see no reason, in principle or of policy, for giving greater finality to plaintiff's
> involuntary election to proceed upon the contract as written than is ordinarily given
> to the bringing in the first instance of an action upon a contract as written.
>
> Our Code (Comp. St. 1929, § 105-406) permits the joinder of several causes of
> action in a complaint, both legal and equitable.  Porter v. Alamocitos Land &
> Livestock Co., 32 N. M. 344, 256 P. 179.  And, under our practice, when a plaintiff
> is in doubt as to his relief, he has the right to set forth his claim in several counts so
> as to meet the facts which are established on the trial.  Ross v. Carr, 15 N. M. 17, 103
> P. 307.  In the case at bar, plaintiff could not be certain, in advance of trial, just what
> form the proof would take, and therefore what was the proper theory of relief.  On
> the theory that the contract as written was not clear and unambiguous on its face, and
> that extrinsic evidence was admissible to explain the ambiguity, the court might, in
> the light of such extrinsic evidence, construe the written contract as plaintiff
> contends the actual agreement of the parties to have been.  But, if the contract as
> written should, in the opinion of the court, be unambiguous and incapable of such
> construction, and if the proof should demonstrate that a mutual mistake had been
> made in reducing the actual agreement of the parties to writing, plaintiff's remedy
> would be reformation of the written contract under which an accounting was sought.
> The two counts were properly joined, and plaintiff should not have been required to
> elect, in advance of trial, upon which count it would proceed.

24 P.2d at 720-21.  The premise of R. Bhandari's misrepresentation claims is that, if the Defendants'

interpretation of the due-process procedures provision is correct, he should be able to recover on his

misrepresentation claims, because the Defendants led him to believe that he would be accorded due

process before termination.  R. Bhandari's breach-of-contract claim and misrepresentation claim are

thus not plainly inconsistent; rather, R. Bhandari seeks to assert his misrepresentation claim in the

event that the relevant portion of his breach-of-contract claim fails.  Because these two claims are

not plainly inconsistent, the Court will not grant summary judgment on R. Bhandari's

misrepresentation claim on this basis.

      The Agreement's integration clause does not preclude R. Bhandari's misrepresentation

claim.  In <u>Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.</u>, the Supreme Court of New Mexico

stated:

> Where one party to the contract has perpetrated a fraud upon the other, by means of
> which the latter was induced to enter into the contract, [one] cannot be precluded
> from seeking redress by a provision inserted in the contract by the party perpetrating
> the fraud, designed to shut the mouth of the adverse party as to such fraudulent
> representations which led up to the making of the contract.  And this is true, whether
> the action be for rescission of the contract or for damages for deceit.

113 N.M. at 11-12, 820 P.2d at 1325-26 (citation omitted)(alteration in original).  In <u>Mountain

Highlands, LLC v. Hendricks</u>, No. CIV 08-0239 JB/ACT 2009 WL 1300750, at *8 (D.N.M. Feb. 13,

2009)(Browning, J.), this Court quoted <u>Gold Cone Concepts, Inc. v. Villa Linda Mall</u>, and stated

that, "[w]hile the Purchase Agreement contains an 'as is' clause purporting to disclaim any

warranties or representations, as well as an integration clause, these clauses will not cut off

Mountain Highlands' claim if it is able to prove that the Defendants perpetrated a fraud on Mountain

Highlands."  2009 WL 1300750, at *8.  Because, under New Mexico law, an integration claim will

not cut off a party's fraud claim,[15] the Court will not grant summary judgment on R. Bhandari's

---

[15] An integration clause may, however, cut off some breach-of-contract claims or claims for
violation of the covenant of good faith and fair dealing.  <u>See, e.g.</u>, <u>Brooks v. Timberline Tours, Inc.</u>,
127 F.3d 1273, 1275-76 (10th Cir. 1997)(interpreting Colorado law)(" Plaintiffs' breach of contract
argument does not provide them with relief because an integration clause in the written exculpatory
agreement prevents them from presenting extrinsic evidence to prove the existence of their alleged

misrepresentation claims based on the Agreement's integration clause.

      To prove fraud, a party must demonstrate evidence of an untrue statement, while to prove negligent misrepresentation, a party may demonstrate evidence that the statement was literally true but misleading.  See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735.  The Defendants argue that R. Bhandari has set forth no evidence that the representations were false.  In his Response, the only evidence to which R. Bhandari directs the Court's attention regarding whether the representations that the Defendants made were untrue or misleading is evidence that, although the Carson Kolb brochure stated that there was no local orthopedic surgeon competition, surgeons from Roswell took cases from Artesia to a private surgical center in Roswell. See R. Bhandari at 56:13-24.  There is thus some evidence that the representation that there was no local orthopedic surgeon competition was untrue or misleading.  It is not the Court's responsibility to scour the record for evidence to defeat the Defendants' Motion.  See Hauff v. Petterson, No. 1:09-cv00639, 2010 WL 2978060, at *9 (D.N.M. July 22, 2010)(Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.'" (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)).  The Court is aware, however, that there is evidence that R. Bhandari understood, through his negotiations with Camp, that the Agreement would provide due process in the form of notice and an opportunity to cure, and that the Defendants did not provide notice and an opportunity to cure; there is thus evidence that Camp's representations regarding due process were misleading or untrue.  Because R. Bhandari has not, however, directed the Court's attention to evidence in the record that the other alleged misrepresentations were untrue or misleading, the Court will dismiss R. Bhandari's fraudulent

---

prior agreements." (citation omitted)); DeGeer v. Gillis, 707 F. Supp. 2d 784, 791-92 (N.D. Ill. 2010)(discussing whether an integration clause barred the plaintiff's breach-of-contract claim).

and/or negligent misrepresentation claims based on those alleged representations.  See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 560, 953 P.2d at 733 (agreeing with the trial court that the defendant's advertising and promotional materials were not false or misleading when the plaintiff presented no evidence that the representations were false or misleading).

The Defendants argue that the Court should grant summary judgment on R. Bhandari's fraudulent/negligent misrepresentation claim, because R. Bhandari cannot prove the requisite intent or negligent "state of mind."[16]  Motion at 20.  To prove fraudulent misrepresentation, R. Bhandari must prove that the Defendants made the representation with the intent to deceive and to induce him to rely on the representation.  See UJI 13-1633 NMRA; Schmitz v. Smentowski, 109 N.M. 386, 399, 785 P.2d 726, 739 (1990)("A fundamental element of fraud is a misrepresentation of fact, made with the intent to deceive a third party and to induce his reliance.").   To prove negligent misrepresentation, R. Bhandari must prove "an intent that the plaintiff receive and be influenced by the statement where it is reasonably foreseeable that the plaintiff would be harmed if the information conveyed was incorrect or misleading."  Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735 (citations omitted).  The intent for the two causes of action are very different. Intent for fraud must be specific; for negligent misrepresentation, the plaintiff must only plead and

---

[16] This Court has stated:

> Despite the lack of any controlling cases on the issue, the Tenth Circuit has held, albeit in a different context, that "negligence is conduct, and not a state of mind." United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005)(quoting W. Keeton, Prosser and Keeton on Torts § 31 (5th ed.1984)). United States v. Ortiz dealt with negligence under the Clean Water Act, and the Tenth Circuit found no reason to depart from the ordinary meaning of negligence, which did not involve a state of mind element. See id. at 1282-83.

Lane v. Page, 581 F. Supp. 2d 1094, 1109 (D.N.M. 2008)(Browning, J.).

prove that the defendant intended the plaintiff to receive and rely on the representation.

"[T]he question of fraudulent intent is almost uniformly submitted to a jury . . . ." Perea v. Colorado Nat. Bank of Texas, 27 P. 322, 325 (N.M. 1891). In Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc., 84 N.M. 524, 505 P.2d 867 (Ct. App. 1972), the Court of Appeals of New Mexico found that the question of the defendant's fraud was a question for the jury, reversing the grant of summary judgment:

> There [wa]s evidence that Culver told Hensley, in May, 1969, that he would "* * * personally see that I got my money * * *." Culver made the written guarantee in June, 1969. There is evidence that the intent of the written guarantee was that Culver would cause Ruidoso to enter the written contract with Sierra when Culver assumed an executive position with Ruidoso. There is evidence that at the closing of the stock transaction Culver promised that Ruidoso would ratify the employment contract. There is evidence that the contract was neither entered nor ratified by Ruidoso. This is evidence of false representations by Culver even though it is, in part, also evidence of Culver's breach of contract.
>
> Culver asserts there is no evidence that he did not intend to abide by his written guarantee at the time he made it. Indirectly, he also asserts an insufficiency of the evidence as to his intent at the time of his alleged oral promise of ratification. Attempting to show an absence of fraudulent intent, Culver relies on his explanation that he did not attempt to have Ruidoso ratify the employment contract because of the alleged condition precedent in that contract. See Point A(1)(f). He also relies on his '* * * apprehension about securing a racing license for the coming season * * *' and delay on the part of Hensley and Frances in bringing the employment contract 'out into the open.'
>
> While the foregoing is evidence material to the question of Culver's intent, it is not all the evidence. There is evidence that the employment contract was an integral part of the stock sale; that Culver made assurances in connection with that contract; that those assurances have not been carried out; and that Culver made no attempt to have the assurances carried out. Culver testified that he did not disclose the contract to his business associates -- Hubbard and Mosier -- and denied the employment agreement was discussed at the closing of the stock sale. Culver admits his presence at the May, 1969 meeting (see Point A(2)), but denies the employment contract was even mentioned at that meeting. The evidence referred to in this paragraph raised a factual issue as to Culver's intent. Telman v. Galles, 41 N.M. 56, 63 P.2d 1049 (1936).
>
> In our opinion, the evidence referred to above is substantial on the questions

of false representations, intent and reliance and could be found by the jury to be clear
and convincing. Culver's fraud was properly a question for the jury.

84 N.M. at 537-38, 505 P.2d 880-81.  As in Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.,

where there was an issue of fact regarding intent when there was evidence that the employment

contract was an integral part of the stock sale, that the defendant made assurances in connection with

that contract, that those assurances have not been carried out, and that the defendant made no

attempt to have the assurances carried out, in this case there is evidence that a key part of R.

Bhandari's decision to work for the Defendants was the promise that his contract was not subject

to summary termination, that the Agreement was terminable but subject to due-process procedures,

that he specifically negotiated for language requiring thirty days' notice before termination for

material breach and to remove the Defendants' right to terminate on a good-faith determination, and

that he did not receive notice and an opportunity to cure before his termination.  See Bhandari Depo.

at 12:23-13:3, 119:11-4; Agreement at 5; Electronic Mail Transmission from Chip Camp to Ramdas

Bhandari (dated January 7, 2005), filed January 24, 2011 (Doc. 129-13); Electronic Mail

Transmission from Ramdas Bhandari to Chip Camp (dated December 30, 2004), filed January 24,

2011 (Doc. 129-13); R. Bhandari Aff. ¶ 2, at 1).  There is thus sufficient evidence to create a genuine

issue of intent for fraudulent misrepresentation.

There is also sufficient evidence to create a genuine issue of intent for negligent

misrepresentation.  See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d

at 736 ("[F]raudulent misrepresentation requires an intent to deceive, while negligent

misrepresentation only requires an intent that the plaintiff receive and be influenced by the statement

where it is reasonably foreseeable that the plaintiff would be harmed if the information conveyed

was incorrect or misleading." (citations omitted)).  There is evidence that the Defendants wanted

R. Bhandari to receive and rely on the information.  See Bhandari Depo. at 12:23-13:3, 119:11-4; Agreement at 5; Electronic Mail Transmission from Chip Camp to R. Bhandari (dated January 7, 2005), filed January 24, 2011 (Doc. 129-13); Electronic Mail Transmission from R. Bhandari to Chip Camp (dated December 30, 2004), filed January 24, 2011 (Doc. 129-13); R. Bhandari Aff. ¶ 2, at 1).  R. Bhandari has thus shown a genuine issue of fact regarding the requisite intent for his fraudulent and/or negligent-misrepresentation claim based upon the representations regarding due process.

There is not sufficient evidence to create an issue of fact for fraudulent misrepresentation regarding the Carson Kolb brochure, but there is sufficient evidence to create an issue of fact for negligent misrepresentation.  To prove fraudulent misrepresentation, R. Bhandari must prove that the Defendants made the representation with the intent to deceive and to induce him to rely on the representation.  See UJI 13-1633 NMRA; Schmitz v. Smentowski, 109 N.M. at 399, 785 P.2d at 739. R. Bhandari has not directed the Court's attention to any evidence that the Defendants made this representation with the intent to deceive and to induce him to rely on the representation.  Unlike Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc., where there was an issue of fact regarding intent when there was evidence that the employment contract was an integral part of the stock sale, that the defendant made assurances in connection with that contract, that those assurances had not been carried out, and that the defendant made no attempt to have the assurances carried out, in this case, there is no evidence that this representation was an integral part of R. Bhandari's decision to work for the Defendants, or that these assurances were made in connection with the negotiation of the Agreement or with R. Bhandari's decision to work for the Defendants.  To prove negligent misrepresentation, R. Bhandari must prove "an intent that the plaintiff receive and be influenced by the statement where it is reasonably foreseeable that the plaintiff would be harmed if the information

conveyed was incorrect or misleading." Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735 (citations omitted). Although the parties have not made it clear to the Court exactly how R. Bhandari received the Carson Kolb brochure, the brochure indicates that Carson Kolb prepared and presented the brochure for AGH. See Carson Kolb Brochure at 1. In making a brochure in which they sought to recruit physicians, it is reasonable to infer that AGH intended the statements in the brochure would influence the people who received the brochure such that the people would consider working at AGH. R. Bhandari received the brochure. A fact-finder could thus reasonably infer that AGH intended that R. Bhandari receive the representations and that the representations would influence him. R. Bhandari has thus shown a genuine issue of fact regarding the requisite intent for his negligent-misrepresentation claim based upon the representations regarding local orthopedic competition in the Carson Kolb brochure.

Fraudulent misrepresentation requires the defendant to make the statement recklessly or with knowledge that it is false, while negligent misrepresentation only requires a failure to exercise ordinary care in obtaining or communicating the statement. See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. at 562, 953 P.2d at 735 (citations omitted). The Defendants allege that there is not an issue of fact whether the alleged statements were made. In response, R. Bhandari states that, "while Defendants questioned . . . R. Bhandari about the due process misrepresentations during the course of his deposition, they never asked him for the source of those misrepresentations." Response at 17. To assert fraudulent or negligent misrepresentation, R. Bhandari must attribute the representations to the Defendants, by setting forth evidence that the person making the representation had apparent or actual authority to make the representations on the Defendants' behalf. See Tabet v. Campbell, 101 N.M. 334, 337, 681 P.2d 111, 1114 (1984). Cf. Bird v. State Farm Mut. Auto. Ins. Co., 142 N.M. 346, 357, 165 P.3d 343, 354 (Ct. App.

-79-

2007)(discussing a case in which the "plaintiff argued that the judgment was based on tortious conduct because it was based on negligent misrepresentations made by the defendant's agent"). Because R. Bhandari has produced no evidence regarding who made representations relating to due process other than Camp, and there is thus no evidence that the persons making these representations had actual or apparent authority to make these representations on behalf of the Defendants, the Court finds that R. Bhandari has not demonstrated a genuine issue of fact to proceed with his fraudulent or negligent misrepresentation claim based on representations about due process from phantom persons; he may proceed, however, with his claim based on Camp's representations, because there is evidence in the record that Camp made statements regarding due process and that Camp was the Defendants' agent.  See, e.g., Camp Depo. at 34:12-23; Response ¶ 9, at 7 (setting forth this fact); Reply at 2-4 (not controverting this fact).

The Defendants allege that R. Bhandari has admitted that Camp did not engage in any fraudulent behavior.[17]  R. Bhandari responds that the Defendants' assertion ignores that the claim sounds in negligence as well and that it is fraud for the Defendants to have "Mr. Camp make representations he believed, but which Defendants did not intend to honor."  Response at 18.  R. Bhandari has not directed the Court's attention to evidence that Camp knew that his representations were false or knew of the risk that the representations might be false.  See Bonnieview Homeowners Ass'n v. Woodmont Builders, LLC, 655 F. Supp. 2d 473, 516 (D.N.J. 2009)(stating that there were no allegations that the agent knew or believed the falsity of his representation, thus the plaintiffs did

---

[17] The Defendants cite to R. Bhandari's deposition in support of this assertion, but do not provide the portion of R. Bhandari's deposition to which they cite.  R. Bhandari, however, does not dispute that he testified that Camp was honest.  See R. Bhandari Depo. at 84:19-24 ("I did not seek legal assistance because I felt that we had a good agreement, and I felt that Chip Camp was -- and I still think that he's a trustworthy, honest person . . . .").

not state a claim against the principal); Lay v. Horizon/CMS Healthcare Corp., 60 F. Supp. 2d 1234, 1240 (D. Kan. 1999)(finding that the plaintiff offered no evidence that the statement by the employer's agent to the plaintiff was made with knowledge of falsity or reckless disregard of falsity, and granting summary judgment on the plaintiff's fraud claim).  Although R. Bhandari argues that it is fraud for the Defendants to have Camp make representations he believed but which the Defendants did not honor, R. Bhandari has not directed the Court's attention to, and the Court has not found, law supporting this proposition.  Furthermore, R. Bhandari has not directed the Court's attention to any evidence supporting this assertion.  The Defendants as a corporation could act only through their agents.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 708 F. Supp. 2d 1272, 1280 (D.N.M. 2010)(Browning, J.)("A corporation can act only through its officers, employees, and agents . . . .").  Here the Defendants' agent -- Camp -- appears to have acted indisputably honestly.  R. Bhandari thus has not presented evidence of this element of fraudulent misrepresentation.  Because there is no evidence that the Defendants made the representation recklessly or with knowledge that it was false, the Court will grant summary judgment on R. Bhandari's fraudulent misrepresentation claim based on Camp's representations regarding due process as a matter of law.

There is evidence, however, that R. Bhandari believed that he would receive notice and an opportunity to cure before termination, based on his conversations with Camp, that the Defendants interpreted the provision in another manner, based on their procedural documents, and that they did not provide R. Bhandari with copies of these documents until he began employment.  See Motion ¶ 6, at 3 (stating that AGH provided R. Bhandari with the Medical Staff Bylaws and Fair Hearing Plan, and citing to a November 11, 2005 letter containing selected portions of the Bylaws and Fair Hearing Plan); Response ¶ 10, at 7-8 (setting forth this fact); Reply at 2-4 (not controverting this

fact). There is evidence that Camp's and the Defendants' interpretation or understanding of the Agreement's provision differed. There is thus evidence that the Defendants did not exercise ordinary care in communicating the meaning of due process to R. Bhandari.

There is evidence that the Defendants failed to exercise ordinary care in obtaining or communicating the statement regarding local competition in the Carson Kolb brochure. Although they represented that the nearest competition was over forty miles away and that there was virtually no competition for orthopedic surgeons, R. Bhandari testified that there were several competing orthopedic surgeons in Artesia. See R. Bhandari Depo. at 56:18-57:4. Although R. Bhandari has presented no evidence that the Defendants knew that their representation was false or that they recklessly disregarded the risk that it was false, it is reasonable to infer that their representation indicates a failure to exercise ordinary care in obtaining the information underlying the representation or in communicating the representation.

The Defendants argue that R. Bhandari could not have reasonably relied on the misrepresentation in the Carson Kolb brochure, because it was a mass advertisement and R. Bhandari did not verify the representations in his visits to AGH. The Court declines to find, as a matter of law, that R. Bhandari could not have reasonably relied on the brochure, because it was a mass advertisement. The brochure contained factual representations and not mere puffery. See, e.g., Stickrath v. Globalstar, Inc., 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007)("Advertisements that amount to 'mere' puffery are not actionable because no reasonable consumer relies on puffery." (citation omitted)); Toro Co. v. Textron, Inc., 499 F. Supp. 241, 253 n.23 (D. Del. 1980)("An advertisement characterized as puffing is one that is not deceptive for no one would rely on its exaggerated claims." (citation omitted)). "The reasonableness or unreasonableness of anything is ordinarily a mixed question of law and fact which should be determined by a jury." W. States

Mechanical Contractors, Inc. v. Sandia Corp., 110 N.M. 676, 680, 798 P.2d 1062, 1066 (Ct. App. 1990)(citation omitted).  Furthermore, R. Bhandari did not have a duty to investigate and verify the representations, because there is no evidence that he had "knowledge of his own or of facts which should arouse suspicion and cast doubt upon the truth of the statement made." Mountain Highlands, LLC v. Hendricks, 2009 WL 2432678, at *9 (citation omitted).  Although the Court is not aware of evidence in the record that R. Bhandari relied on the representation regarding local competition in making his decision to move to Artesia and work at AGH, the Defendants did not move for summary judgment on the grounds that R. Bhandari has no evidence that he relied on this representation.  The Defendants moved only on the grounds that R. Bhandari could not have reasonably relied on this representation, because it was a mass advertisement, and because R. Bhandari had a duty to investigate yet did not verify the representation during his visit to AGH. These call for legal conclusions rather than the factual questions of actual reliance.  Because the Defendants did not move for summary judgment on the grounds that R. Bhandari had no evidence that he relied on this representation, see Celotex Corp. v. Catrett, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted); Reed v. Bennett, 312 F.3d 1190, 1194-95 (10th Cir. 2002), R. Bhandari was not on notice that he must point to evidence in the record disputing the Defendants' argument, see Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241 (stating that the party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.").  While the Court is concerned about the absence of evidence in the record, the Court is also

reluctant to grant summary judgment sua sponte on an issue not briefed and which R. Bhandari may have thought no evidence was needed, because the Defendants did not seek summary judgment on factual reliance.  Because the Defendants did not move for summary judgment on this ground, and because R. Bhandari was not aware that he should direct the Court's attention to evidence in the record regarding his reliance on this representation, or that he should put evidence in the record -- such as an affidavit -- indicating that he relied on this representation, the Court will not sua sponte grant summary judgment on R. Bhandari's misrepresentation claim, based on the representation regarding local competition in the Carson Kolb brochure, on this ground.

Assuming that the due-process procedures provision does not afford R. Bhandari with notice and an opportunity to cure, there is evidence that Camp's representations were untrue or misleading. There is evidence of intent to induce reliance, and there is evidence that the Defendants did not exercise ordinary care in communicating the representation to R. Bhandari.  There is also evidence that R. Bhandari relied on the representations regarding due process in deciding to enter into the Agreement, and that he suffered harm when he was terminated without notice and an opportunity to cure.  There is also evidence that the Defendants' representation regarding local competition was untrue or misleading, that the Defendants intended R. Bhandari to receive the representation and rely on it.  Although the Court is not aware of evidence in the record that R. Bhandari relied on the representation regarding local competition in making his decision to relocate to Artesia, and that he suffered harm when there were competing surgeons in Artesia, the Defendants did not move for summary judgment on these grounds, and the Court will not sua sponte grant summary judgment when R. Bhandari was not on notice that he should produce evidence regarding these elements.  The Court therefore will not grant summary judgment on R. Bhandari's negligent misrepresentation claim which is based upon Camp's representations regarding due process or which is based on the

representation regarding local competition in the Carson Kolb brochure.

## VI.   THE COURT WILL GRANT SUMMARY JUDGMENT ON R. BHANDARI'S CONSTRUCTIVE-FRAUD CLAIM.

The Defendants allege that the Court should dismiss R. Bhandari's constructive-fraud claim. They argue that R. Bhandari's constructive-fraud claim is a disguised fraud claim and that the Court should dismiss his claim for the reasons they gave in their arguments regarding his fraud claim.  The Defendants also argue that R. Bhandari failed to identify a legal or equitable duty that would give rise to a claim for constructive fraud, and that he has failed to raise an issue of material fact showing a breach of any legal or equitable duty.

R. Bhandari alleges that the Defendants engaged in constructive fraud when they breached their duty to disclose.  R. Bhandari alleges that the Defendants were in a better vantage to obtain information regarding their understanding of the due-process procedures provision and were under a duty to disclose this information.  He further alleges that, regarding the Defendants' other failures to disclose, they made representations as to their business' condition and its prospects when they knew facts that showed the representations were false.

Although R. Bhandari relies on the same facts for his misrepresentation claims and his constructive-fraud claim, the law regarding constructive fraud is different than the law regarding fraudulent or negligent misrepresentation; the Court must therefore separately address R. Bhandari's claim for constructive fraud.

Constructive fraud is a breach of a legal or equitable duty which the law declares to be fraudulent because of its tendency to deceive others; it is not necessary to prove actual dishonesty of purpose nor intent to deceive to prove constructive fraud.  See Snell v. Cornehl, 81 N.M. at 249, 466 P.2d at 95; Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 13, 820 P.2d at

1327 (citations omitted).  "A finding of constructive fraud need not be based upon a fiduciary relationship between the parties, as constructive fraud is defined as 'acts contrary to public policy, to sound morals, to the provisions of a statute, etc., however honest the intention with which they may have been performed.'"  Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 13, 820 P.2d at 1327 (citations omitted).  "An action for constructive fraud is maintainable where there is a nondisclosure of material facts and the person charged with the constructive fraud had a duty to speak under existing circumstances."  Barber's Super Markets, Inc. v. Stryker, 84 N.M. at 186, 500 P.2d at 1309.  "Whether a duty exists is generally a question of law for the trial court to decide."  Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 12, 820 P.2d at 1326 (citation omitted).  Superior knowledge will give rise to a duty to disclose.  See Mountain Highlands, LLC v. Hendricks, 2009 WL 1300750, at *5 ("[S]uperior knowledge will give rise to a duty to disclose . . . .").  Superior knowledge can be knowledge peculiarly within the awareness of a party.  See Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 113 N.M. at 12-13, 820 P.2d at 1326-27.  In Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., an ice cream store, Golden Cone, was negotiating with a mall to lease space.  The mall did not disclose complaints it had received from other food vendors in the mall about low traffic.  The Supreme Court of New Mexico held that the "traffic flow information was peculiarly within the Mall's knowledge," obligating it to disclose the information to Golden Cone.  113 N.M. at 13, 820 P.2d at 1327.

R. Bhandari argues that the Defendants committed constructive fraud because they breached their duty to disclose.  Although the Defendants' interpretation of the due-process procedures provision is based upon their policies, there is no evidence that they had previously faced the issue of what the provision meant or that the provision was susceptible to two meanings.  This situation is unlike Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., where the information was

peculiarly within the defendant's knowledge, obligating it to disclose the information to the plaintiff, when the defendant had received complaints and did not disclose the information it received in the complaints. Furthermore, R. Bhandari has not directed the Court's attention to evidence regarding the information peculiarly within Defendants' knowledge that its other representations, such as the condition of its business and its prospects, were false. This case is unlike the situation in <u>Mountain Highlands, LLC v. Hendricks</u>, where there was evidence that the defendants' position gave them a significantly better vantage to obtain the information regarding the property at issue, given the defendants' initiation of the foreclosure and their interactions with the party who owned the property during the foreclosure process. Because there is no evidence on which a fact-finder could reasonably find that the Defendants had superior knowledge and thus a duty to disclose, and because constructive fraud is breach of a legal or equitable duty which the law declares fraudulent because of its tendency to deceive others, R. Bhandari's constructive fraud claim fails as a matter of law. The Court will therefore grant summary judgment on R. Bhandari's constructive fraud claim.

**VII.   THE COURT WILL GRANT SUMMARY JUDGMENT ON R. BHANDARI'S <u>INVASION OF PRIVACY CLAIM REGARDING USE OF HIS LIKENESS.</u>**

The Defendants allege that R. Bhandari's invasion-of-privacy claim rests on his allegations that the Defendants placed him in false light by continuing to use his name and likeness in an advertising campaign designed to benefit them by implying he still worked for them. The Defendants argue that this conduct does not constitute unreasonable and highly objectionable publicity, because R. Bhandari's employment with AGH was publically available knowledge.

R. Bhandari argues that the facts of record establish a claim of invasion of privacy. He argues that his false-invasion-of-privacy claim is based on the Defendants' post-termination publication of statements designed to make it appear that he had resigned from his employment and

their continued use of his likeness in advertising materials.  He argues that, because the Defendants do not address the first of these violations, his claim should proceed on that basis.[18]  R. Bhandari argues that his appropriation claim should continue as well, because the Defendants continued to use his name and likeness in their advertising materials, and because he did not authorize such use.

New Mexico courts have recognized the tort of invasion of privacy, and have recognized that the tort is generally broken into four categories: (i) false light; (ii) intrusion; (iii) publication of private facts; and (iv) appropriation.  See Moore v. Sun Pub. Corp., 118 N.M. at 382, 881 P.2d at 742; Andrews v. Stallings, 119 N.M. at 492, 892 P.2d at 625.

R. Bhandari alleges that his invasion-of-privacy claim based on the Defendants' continued use of his name and likeness in advertising campaigns is an appropriation claim.  In his SAC, R. Bhandari alleges that, after his termination, the Defendants "continued to use [his] name and likeness in advertising campaigns designed to benefit Defendants by implying that [he] continued to support and work for Defendants."  SAC ¶ 89, at 21.  These facts support an appropriation claim. Because R. Bhandari is the master of his complaint, the Court will treat R. Bhandari's invasion of privacy claim based on the Defendants' use of his likeness as an appropriation claim.

"Invasion of the 'right of publicity,' also known as 'appropriation,' consists of the exploitation of the plaintiff's name or likeness, usually for commercial gain, as in the unauthorized use of the plaintiff's name in an advertising endorsement for a product."  Moore v. Sun Pub. Corp., 118 N.M. at 383, 881 P.2d at 743 (citation omitted).

In Butkus v. Downtown Athletic Club of Orlando, Inc., No. CV 07-2507 PA (JWJx), 2008

---

[18] Because the Defendants have not moved for summary judgment on R. Bhandari's claim for invasion of privacy based on the Defendants' post-termination publication of statements designed to make it appear that he resigned from his employment, this claim will proceed.

WL 2557427 (C.D. Cal. Apr. 2, 2008), the United States District Court for the Central District of California found that the manner in which the defendant used the plaintiff's name and likeness "since 2007" violated the plaintiff's privacy rights.  2008 WL 2557227, at *10.  One of the plaintiff's claims was for a violation of his common-law rights of publicity -- which required proof that the defendant used the plaintiff's identity, appropriation of the plaintiff's name or likeness to the defendant's advantage, lack of consent, and resulting injury.  See 2008 WL 2557227, at *7.  The district court stated:

> In support of his claims that DACO has misappropriated his publicity rights, Butkus relies on DACO's continued use of his likeness as embodied in the Butkus Award trophy, statements available through DACO's website that "the Butkus Award® carries the name and support of one of the greatest middle linebackers in football history, Dick Butkus," photographs of Butkus and the Butkus Award trophy in the 2007 Butkus Award program, biographical information about Butkus in that program, and repeated references to Butkus on DACO's website. See Colby Decl., Exs. 6, 8, 10, & 26. DACO apparently made no effort to remove references on its website to Butkus, or his support for the award, after he withdrew his consent to use his name and likeness in April 2007. Nor did DACO remove Butkus' name and jersey number from the Butkus Award trophy it presented in December 2007.
>
> . . . .
>
> Both through its specific uses of Butkus' name and likeness, and viewed as a whole, DACO's use of Butkus' name and likeness impermissibly creates the false impression that Butkus continues to endorse DACO's presentation of the award.
>
> . . . .
>
> [T]he Court . . . finds that the specific manner in which DACO has used Butkus' name and likeness since 2007 has violated his publicity rights.

2008 WL 2557227, at *7, 10.

The evidence in the record regarding the Defendants' continued use of R. Bhandari's name and likeness is R. Bhandari's statement that, "[a]fter Defendants terminated [his] employment, they continued to use [his] name and likeness in their advertising materials," that he "specifically recall[s]

-89-

seeing a billboard using [his] name and likeness in Artesia throughout 2006," and that he "also recall[s] Defendants' patient guide for 2006 having my image on its cover and that there was no replacement of that patient guide until 2007." Bhandari Aff. ¶ 4, at 1-2. A fact-finder could reasonably infer that R. Bhandari withdrew his consent for the Defendants' use of his name and likeness upon his termination in September 2006.

New Mexico courts have not discussed proof of intent for this tort. New Mexico courts have relied on the RST in identifying and defining the four categories of the invasion of privacy tort. See, e.g., Moore v. Sun Pub. Corp., 118 N.M. at 383-84, 881 P.2d at 743-44; Bitsie v. Walston, 85 N.M. 655, 657, 515 P.2d 659, 662 (Ct. App. 1973).[19] The RST states: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." RST § 652C. It also states:

> The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded.

RST § 652C cmt. d.   Courts have held that there must be a intentional or knowing appropriation. See, e.g., Tana v. Dantanna's, 611 F.3d 767, 783 (11th Cir. 2010)("An appropriation of likeness without an intent to use the likeness for one's benefit fails to meet the very definition of the tort itself. Furthermore, Georgia case law plainly establishes that summary judgment is proper where

_____

[19] "The New Mexico courts . . . often look to the law as stated in the Restatement (Second) of Torts." Gose v. Bd. of County Comm'rs of County of McKinley, 727 F. Supp. 2d 1256, 1261 (D.N.M. 2010)(citing Montanez v. Cass, 89 N.M. 32, 38, 546 P.2d 1189, 1195 (Ct. App. 1975)("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d.")).

a plaintiff fails to show an intentional or knowing appropriation of likeness." (citation omitted)).

In Kovatovich v. K-Mart Corp., 88 F. Supp. 2d 975, 986-87 (D. Minn. 1999), the United States

District Court for the District of Minnesota stated:

> The Defendant cites the Restatement in support of its assertion that appropriation is an intentional tort. The Plaintiff disagrees, and argues that, in the event that intent is deemed to be an element of the tort of appropriation, she has established intent by highlighting those facts which demonstrate that the Defendant used her name, without her consent, thereby allowing one to reasonably infer that the appropriation was intended for the Defendant's commercial benefit.
>
> A review of the Restatement's commentary, on the tort of appropriation, reveals a notable dearth of attention to the issue of intent. As the Plaintiff observes, the word "intent" does not appear anywhere in the Restatement, nor in the text of the Lake opinion. However, the Restatement, in a comment, states that the value of a plaintiff's name is not appropriated in the following circumstance:
>
>> [W]hen it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity * * *. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness that the right to privacy is invaded.
>
> See, Restatement (Second) of Torts, § 652C, comment (d).
>
> To tortiously appropriate an individual's name, one must appropriate for the purpose of taking advantage of that individual's name, or reputation. It would seem axiomatic that an individual could not commit an act, for a purpose, without implicitly demonstrating an intent to accomplish that purpose.
>
> While the tort of appropriation is relatively undeveloped in the law of Minnesota, a review of the decisions in foreign jurisdictions supports the proposition that the tort of appropriation requires intent.

88 F. Supp. 2d at 986-87.

The Court believes that intentional or knowing appropriation for the benefit of the person

who is appropriating another's name or likeness is an element of the tort of appropriation, given

New Mexico courts' reliance on the RST in adopting and defining this tort, and the comment in the

RST.  See Kovatovich v. K-Mart Corp., 88 F. Supp. 2d at 986-87.  It appears that the required intent is not a general intent to do the acts, but a specific intent to use another's name or likeness for one's benefit.  R. Bhandari has not directed the Court's attention to evidence in the summary-judgment record that the Defendants intentionally or knowingly appropriated his name or likeness for their benefit.  R. Bhandari states that he recalls seeing a billboard using his name and likeness "throughout 2006," and that the Defendants' patient guide for 2006 had his image on its cover and that there was no replacement of that patient guide until 2007.  R. Bhandari Aff. ¶ 4, at 1-2.  R. Bhandari does not indicate when exactly in 2006 he saw the billboard; before he was terminated or after, or both.  It is just as reasonable to infer from this evidence that the Defendants put out the billboard and patient guide before R. Bhandari's termination, and that they did not take down the billboard and replace the patient guide immediately following his termination as it is to infer that the Defendants put out new billboards following R. Bhandari's termination.  A fact-finder could not reasonably infer from this evidence that, after R. Bhandari was terminated, the Defendants put up billboards with the intent to take advantage of his name and likeness for their benefit.  An equal inference is that of negligence in taking them down.  In any case, even if the inference is that the billboards existed after he was terminated, the evidence would not support a reasonable jury inferring specific intent to benefit from his likeness; more evidence is needed.  Because there is no evidence on which a jury could reasonably find that the Defendants intentionally or knowingly appropriated R. Bhandari's name or likeness for their benefit, the Court will grant summary judgment on R. Bhandari's claim for invasion of privacy based on use of his likeness, because his claim fails as a matter of law.

## VIII.   THE COURT WILL GRANT SUMMARY JUDGMENT ON R. BHANDARI'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The Defendants argue that the Court should dismiss R. Bhandari's claim for intentional infliction of emotional distress.  They argue that damages for emotional distress are not recoverable in an action for breach of an employment contract unless the plaintiff can show that the parties contemplated such damages at the time the contract was made and that, because there is no such showing here, the Court must dismiss R. Bhandari's claim.  They further argue that, even if R. Bhandari can assert his intentional-infliction-of-emotional-distress claim, there is no evidence showing extreme and outrageous conduct, and there is not sufficient evidence of emotional distress.

R. Bhandari argues that the existence of an employment contract does not protect the Defendants from liability.  He argues that the Defendants engaged in extreme and outrageous conduct, because they chose to terminate the Agreement for financial reasons, they engaged in a fraudulent investigation, they deliberately refused to allow him to view the allegations they assembled, they conducted the meeting in the presence of R. Bhandari's wife to increase emotional harm, they threatened him with a lawsuit if he would not immediately resign, and they changed the locks and escorted him off the premises.  R. Bhandari also argues that he suffered severe emotional distress, because there is evidence that the Defendants' actions devastated him, that he received counseling, that he developed a fear of leaving him home, and that he could not sleep.

The Court will not dismiss R. Bhandari's claim for intentional-infliction-of-emotional-distress on the basis that the parties did not contemplate emotional distress damages at the time they made the Agreement.  In Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp., 106 N.M. 19, 738 P.2d 513 (1987), the Supreme Court of New Mexico held that "damages for emotional distress are not recoverable in an action for breach of an employment contract, whether

-93-

express or implied, in the absence of a showing that the parties contemplated such damages at the time the contract was made," because the purpose of allowing damages in a breach of contract case is the restoration to the injured of what he lost by the breach, and what he reasonably expected to gain if there had been no breach. 106 N.M. at 19, 738 P.2d at 514. The plaintiff sought damages for emotional distress "only in connection with the breach of contract claim." 106 N.M. at 19, 738 P.2d at 513. R. Bhandari argues that he "does not seek emotional harm damages for Defendants' breach of contract. Instead, he seeks to hold them liable for the manner in which they breached that contract, a manner deliberately designed to cause emotional harm." Response at 22. Unlike Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp., where the plaintiff sought damages for emotional distress only in connection with her breach-of-contract claim, and brought an intentional-infliction-of-emotional-distress claim, in this case, R. Bhandari does not seek damages for emotional distress in connection with his breach-of-contract claim; instead, he seeks damages for emotional distress in connection with his intentional-infliction-of-emotional-distress claim, which is based on the manner in which the Defendants terminated him. Because R. Bhandari seeks damages for emotional distress in connection with his intentional-infliction-of-emotional-distress claim, and not with his breach-of-contract claim, the Court does not believe that it must dismiss R. Bhandari's claim for intentional-infliction-of-emotional-distress because there is no showing that the parties contemplated emotional distress damages at the time they entered into the Agreement.

The following elements must be proven to establish a claim of intentional infliction of emotional distress: "[i] the conduct in question was extreme and outrageous; [ii] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [iii] the plaintiff's mental distress was extreme and severe; and [iv] there is a causal connection between the defendant's conduct and

the claimant's mental distress." <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.,</u>131 N.M. at 616, 41 P.3d at 342.  For purposes of the tort of intentional infliction of emotional distress, New Mexico law adopts the RST's definition of extreme and outrageous conduct. <u>See  Trujillo v. N. Rio Arriba Elec. Coop., Inc.,</u>131 N.M. at 616, 41 P.3d at 342.  According to theRST, extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RST § 46 cmt. d.  <u>See</u> UJI 13-1628 NMRA ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").  The RST § 46 states:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

RST § 46 cmt. d.

Extreme and "[s]evere emotional distress means that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.,</u> 131 N.M. at 617, 41 P.3d at 343 (internal quotation marks and citations omitted).  "The law intervenes only where the distress is so severe that no reasonable person could be expected to endure it." <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.,</u> 131 N.M. at 617, 41 P.3d at 343 (quoting RST § 46 cmt. j.).  The extreme and severe emotional distress element of intentional infliction of emotional distress was not met, for example, where a plaintiff felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits. <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.,</u> 131 N.M. at 617, 41 P.3d at 343.

The Defendants' conduct in terminating R. Bhandari was not extreme and outrageous. "Being fired is a common occurrence that rarely rises to the level of being 'beyond all possible bounds of decency' and 'utterly intolerable in a civilized community.'" Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. at 617, 41 P.3d at 343 (citation omitted). "[O]nly in extreme circumstances can the act of firing an employee support a claim of intentional infliction of emotional distress." Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. at 617, 41 P.3d at 343 (citing Stock v. Grantham, 125 N.M. 564, 575, 964 P.2d 125, 136 (Ct. App. 1998)). In Trujillo v. Northern Rio Arriba Electric Cooperative, Inc., the employee, who worked in the employer's billing department, attended a seminar designed to address billing errors and revenue losses that an audit had identified. See 131 N.M. at 610, 41 P.3d at 336. Soon after, the employee felt fatigued, dizzy, and disoriented, and left work to visit a doctor. See 131 N.M. at 610, 41 P.3d at 336. After the doctor screened the employee for possible problems, she cleared the employee to return to work on a part-time basis. See 131 N.M. at 611, 41 P.3d at 337. Upon the employee's return to work,

> he met with the general manager to discuss further concerns about Mr. Trujillo's job performance and additional problems with his work that had been discovered during his absence. The additional problems included delays in billing and inaccurate records which had resulted in lost and delayed revenues of thousands of dollars. With regard to the work release, the general manager stated that he was hesitant about having Mr. Trujillo work part-time hours and that he wanted him working full time. Following their discussion, the general manager placed Mr. Trujillo on administrative leave with pay.
>
> The following week, NORA sent Mr. Trujillo a letter advising him that his employment . . . would be terminated as of March 20, 1995. The letter also described [the employer's] loss of confidence in Mr. Trujillo based on the shortcomings in his job performance.

See 131 N.M. at 611, 41 P.3d at 337. The Supreme Court of New Mexico stated that the plaintiff did not point to evidence

> of specific instances in which NORA's conduct was so outrageous in character and

so extreme in degree as to go beyond all possible bounds of decency.  NORA's conduct in this case was to fire an employee whose performance they no longer considered satisfactory.  When Mr. Trujillo received the termination letter from NORA, he had been cleared by his doctor to return to work on a part-time basis because medical testing had revealed no physical problems.  We conclude that NORA's actions were not extreme and outrageous and thus did not satisfy the threshold requirement for intentional infliction of emotional distress.

131 N.M. at 617, 41 P.3d at 343.

Randall made the decision to terminate R. Bhandari's agreement only after he reviewed R. Bhandari's contract and conducted an investigation into R. Bhandari's work at AGH.  See Randall Decl. ¶ 6, at 2.  Randall spoke with five AGH physicians about R. Bhandari's performance and willingness to respond to requests for referrals.  See Randall Decl. ¶ 6, at 2.  Randall also discussed the matter with in-house counsel for CHC, David Butler.  See id. ¶ 6, at 2.  Randall asked Butler to conduct his own legal investigation of Bhandari's contract and AGH's legal rights under the contract.  See id. ¶ 6, at 2.  Eventually, Randall concluded that there was adequate cause to terminate R. Bhandari's Agreement.  See Randall Decl. ¶ 6, at 2.  Butler and Randall personally met with R. Bhandari for hours on September 27, 2010, his last day of employment.  See id. ¶ 7, at 2. Among other things, the parties discussed a proposed separation agreement with R. Bhandari; R. Bhandari testified that Randall told him that, if he did not sign the separation agreement, the Defendants would sue him for the money that they paid him.  See Randall Decl. ¶ 7, at 2; Bhandari Depo. at 177:4-8.  Under this agreement, R. Bhandari would be allowed to resign and be given a neutral recommendation by AGH.  See Randall Decl. ¶ 7, at 2; R. Bhandari Depo. at 183:1-8.

The circumstances of R. Bhandari's termination do not constitute extreme circumstances, because the Defendants' behavior did not go beyond the bounds of common decency, and was not atrocious and intolerable to the ordinary person.  See UJI 13-1628 NMRA.  See Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 131 N.M. at 616, 41 P.3d at 342.  As in Trujillo v. Northern Rio Arriba

-97-

Electric Cooperative, Inc., where there was no evidence that the employer's conduct was so outrageous and so extreme as to go beyond all possible bounds of decency when the employer fired an employee whose performance they no longer considered satisfactory, in this case, the Defendants, after performing an investigation, determined that there was adequate cause to terminate R. Bhandari, and met with R. Bhandari to terminate him.  Although R. Bhandari testified that Randall told him that, if he did not sign the separation agreement, the Defendants would sue him for the money they paid him, this insulting or annoying conduct does not constitute extreme or outrageous conduct.  See RST § 46 cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (emphasis added)).  This behavior does not go beyond all possible bounds of decency, nor is it atrocious or utterly intolerable in a civilized community.  In our society, many disputes are resolved through litigation.  A mere threat of litigation in the context of a termination, without more, is not sufficient  to create extreme circumstances which will support a claim of intentional infliction of emotional distress.  Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. at 617, 41 P.3d at 343.

R. Bhandari's emotional distress was not extreme or severe.  Under New Mexico law, "[e]motional distress is severe if it is of such an intensity and duration that no ordinary person would be expected to tolerate it." UJI 13-1628 NMRA (internal quotation marks omitted).  In Trujillo v. Northern Rio Arriba Electric Co-op, Inc., the plaintiff testified that

> his initial reaction was to feel offended by being called "Sir" in the termination letter and that he resented being fired after giving NORA so many years.  He also testified that he felt "lousy" and depressed and that Prozac was prescribed for him.  His wife described him as being depressed and sleeping long hours and as having erratic eating habits during the period after he was fired.

131 N.M. at 617, 41 P.3d at 343.  The Supreme Court concluded that this evidence was legally insufficient to show severe emotional distress under New Mexico law, because the law intervenes

only where the emotional distress is so severe that no reasonable person could be expected to endure it.  See 131 N.M. at 617, 41 P.3d at 343.  With respect to emotional distress, R. Bhandari experienced sleeplessness.  See R. Bhandari Depo. at 149:8-12.  He wanted to cry, but did not, because he thought that, being a man, he should not cry.  See Bhandari Depo. at 149:18-150:1. R. Bhandari: (i) was devastated; (ii) did not seek counseling outside of his house, but he spoke to his wife, a mental health professional; (ii) did not seek medication for his emotional distress; (iii) did not take any sleeping medication; (v) was scared to go outside of his home and did not go anywhere for approximately a week; and (iv) did not contact any physician to discuss his purported emotional distress.  See Bhandari Depo. at 148:23-150:8.  As in Trujillo v. Northern Rio Arriba Electric Co-op, Inc., where the evidence was legally insufficient to show severe emotional distress when the plaintiff testified that he felt lousy and depressed, that Prozac was prescribed for him, and when his wife described him as being depressed, sleeping long hours, and having erratic eating habits after he was fired, the evidence that R. Bhandari was devastated, spoke to his wife about being sad, but did not seek counseling outside his house, did not seek medication, had trouble sleeping but did not take sleeping medication, did not go outside his home for approximately a week, is not legally sufficient to show severe emotional distress.

Because there is not sufficient evidence on which a jury could reasonably find that the Defendants' conduct was extreme and outrageous or that R. Bhandari suffered extreme and severe emotional distress, the Court will grant summary judgment on R. Bhandari's intentional-infliction-of-emotional-distress claim, because his claim fails as a matter of law.

## IX.  THE COURT WILL GRANT SUMMARY JUDGMENT ON R. BHANDARI'S REQUEST FOR PUNITIVE DAMAGES.

The Defendants argue R. Bhandari is not entitled to an award of punitive damages for his

breach-of-contract claim and that there is no evidence raising an issue of material fact on punitive damages for R. Bhandari's tort claims.  R. Bhandari argues that the parties' differing views as to the Defendants' reprehensibility for breach of contract demonstrates a material dispute of fact on whether punitive damages are appropriate.

The Supreme Court of New Mexico has stated that, "[w]ith sparse exception, this Court consistently has held that an award of punitive damages in a breach-of-contract case must be predicated on a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party." Paiz v. State Farm Fire and Cas. Co., 118 N.M. 203, 210, 880 P.2d 300, 307 (1994)(citing United Nuclear Corp. v. Allendale Mut. Ins. Co., 103 N.M. 480, 485, 709 P.2d 649, 654 (1985)("To assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim."); Hood v. Fulkerson, 102 N.M. 677, 680, 699 P.2d 608, 611 (1985)("Punitive damages [for breach of contract] cannot be established by mere negligence . . . . 'Punitive or exemplary damages may be awarded only when the conduct of the wrongdoer [is] maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights.'" (quoting Loucks v. Albuquerque Nat'l Bank, 76 N.M. 735, 747, 418 P.2d 191, 199 (1966)); Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 102 N.M. 28, 30-31, 690 P.2d 1022, 1023-25 (1984)(stating that, unless negligence by insurance company rises to level of bad faith, it cannot give rise to damages other than those arising from breach of contract)); Green Tree Acceptance, Inc. v. Layton, 108 N.M. 171, 174, 769 P.2d 84, 87 (1989).

> In New Mexico, it is well settled that because the limited purpose of punitive damages is to punish and deter persons from certain conduct, there must be some evidence of a culpable mental state. Certainly the mere breach of a contract does not imply any basis for punitive damages without evidence of such a culpable mental state or other form of overreaching, malicious, or wanton conduct.

Paiz v. State Farm Fire and Cas. Co., 118 N.M. at 210, 880 P.2d at 307 (citation omitted).  "An

intentional breach [of contract] by itself ordinarily cannot form the predicate for punitive damages,

not even when the breach is flagrant, that is, when there is no question that the conduct breaches the

contract, even if the other party will clearly be injured by the breach."  Bogle v. Summit Investment

Co., LLC, 137 N.M. 80, 90, 107 P.3d 520, 530 (Ct. App. 2005)(citation omitted).  "Circumstances

which could make punitive damages appropriate in a breach of contract case include, for example,

an intentional breach accompanied by fraud."  Bogle v. Summit Investment Co., LLC, 137 N.M. at

90, 107 P.3d at 530 (citation omitted).  "Also, when the breaching party intends to inflict harm on

the non-breaching party or engages in conduct which violates community standards of decency,

punitive damages are appropriate."  Bogle v. Summit Investment Co., LLC, 137 N.M. at 90, 107

P.3d at 530 (citation omitted).

        The Court will grant summary judgment on R. Bhandari's request for punitive damages for

his breach-of-contract claim.  There is no evidence that the Defendants intentionally breached the

contract and did so with the intent to defraud R. Bhandari.  See Whitehead v. Allen, 63 N.M. 63, 66,

313 P.2d 335, 336 (1957)(finding that the trial court did not err in submitting the issue of punitive

damages where "the court charged the jury if they found defendants made, or caused to be made,

a falsification of the weight records of plaintiff's hay, and did so with intent to cheat or defraud him,

then they had a case authorizing the award of punitive damages").  Furthermore, there is no evidence

that the Defendants intended to inflict harm on R. Bhandari or engaged in conduct which violated

community standards of decency.  Instead, there is evidence that Randall decided to terminate the

Agreement only after reviewing R. Bhandari's Agreement and conducting an investigation into his

work at AGH, conferring with in-house counsel, Butler, asking Butler to conduct a legal

investigation of AGH's rights under the Agreement, personally meeting with R. Bhandari to

-101-

terminate his employment, and discussing a separation agreement under which R. Bhandari could resign and be given a neutral recommendation from AGH.  There is thus no genuine issue of fact whether R. Bhandari can recover punitive damages for his breach-of-contract claim, and the Court will grant summary judgment on R. Bhandari's request for punitive damages on his contract claim.

The Supreme Court of New Mexico has stated that punitive damages are available as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, fraudulent or in bad faith.  See Coates v. Wal-Mart Stores, Inc., 127 N.M. 47, 57, 976 P.2d 999, 1009 (1999); UJI 13-1827 NMRA. R. Bhandari has withdrawn his defamation and wrongful discharge claims.  R. Bhandari's claim for negligent misrepresentation, which is based on Camp's representations regarding due process and on the representation regarding local competition in the Carson Kolb brochure, is his only remaining misrepresentation claim.  The Court granted summary judgment on R. Bhandari's constructive-fraud claim, intentional-infliction-of-emotional-distress claim, and his claim for invasion of privacy based on use of his likeness.  Negligence, such as negligent misrepresentation, is not a sufficient basis for punitive damages.  See UJI 13-1827 NMRA.  The Court will therefore grant summary judgment on R. Bhandari's request for punitive damages for his tort claims, because there are no genuine issue of material fact regarding R. Bhandari's entitlement to punitive damages.

**IT IS ORDERED** that the Defendants' Motion for Partial Summary Judgment, filed January 5, 2011 (Doc. 113) is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory L. Denes
Juno Beach, Florida

-- and --

Michelle L. Gomez
Brownstein Hyatt Farber Schreck, LLP
Denver, Colorado

-- and --

Eric R. Burris
Adam E. Lyons
Brownstein Hyatt Farber Schreck, P.C.
Albuquerque, New Mexico

>        *Attorneys for the Plaintiff*

Matthew P. Holt
Blaine T. Mynatt
Brad Springer
Holt, Babington & Mynatt
Las Cruces, New Mexico

>        *Attorneys for Counter Defendant*

William C. Madison
Madison, Harbour & Mroz, P.A.
Albuquerque, New Mexico

-- and --

Mary Olga-Lovett
Paul J. Brown
Greenberg Traurig, LLP
Houston, Texas

>        *Attorneys for the Defendants*