IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RAMDAS BHANDARI, M.D.,

       Plaintiff/Counter-defendant,

vs.                                No. CIV 09-0932 JB/GBW

VHA SOUTHWEST COMMUNITY
HEALTH CORPORATION d/b/a
COMMUNITY HOSPITAL CORPORATION
and ARTESIA GENERAL HOSPITAL,

       Defendants/Counter-claimants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Counter-Defendant's Motion for Summary

Judgment, filed January 5, 2011 (Doc. 114)("Motion"). The Court held a hearing on February 2,

2011. The primary issues are: (i) whether there is a genuine issue of fact whether R. Bhandari

breached the Physician Employment Agreement (Ramdas Bhandari, M.D.) at 1 (dated March 16,

2005), filed January 5, 2011 (Doc. 115-1)("Agreement"); and (ii) whether there is a genuine issue

of fact whether R. Bhandari entered into the Agreement with the intent not to perform his duties

under the Agreement. The Court will grant in part and deny in part R. Bhandari's Motion. The

Court will not grant summary judgment on the Defendants' breach-of-contract claim insofar as the

claim is based on R. Bhandari's unavailability, refusal to see patients, and use of his time at work

to manage other business, because there is a genuine issue of material fact whether R. Bhandari

breached the Agreement by being unavailable, refusing to see patients, and spending time at work

managing other businesses. The Court will grant summary judgment on the Defendants' breach-of-

contract claim insofar as the claim is based on R. Bhandari's excessive absence, because there is no

a genuine issue of material fact whether R. Bhandari breached the Agreement by being excessively absent.  There is no genuine issue of fact on the Defendants' fraud claim.  The Court will therefore grant summary judgment on the Defendants' fraud claim.

## FACTUAL BACKGROUND

The Defendants recruited and hired R. Bhandari to provide general, orthopedic surgery services to Artesia, New Mexico and the surrounding communities that Defendant Artesia General Hospital ("AGH") services.  See, e.g., Defendants/Counterclaimants' Response to Plaintiff/Counter-Defendant's Motion for Summary Judgment at 4, filed January 19, 2011 (Doc. 124)("Response")(setting forth this fact); Dr. Bhandari's Reply to CHC/AGH's Response to Dr. Bhandari's Motion for Summary Judgment, filed February 1, 2011 (Doc. 141)("Reply")(not controverting this fact).[1] R. Bhandari entered into the Agreement with the Defendants on March 16,

---

[1] The Court has recently proposed amendments to D.N.M.LR-Civ 56.1(b) that will require the party responding to the motion for summary judgment to number any additional facts, and the party moving for summary judgment to specify whether the additional facts are disputed or not in its reply.  A "redline" version of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us. The proposed revisions were posted for public comment. The period for public comment closed November 24, 2010. The Court will now consider the comments and further revisions, as necessary. The proposed version of D.N.M.LR-Civ 56.1(b) states:

> The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional

2005.  See, e.g., Agreement at 1; Counter-Defendant's Memorandum in Support of Motion for Summary Judgment ¶ 1, at 3, filed January 5, 2011 (Doc. 115)("Memorandum")(setting forth this fact); Response at 3-4 (not controverting this fact);[2] Response at 4 (setting forth this fact); Reply (not

_____

fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

Proposed revisions to D.N.M.LR-Civ. 56.1(b)(emphasis added).  The Defendants set forth facts in their Response that they believe are relevant to the Court's consideration of R. Bhandari's Motion. In his Reply, R. Bhandari does not controvert, or even address, the additional facts that the Defendants set forth.  Because R. Bhandari does not address or dispute the Defendants' additional facts, the Court will deem these facts admitted.

[2] In their Response, the Defendants state: "It must be noted that [R.] Bhandari's 'Statement of Undisputed Facts' asserted in the Motion for Summary Judgment is replete with conclusory statements, significant omissions, and mere argument disguised as organizational headings.  To that extent, CHC/AGH objects to [R.] Bhandari's recitation of facts."  Response at 3-4.  D.N.M.LR-Civ. 56.1(b) states:

The memorandum in support of the motion must initially set out a concise statement of all material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.

A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Defendants do not direct the Court's attention to any facts that they dispute and do not refer with particularity to portions of the record which place the asserted facts in dispute, the Court will deem the facts that R. Bhandari asserts in his Memorandum admitted. See D.N.M. LR-Civ. 56.1(b).  The Court has included in its Memorandum Opinion and Order only

controverting this fact).  In exchange for a base salary of $500,000.00 a year -- plus quarterly bonuses -- R. Bhandari agreed to provide professional medical services relating to general orthopedic surgery at AGH.  <u>See</u>, <u>e.g.</u>, Agreement at 1; Response at 4 (setting forth this fact); Reply (not controverting this fact).  The Agreement required R. Bhandari to provide such services "exclusively" to AGH's patients, and to devote his "full, entire, and undivided professional time and attention to the practice of medicine/surgery" for AGH.  Agreement at 2, 4.  <u>See</u> Response at 4 (setting forth this fact); Reply (not controverting this fact).  R. Bhandari agreed to use his "best efforts" in performing his duties under the Agreement.  Agreement at 2. <u>See</u> Response at 4 (setting forth this fact); Reply (not controverting this fact).  In addition to providing patient care, the Agreement required R. Bhandari to promote AGH's professional practice and to meet professional standards of quality in his practice.  <u>See</u>, <u>e.g.</u>, Agreement at 3; Response at 4 (setting forth this fact); Reply (not controverting this fact).  The Agreement contained exclusions for orthopedic cases concerning hand, spine, and pediatrics.  <u>See</u>, <u>e.g.</u>, Agreement at 1 ("Hospital has determined to provide a physician practicing in the specialty of **General Orthopedic Surgery (excludes hand, spine, and pediatric orthopedics)** to staff a surgical practice located adjacent to its location in Artesia, New Mexico.")(bold in original);  Memorandum ¶ 4, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact).

Claude Camp is AGH's former Chief Executive Officer ("CEO"), and he negotiated the Agreement with R. Bhandari.  <u>See</u>, <u>e.g.</u>, Deposition of Ramdas Bhandari, M.D. at 81:16-25 (taken December 6, 2010), filed January 5, 2011 (Doc. 115-2); Deposition of Claude E. Camp, III at 35:18-

---

the facts relevant to its decision of R. Bhandari's Motion.  Because the Defendants have represented that they would either withdraw their defamation and conversion claims, or voluntarily submit to dismissals of those claims, the Court will not include the facts relevant to those claims, because they are not relevant to the Defendants' other claims.

23 (taken December 22, 2010), filed January 5, 2011 (Doc. 115-3)(stating that he was involved in negotiation of the Agreement and that he personally had discussions with R. Bhandari about the Agreement); Memorandum ¶ 2, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact). Kenneth Randall is AGH's current CEO. See, e.g., Deposition of Kenneth W. Randall at 7:21-24 (taken December 7, 2010), filed January 5, 2011 (Doc. 115-4); Memorandum ¶ 3, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact).

Other orthopedic surgeons had been taking patients from Artesia to Roswell, New Mexico to do surgery before and after R. Bhandari arrived. See, e.g., R. Bhandari Depo. at 58:4-24; Memorandum ¶ 19, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact). When R. Bhandari arrived at Artesia, there was initially a lower volume of patients than he expected. See, e.g., R. Bhandari at 46:5-13; Memorandum ¶ 20, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact). After he moved to Artesia, R. Bhandari joined the Kiwanis Club and became the Vice President of the club; he also joined the Lyons club and did community introductions. See, e.g., R. Bhandari at 51:8-52:2; Memorandum ¶ 21, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

AGH physician Joseph Salgado testified that R. Bhandari was unavailable at times when orthopedic cases were coming through the emergency room or through a referral process from other physicians. See Deposition of Joseph Salgado, M.D. at 16:1-17, 20:24-21:8, 25:22-26:23, 39:20-24 (taken December 8, 2010), filed January 19, 2011 (Doc. 124-2); Response at 4-5 (setting forth this fact); Reply (not controverting this fact). According to Salgado, R. Bhandari was "unavailable at times." Salgado Depo. at 110:18-21. See Response at 5 (setting forth this fact); Reply (not controverting this fact). When R. Bhandari was unavailable, orthopedic patients were sent from AGH's emergency room to Roswell or Carlsbad, New Mexico for fracture care and follow-up. See,

e.g., Salgado Depo. at 111:8-13 ("[I]n general . . . if [R. Bhandari] wasn't available . . . we would have to send somebody to either Roswell or Carlsbad for fracture care or follow-up."); Deposition of Jorge Abalos, M.D. at 76:6-13 (taken December 8, 2010), filed January 19, 2011 (Doc. 124-3)("Before any ortho case people knew we were going to transfer 'em.  But after he arrived here people knew we had an orthopedic surgeon, and many would prefer to stay in town, but we still had to transfer 'em."); Deposition of Kenneth Randall at 191:2-6 (taken December 7, 2010), filed January 19, 2011 (Doc. 124-4)("Dr. Bhandari was the only orthopedic surgeon.  If he didn't do the case, it wouldn't be in a file in the OR.  It wouldn't be there."); Response at 5 (setting forth this fact); Reply (not controverting this fact).

Randall testified that R. Bhandari did not follow up on referrals that were sent to him.  See, e.g., Randall Depo. at 104:10-12 ("[T]here w[ere] referrals being sent to Dr. Bhandari which were not being followed up on.").  AGH's Medical Executive Committee ("MEC") conducted a review of R. Bhandari's performance.  Response at 5 (setting forth this fact); Reply (not controverting this fact).  MEC minutes reflect that, on January 18, 2006, Salgado informed members of the MEC that members of AGH's medical staff had approached him regarding Bhandari's unavailability.

> Dr. Salgado stat[ed] that since Dr. Bhandari lives out of town, he is often not available when a patient needs attention in the Emergency Room.  Dr. Salgado stated members of the Medical Staff have stated they will take their concerns regarding Dr. Bhandari to the Artesia Special Hospital District Board and the Governing Board if matters are not addressed.  The physicians feel too much money has been spent on Dr. Bhandari for him not to be available.  Dr. Salgado stated Medical Staff members have also approached him regarding referring patients to Dr. Bhandari and Dr. Bhandari refusing to see them. . . .   The members of the Medical Executive Committee agreed to call a special meeting on January 19th at 12:00 pm . . . to discuss matters of concern.  Dr. Salgado stated Dr. Bhandari has refused to treat children and sports injury patients . . . .  Dr. Alaniz stated Dr. Bhandari is refusing to treat indigent patients.

MEC Minutes at 4 (taken January 18, 2006), filed January 19, 2011 (Doc. 124-5).  See Randall

Depo. at 127:17-25 (stating that the minutes were kept in the ordinary course of business, and that they were done at or about the time of the events they represent and that it is the ordinary business of the hospital to keep such documents); Response at 5 (setting forth this fact); Reply (not controverting this fact).

Randall stated that AGH's goal as a community hospital is to see patients in the community and that the purpose of having an orthopedic surgeon, such as R. Bhandari, is for the surgeon to see orthopedic patients at AGH. See, e.g., Randall Depo. at 24:19-22; Response at 6 (setting forth this fact); Reply (not controverting this fact). Randall testified that R. Bhandari was "not focused on developing a practice" and "did not attempt to develop a practice." Randall Depo. at 198:11-13, 294:13-21. See Response at 6 (setting forth this fact); Reply (not controverting this fact). Camp testified that he had conversations with R. Bhandari about building his orthopedic practice. See Camp Depo. at 82:1-8; Response at 6 (setting forth this fact); Reply (not controverting this fact). Randall testified that R. Bhandari saw few orthopedic patients. See Randall Depo. 25:6-25; Response at 6 (setting forth this fact); Reply (not controverting this fact). Randall testified that, in a period of approximately fifteen months, R. Bhandari performed approximately eighteen to nineteen surgeries. See, e.g., Randall Depo. at 25:22-25; Response at 6 (setting forth this fact); Reply (not controverting this fact). R. Bhandari testified that, in 2001 and in prior years, assuming that he was operating forty weeks a year, he could do anywhere from forty to two hundred and fifty cases a year, and "probably even a little bit more than that." R. Bhandari Depo. at 17:8-18. See Response at 6-7 (setting forth this fact); Reply (not controverting this fact).

Dr. Jorge Abalos, a member of the MEC, testified that he called R. Bhandari regarding consults, but R. Bhandari could not see the patients. See Abalos Depo. at 12:24-13:7; Response at 5 (setting forth this fact); Reply (not controverting this fact). This failure to see patients happened

more than a dozen times in response to Abalos' inquiries regarding consults.  <u>See</u> Abalos Depo. at 13:1-7; Response at 5 (setting forth this fact); Reply (not controverting this fact).

Abalos investigated R. Bhandari's performance at AGH.  <u>See</u> Response at 6 (setting forth this fact); Reply (not controverting this fact).  In conducting his investigation, Abalos asked AGH physicians about R. Bhandari.  <u>See, e.g.,</u> Abalos Depo. at 26:13-18, 27:10-15 (stating that the document he wrote contained a list of physicians that he spoke to regarding R. Bhandari and their responses to his questions about R. Bhandari's response to their calls); Memorandum ¶ 6, at 3 (setting forth that Abalos conducted interviews with AGH physicians concerning R. Bhandari); Response at 3-4 (not controverting this fact).  It appears that Abalos spoke to approximately eleven physicians.  <u>See</u> Abalos Depo. at 26:8-27:14; Response at 6 (setting forth this fact); Reply (not controverting this fact). Abalos created a random sample of orthopedic patients for a one to two month period by pulling patient names from the emergency room ("ER") log.  <u>E.g.,</u> Abalos Depo. at 30:7-31:20 (testifying that the document contained names of some cases or patients that were seen in the ER, and that he obtained these names by going through the ER log for a month or two and pulling orthopedic cases off the log); Memorandum ¶ 7, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).   Abalos created a memorandum documenting his interviews and random sample.  <u>See, e.g.,</u> Abalos Depo. at 26:10-11; Abalos Report at 1-2, filed January 5, 2011 (Doc. 115-31); Memorandum ¶ 8, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact); Memorandum ¶ 5, at 3 (setting forth this fact); Response at 3-4 (not controverting this fact).  The memorandum that Abalos prepared showed, based on a random sample of patients from ER logs, that R. Bhandari did not treat at least twelve orthopedic patients.  Artesia General Hospital Memorandum at 1-2, filed January 19, 2011 (Doc. 124-6); Abalos Depo. at 26:8-18; Response at 6 (setting forth this fact); Reply (not controverting this fact).  The memorandum notes that several

other physicians described R. Bhandari as being rude to patients and offering no help when called. See Memorandum at 1-2; Response at 6 (setting forth this fact); Reply (not controverting this fact). Abalos was unaware of the hand, spine, and pediatric exclusions in R. Bhandari's Agreement. See, e.g., Abalos Depo. at 24:8-25; Memorandum ¶ 9, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). Abalos did not examine the patient files from the random sample or talk with R. Bhandari about them before making his report. See, e.g., Abalos Depo. at 37:3-11; Memorandum ¶ 10, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).[3]

During his employment at AGH, R. Bhandari maintained a residence in Florida and managed at least three rental properties in Florida. See, e.g., R. Bhandari Depo. at 174:5-176:6. R. Bhandari did not maintain a personal cellular telephone while at AGH; he frequently used his AGH-issued cellular telephone, and he used his AGH-issued cellular telephone for personal use to call Miami,

---

[3] In their Response, the Defendants also assert:

> By any standard, Dr. Bhandari failed to perform under the Contract and use his best efforts or work exclusively for the Hospital. In addition to his failure to practice at the Hospital as required by the Contract, Dr. Bhandari's maintaining of a residence in Florida and management of at least three rental properties meant he did not focus his undivided, exclusive professional efforts towards his work that the Hospital. Phone records for his Hospital issued cell phone indicate that Dr. Bhandari was not focused on providing his exclusive professional services to AGH. Instead, Dr. Bhandari admitted that during business hours he used the AGH cell phone for personal use and to call Miami regarding management of his rental properties.

Response at 7-8 (internal citations omitted). The Court will not accept all of these assertions, which contain legal argument or conclusions, and not factual assertions, as undisputed facts. See Ruiz v. City of Brush, No. 09-0188, 2006 WL 1816454, at *4 (D. Colo. 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;][l]egal argument should be reserved for separate portions of the brief." (citation omitted)). There are, however, facts in the statement that the Court can and will accept: (i) R. Bhandari maintains a residence in Florida; (ii) he managed at least three rental properties in Florida; (iii) he did not maintain a personal cellular telephone while at AGH; and (iv) he used his AGH cellular telephone for personal use to call Miami, Florida regarding management of several rental properties.

Florida regarding management of several rental properties.  See, e.g., Bhandari Depo. at 173:9-176:7.  R. Bhandari used the hospital cellular telephone to make calls to Florida to tend to his property that had been damaged by hurricanes.  See, e.g., R. Bhandari Depo. at 173:9-21; Memorandum ¶ 15, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  R. Bhandari testified:

> Q.  Did you have any rental properties from which you derived income?
>
> A.  They were properties that I had stayed in as a resident, as a growing physician with a growing family.  And these residences, I never sold them because I -- I just didn't sell them.  And they just produced very limited amount of income because the real estate tax is so very high.  . . . And they were not businesses til the year before I -- the year I left, when I was advised by my attorney to form an L.L.C. to cover slips and falls.  So it was not really a business.
>
> . . . .
>
> Q.  All right.  You were generating income from those rental properties prior to 2002.
>
> A.  Not all of them.
>
> Q.  All right.
>
> A.  Actually, there was only just three of them that had some income coming, which was practically eaten away by the real estate taxes and by -- directly there was a loss on each of them.

R. Bhandari Depo. at 20:2-21:3.  See Memorandum ¶ 16, at 5 (setting fort this fact); Response at 3-4 (not controverting this fact).

R. Bhandari testified that these properties produced no profit for him.  See R. Bhandari Depo. at 20:21-21:3 (testifying that there were three rental properties that "had some income coming, which was practically eaten away by the real estate taxes and by -- directly there was a loss on each of them"); Memorandum ¶ 17, at 5 (setting forth this fact); Response at 2-3 (not controverting this fact).  R. Bhandari's Agreement does not specifically state that he cannot manage

rental houses, and it "allow[s] him to do orthopedic medicine-related activities with the written consent of the hospital."  Hill Depo. at 127:2-20.  <u>See</u> Memorandum ¶ 18, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

The Defendants never informed R. Bhandari he was not to use the cellular telephone for personal use.  <u>See, e.g.</u>, R. Bhandari Depo. at 175:10-17; Memorandum ¶ 11, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  Lisa Hill, and employee of the Defendants, testified:

> Q.  And you're not aware of any hospital policy regarding phone usage, are you?
>
> A.  I don't recall today if I looked at that or not.
>
> Q.  Well, then let me kind of ask some of the same questions.  I mean, when you did this investigation, if there had been a policy in place at the time, that would have been something you probably would have noted in the course of your investigation because that would have been something you could have hung your hat on, right?
>
> A.  And I was tending to remember that there was one.  I thought there was a policy on use of hospital equipment.
>
> Q.  But that's not been noted anywhere with regard to your investigation, has it, or in any other letters?
>
> A.  Not a specifically policy number, no.
>
> Q.  Okay.  And that might have been something you could have said, " Hey, look, right here you signed in black and white, you know, that you weren't going to do this and you violated that," correct?  You could have done that?
>
> A.  Could have done that.
>
> Q.  You could have done that, but you did not, right?
>
> A.  Not that I'm aware of.

Deposition of Lisa Hill at 128:19-129:9 (taken December 14, 2010), filed January 6, 2011 (Doc. 116-2).  <u>See</u> Memorandum ¶ 12, at 4 (setting forth that there was no written policy that prohibited

R. Bhandari from using the telephone for personal calls); Response at 3-4 (not controverting this fact).

There is no provision in R. Bhandari's Agreement that prohibited personal use of the AGH-issued cellular telephone.  See, e.g., Agreement; Memorandum ¶ 13, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  David Butler testified:

> Q.  Okay.  Well, you would agree with me that doctors, like attorneys, sometimes have to conduct personal business during the course of their workday?
>
> A.  Occasionally, yes.
>
> Q.  Okay.  Occasionally that happens, right?
>
> A.  Occasionally.
>
> Q.  Because occasionally attorneys and doctors have to interrupt what would be their "normally" considered outside the business hours to actually do work?
>
> A.  Yes.
>
> Q.  And so it would preclude doctors and attorneys sometimes from addressing those things which they might -- which other folks might be able to handle outside of the office?
>
> A.  That is a practice, but it should not interfere with their practice of medicine.

Deposition of David Butler at 175:15-176:6 (taken December 14, 2010), filed January 5, 2011 (Doc. 115-12).  Hill testified that, at times, she has to conduct personal business during work hours and that, when that happens, sometimes she has to make up work outside of normal business hours.  See Hill Depo. at 40:19-41:1.  See Memorandum ¶ 14, at 4 (setting forth that personal calls during business hours are not uncommon); Response at 3-4 (not controverting this fact).

R. Bhandari had approved leave from AGH to travel.  See, e.g., Randall Depo. at 116:11-16 (stating that he sent a memorandum to R. Bhandari and R. Bhandari's wife, Chitra Bhandari, on August 9, 2006, confirming that he gave them ninety-six hours off); id. at 118:9-12; id. at 163:3-

164:13 (reviewing a request for leave regarding R. Bhandari, which Randall signed, and which states that R. Bhandari's request for leave is granted); id. at 212:15-23; Memorandum ¶ 22, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact). R. Bhandari had accrued paid time off ("PTO") at the time he was terminated. See R. Bhandari Depo. at 212:9-23 (stating that, as of September 26, 2006, R. Bhandari had accumulated PTO and that, as of September 26, 2006, R. Bhandari had ninety-six hours of PTO in his account); Memorandum ¶ 23, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

R. Bhandari testified that he has suffered from symptoms related to carpal tunnel syndrome for years and that he had "the problems with carpal tunnel syndrome" before he went to Artesia, but that the problems did not interfere with his work. R. Bhandari Depo. at 7:7:5-22, 33:21-34:5. See Response at 7 (setting forth this fact); Reply (not controverting this fact). R. Bhandari answered no to the New Mexico Statewide Application for Physician/Practitioner Appointment's question "Do you know of any reason why you cannot perform the essential duties of the clinical privileges/functions for which you are requesting with or without a reasonable accommodation according to acceptable standards of professional performance and without posing a direct threat to patients?" The New Mexico Statewide Application for Physician/Practitioner Appointment at 1-3, filed January 19, 2011 (Doc. 124-10). See Response at 7 (setting forth this fact); Reply (not controverting this fact).

## PROCEDURAL BACKGROUND

On July 12, 2010, R. Bhandari filed his Second Amended Complaint for Fraudulent and/or Negligent Misrepresentation; Constructive Fraud; Breach of Contract; Breach of the Implied Covenant of Good Faith and Fair Dealing; Wrongful Discharge in Violation of Public Policy; Outrageous Conduct; Defamation; False Light Invasion of Privacy; and Intentional Infliction of

Emotional Distress.  <u>See</u> Doc. 35.  On July 27, 2010, the Defendants filed their First Amended Answer and Counterclaim, alleging causes of action for breach of contract, conversion/theft, defamation, and fraud.  <u>See</u> Doc. 44.

On January 5, 2011, R. Bhandari filed the Counter-Defendant's Motion for Summary Judgment.  <u>See</u> Doc. 114.  The same day, R. Bhandari filed the Counter-Defendant's Memorandum in Support of Motion for Summary Judgment.  <u>See</u> Doc. 115.  In his Memorandum, R. Bhandari argues that the Defendants have failed to adduce evidence from which a jury could reasonably conclude that R. Bhandari breached his contract, because R. Bhandari was not regularly unavailable and did not refuse to see orthopedic patients, because R. Bhandari did not spend a significant amount of time and resources managing his other business, and because R. Bhandari was not excessively absent.  R. Bhandari further argues that, even if R. Bhandari was in breach of contract, termination of the contract was the Defendants' only remedy under the terms.  R. Bhandari further argues that the Defendants have failed to produce evidence to support the required elements of conversion, and that the economic-loss rule bars recovery for conversion and fraud.  R. Bhandari also argues that the Defendants have failed to produce sufficient evidence to support liability for defamation and that the Defendants have failed to adduce evidence from which a jury could reasonably conclude that R. Bhandari defrauded them.

On January 19, 2011, the Defendants filed the Defendants/Counterclaimants' Response to Plaintiff/Counter-Defendant's Motion for Summary Judgment.  <u>See</u> Doc. 124.  In their Response, the Defendants argue that there is a material issue of fact whether R. Bhandari breached the Agreement.  The Defendants also argue that there is no limitation of remedies in the Agreement.  The Defendants argue that the economic-loss rule does not bar their claims, because the facts forming the basis for their claims are separate and distinct from the Defendants' breach-of-contract

claim.  The Defendants argue that their fraud claim is based on the allegation that R. Bhandari signed the Agreement intending not to perform his duties under the Agreement, and that there is evidence in the record creating a genuine issue of material fact whether R. Bhandari had an "utter lack of intent to perform."  Response at 15.

On February 1, 2011, R. Bhandari filed Dr. Bhandari's Reply to CHC/AGH's Response to Dr. Bhandari's Motion for Summary Judgment.  <u>See</u> Doc. 141 ("Reply").  In his Reply, R. Bhandari contends that general averments of unavailability fail to create a triable issue of fact for breach of contract.  R. Bhandari also argues that the economic-loss doctrine precludes recovery.  R. Bhandari further argues that he intended to fulfill his obligations at the time he executed the Agreement.  R. Bhandari also contends that the election-of-remedies doctrine bars the Defendants fraud claim.

At the hearing, the Defendants represented that they would withdraw their defamation claim and their conversion claim, or that they would voluntarily submit to dismissal of their defamation and conversion claims.  <u>See</u> Transcript of Hearing at 129:5-11 (taken February 2, 2011)(Brown)("Tr.")("And so the reason why the defendants have withdrawn or voluntarily submitted to dismissals because defamation and conversion were not addressed in the response.").[4]

## <u>LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT</u>

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891

---

[4]  The Court's citations to the transcript refer to the court reporter's original, unedited version. The final transcript may contain slightly different page and/or line numbers.

(10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986)("Of course, a party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the [record],

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e)

requires the non-moving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal

quotation marks omitted).

      The party opposing a motion for summary judgment must "set forth specific facts showing

that there is a genuine issue for trial as to those dispositive matters for which it carries the burden

of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir.

1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in

its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set

out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for

the party opposing a properly supported motion for summary judgment to "rest on mere allegations

or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See

Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States,

622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment

motion is made, the opposing party may not rest on the allegations contained in his complaint, but

must respond with specific facts showing the existence of a genuine factual issue to be tried.'"

(citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To survive summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## ANALYSIS

The Court will not grant summary judgment on the Defendants' breach-of-contract claim insofar as the claim is based on R. Bhandari's unavailability, refusal to see patients, and use of his time at work to manage other business, because there is a genuine issue of material fact whether R. Bhandari breached the Agreement by being unavailable, refusing to see patients, and spending time at work managing other businesses.  The Court will grant summary judgment on the Defendants' breach-of-contract claim insofar as the claim is based on R. Bhandari's excessive absence, because there is no a genuine issue of material fact whether R. Bhandari breached the Agreement by being excessively absent.  There is no genuine issue of fact on the Defendants' fraud claim.  The Court will therefore grant summary judgment on the Defendants' fraud claim.

I. **THE COURT WILL GRANT IN PART AND DENY IN PART R. BHANDARI'S REQUEST THAT IT GRANT SUMMARY JUDGMENT ON THE DEFENDANTS' BREACH-OF-CONTRACT CLAIM.**

R. Bhandari argues that the Defendants have not adduced evidence from which a fact-finder could reasonably conclude that R. Bhandari breached the Agreement.  The Defendants contend that R. Bhandari breached his contract because he: (i) was unavailable or refused to see orthopedic patients; (ii) spent a significant amount of time and resources managing his other business; and (iii) was excessively absent from work.  The Defendants argue that there is a genuine issue of fact whether R. Bhandari breached the Agreement.

-18-

Because R. Bhandari argues only that the Defendants have no evidence from which a jury could reasonably conclude that he breached his Agreement, and does not address the other elements of a breach of contract action, see Camino Real Mobile Home Park Partnership v. Wolfe, 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995)(stating that the elements of a breach-of-contract action are existence of a contract, breach of the contract, causation, and damages), the Court will address only whether there is evidence in the summary judgment record from which a fact-finder could reasonably find that R. Bhandari breached the Agreement.

**A.    THERE IS A GENUINE ISSUE OF FACT WHETHER R. BHANDARI BREACHED THE AGREEMENT BECAUSE HE WAS UNAVAILABLE TO SEE PATIENTS, REFUSED TO SEE PATIENTS, AND DID NOT DEVELOP A PRACTICE.**

R. Bhandari argues that he was not regularly unavailable and did not refuse to see orthopedic patients.  He also argues that the Court should not rely on Abalos' report, because that report is based on incomplete information.

The Defendants argue that they rely on other evidence, in addition to Abalos' report, to support their breach-of-contract claim.  They also argue that R. Bhandari's arguments about Abalos' testimony and report go to the weight of the evidence, not its admissibility, and effectively admits the evidence establishes a genuine issue of fact.

The Agreement provides: "Hospital has agreed to employ Physician to provide professional medical services for Hospital."  Agreement at 1.  The Agreement excludes hand, spine, and pediatric orthopedics from R. Bhandari's Agreement.  See Agreement at 1.  The Agreement requires R. Bhandari to provide orthopedic services "exclusively" to AGH's patients, and to devote his "full, entire, and undivided professional time and attention to the practice of medicine/surgery" for AGH. Agreement at 2, 4.  R. Bhandari agreed to use his "best efforts" in performing his duties under the

-19-

Agreement.  Agreement at 2.  In addition to providing patient care, the Agreement requires R. Bhandari to promote AGH's professional practice and to meet professional standards of quality in his practice.  See Agreement at 3.

There is evidence that R. Bhandari was unavailable at times and refused to see patients. Salgado testified that R. Bhandari was unavailable at times when orthopedic cases were coming through the emergency room or through a referral process from other physicians.  See Salgado Depo. at 16:1-17, 20:24-21:8, 25:22-26:23, 39:20-24.  According to Salgado, R. Bhandari was "unavailable at times."  Salgado Depo. at 110:18-21.  When R. Bhandari was unavailable, orthopedic patients were sent from AGH's emergency room to Roswell or Carlsbad for fracture care and follow-up.  See, e.g., Salgado Depo. at 111:8-13  ("[I]n general . . . if [R. Bhandari] wasn't available . . . we would have to send somebody to either Roswell or Carlsbad for fracture care or follow-up."); Abalos Depo. at 76:6-13 ("Before any ortho case people knew we were going to transfer 'em.  But after he arrived here people knew we had an orthopedic surgeon, and many would prefer to stay in town, but we still had to transfer 'em."); Randall Depo. at 191:2-6 ("Dr. Bhandari was the only orthopedic surgeon.  If he didn't do the case, it wouldn't be in a file in the OR.  It wouldn't be there.").  Abalos, a member of the MEC, testified that he called R. Bhandari regarding consults, but R. Bhandari could not see the patients.  See Abalos Depo. at 12:24-13:7; Response at 5 (setting forth this fact); Reply (not controverting this fact).  This refusal or failure to see patients happened more than a dozen times in response to Abalos' inquiries regarding consults.  See Abalos Depo. at 13:1-7; Response at 5 (setting forth this fact); Reply (not controverting this fact).

Randall testified that R. Bhandari did not follow up on referrals that were sent to him.  See, e.g., Randall Depo. at 104:10-12 ("[T]here w[ere] referrals being sent to Dr. Bhandari which were not being followed up on.").  AGH's MEC conducted a review of R. Bhandari's performance.  See

-20-

Response at 5 (setting forth this fact); Reply (not controverting this fact).  MEC minutes reflect that,

on January 18, 2006, Salgado informed members of the MEC that members of AGH's medical staff

had approached him regarding Bhandari's unavailability.

> Dr. Salgado stat[ed] that since Dr. Bhandari lives out of town, he is often not available when a patient needs attention in the Emergency Room.  Dr. Salgado stated members of the Medical Staff have stated they will take their concerns regarding Dr. Bhandari to the Artesia Special Hospital District Board and the Governing Board if matters are not addressed.  The physicians feel too much money has been spent on Dr. Bhandari for him not to be available.  Dr. Salgado stated Medical Staff members have also approached him regarding referring patients to Dr. Bhandari and Dr. Bhandari refusing to see them. . . .  The members of the Medical Executive Committee agreed to call a special meeting on January 19th at 12:00 pm . . . to discuss matters of concern.  Dr. Salgado stated Dr. Bhandari has refused to treat children and sports injury patients . . . .  Dr. Alaniz stated Dr. Bhandari is refusing to treat indigent patients.

MEC Minutes at 4.  See Randall Depo. at 127:17-25 (stating that the minutes were kept in the

ordinary course of business, that they were done at or about the time of the events they represent,

and that it is the ordinary business of the hospital to keep such documents).

     This evidence, in and of itself, creates a genuine issue of fact whether R. Bhandari was

unavailable at times and refused to see patients.  R. Bhandari argues that the Defendants must

affirmatively demonstrate that R. Bhandari failed to treat patients within his Agreement's

contractual limitations.  R. Bhandari argues that the Defendants have not demonstrated that he failed

to treat patients within his Agreement's contractual limitations, because the physicians on whose

testimony the Defendants rely were unaware of the exclusions in R. Bhandari's Agreement.  This

argument goes to the weight of the Defendants' evidence.  The Court does not weigh evidence in

a summary-judgment proceeding.  See United States v. $148,840.00 in U.S. Currency, 521 F.3d

1268, 1273 (10th Cir. 2008)("Accordingly, at this stage of the proceedings, we do not weigh the

evidence or make credibility determinations, as it is not our office to do so; these are functions

properly reserved for the ultimate finder of fact.").  Moreover, the Defendants have directed the Court's attention to evidence that R. Bhandari refused to treat sports injury patients and indigent patients.  These patients do not fall into the exclusions under R. Bhandari's Agreement.  There is thus a genuine issue of fact whether R. Bhandari was unavailable at times or refused to see patients.

In addition to this evidence, there is evidence of the memorandum that Abalos complied after speaking to other physicians and sampling patients from hospital logs.  R. Bhandari argues that "Abalos' report should not be relid on because it is based on incomplete information."  Memorandum at 8.  R. Bhandari argues that it is unreasonable for the Defendants to rely on Abalos' memorandum, because Abalos did not verify whether the patients fell under the exclusions in the Agreement, and because it is unclear whether the physicians to whom Abalos spoke were aware of the exclusions in R. Bhandari's Agreement.

Abalos investigated R. Bhandari's performance at AGH.  Following his investigation, Abalos wrote a document containing the information he obtained in the investigation.  See, e.g., Abalos Depo. at 27:10-15 ("**Q**  How did you write this document? Let me start that again.  You wrote this document after collecting your own thoughts, and then speaking to five other physicians; is that fair?  **A Yes.**").  The memorandum that Abalos prepared, based on a random sample of patients from ER logs, revealed that R. Bhandari did not treat at least twelve orthopedic patients.  Artesia General Hospital Memorandum at 1-2.  In preparing the memorandum, Abalos spoke to approximately eleven physicians.  See Abalos Depo. at 26:8-27:14.  The memorandum notes that several other physicians described R. Bhandari as being rude to patients and offering no help when called.  See Memorandum at 1-2.  Abalos was unaware of the hand, spine, and pediatric exclusions in R. Bhandari's Agreement.  See, e.g., Abalos Depo. at 24:8-25.  Abalos did not examine the patient files from the random sample or talk with R. Bhandari about them before making his report.  See, e.g.,

Abalos Depo. at 37:3-11.

The Court believes that the issues that R. Bhandari has raised regarding whether Abalos, or the physicians he interviewed, were aware of the exclusions in the Agreement, and whether Abalos examined the patient's files before making the memorandum, go to the weight of this evidence, not its admissibility in a summary judgment proceeding.  In ruling on a motion for summary judgment, the Court does not weigh the evidence; that is the jury's function.  See United States v. $148,840.00 in U.S. Currency, 521 F.3d at 1273.  The Court therefore believes that the evidence regarding the memorandum that Abalos compiled is further evidence demonstrating a genuine issue of material fact whether R. Bhandari refused to see patients.  The Agreement required R. Bhandari to provide orthopedic services exclusively to AGH's patients, to devote his full, entire, and undivided professional time and attention to practicing of medicine and/or surgery for AGH, and to use his best efforts in performing his duties.  Because there is a genuine issue of fact whether R. Bhandari was unavailable to see patients at times and refused to see patients, there is a genuine issue of fact whether R. Bhandari breached the Agreement by being unavailable and refusing to see patients.

There is also evidence that R. Bhandari did not work to develop AGH's practice.  Randall stated that AGH's goal as a community hospital is to see patients in the community and that the purpose of having an orthopedic surgeon, such as R. Bhandari, is for the surgeon to see orthopedic patients at AGH.  See, e.g., Randall Depo. at 24:19-22.  Randall testified that R. Bhandari was "not focused on developing a practice" and "did not attempt to develop a practice."  Id. at 198:11-13, 294:13-21.  Camp testified that he had conversations with R. Bhandari about building his orthopedic practice.  See Camp Depo. at 82:1-8.  Randall testified that R. Bhandari saw few orthopedic patients.  See Randall Depo. 25:6-25.  Randall testified that, in a period of approximately fifteen months, R. Bhandari performed approximately eighteen to nineteen surgeries.  See, e.g., Randall Depo. at

25:22-25.  R. Bhandari testified that, in 2001 and prior years, assuming that he was operating forty

weeks a year, he could do anywhere from forty to two-hundred-and-fifty cases a year and "probably

even a little bit more than that."  R. Bhandari Depo. at 17:8-18.  Although there is also evidence that,

after R. Bhandari moved to Artesia, he joined the Kiwanis Club, became the Vice President, joined

the Lyons club, and did community introductions, see, e.g., R. Bhandari at 51:8-52:2; Memorandum

¶ 21, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact), there is still sufficient

evidence in the form of Randall's testimony from which a fact-finder could reasonably conclude that

R. Bhandari did not use his best efforts to develop AGH's practice.  Because the Agreement requires

R. Bhandari to use his best efforts to promote AGH's professional practice, there is thus a genuine

issue of fact whether R. Bhandari breached the Agreement by not promoting AGH's practice.

Because there is a genuine issue of material fact whether R. Bhandari breached the

Agreement by not promoting AGH's practice, and by being unavailable and refusing to see patients,

the Court will not grant summary judgment on the Defendants' breach-of-contract claim based on

these grounds.

### B.   THERE IS A GENUINE ISSUE OF FACT WHETHER R. BHANDARI BREACHED THE AGREEMENT BY SPENDING A SIGNIFICANT AMOUNT OF TIME MANAGING OTHER BUSINESS.

R. Bhandari argues that he did not breach his Agreement by spending a significant amount

of time managing his other businesses, because: (i) the Defendants never told him that he should not

use his cellular telephone for personal calls; (ii) his Agreement did not prohibit personal calls; (iii)

he made calls to Florida to tend property that was damaged by hurricane Katrina and these properties

did not produce a profit for him; and (iv) there was no restriction in his Agreement prohibiting him

from managing other non-medical business.  The Defendants argue that there is a genuine issue of

fact whether R. Bhandari breached his Agreement by managing outside interests while performing

his duties under the Agreement, because R. Bhandari maintained and managed three rental properties while working at AGH, thus breaching the Agreement's exclusivity requirement for his professional actions.

The Agreement provides: "Hospital has agreed to employ Physician to provide professional medical services for Hospital."  Agreement at 1.  The Agreement required R. Bhandari to provide orthopedic services "exclusively" to AGH's patients, and to devote his "full, entire, and undivided professional time and attention to the practice of medicine/surgery" for AGH.  Agreement at 2, 4. R. Bhandari agreed to use his "best efforts" in performing his duties under the Agreement. Agreement at 2.

During his employment at AGH, R. Bhandari maintained a residence in Florida and managed at least three rental properties in Florida.  See, e.g., R. Bhandari Depo. at 174:5-176:6.  R. Bhandari did not maintain a personal cellular telephone while at AGH; he frequently used his AGH-issued cellular telephone, and he used his AGH-issued cellular telephone for personal use to call Miami regarding management of several rental properties.  See, e.g., Bhandari Depo. at 173:9-176:7

The Defendants never informed R. Bhandari he was not to use the telephone for personal use. See, e.g., R. Bhandari Depo. at 175:10-17; Memorandum ¶ 11, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  Hill testified:

Q.  And you're not aware of any hospital policy regarding phone usage, are you?

A.  I don't recall today if I looked at that or not.

Q.  Well, then let me kind of ask some of the same questions.  I mean, when you did this investigation, if there had been a policy in place at the time, that would have been something you probably would have noted in the course of your investigation because that would have been something you could have hung your hat on, right?

A.  And I was tending to remember that there was one.  I thought there was a policy on use of hospital equipment.

Q. But that's not been noted anywhere with regard to your investigation, has it, or in any other letters?

A. Not a specifically policy number, no.

Q. Okay. And that might have been something you could have said, " Hey, look, right here you signed in black and white, you know, that you weren't going to do this and you violated that," correct? You could have done that?

A. Could have done that.

Q. You could have done that, but you did not, right?

A. Not that I'm aware of.

Hill Depo. at 128:19-129:9.

There is no provision in R. Bhandari's Agreement that prohibited personal use of the cellular telephone. See, e.g., Agreement; Memorandum ¶ 13, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact). Butler testified:

Q. Okay. Well, you would agree with me that doctors, like attorneys, sometimes have to conduct personal business during the course of their workday?

A. Occasionally, yes.

Q. Okay. Occasionally that happens, right?

A. Occasionally.

Q. Because occasionally attorneys and doctors have to interrupt what would be their "normally" considered outside the business hours to actually do work?

A. Yes.

Q. And so it would preclude doctors and attorneys sometimes from addressing those things which they might -- which other folks might be able to handle outside of the office?

A. That is a practice, but it should not interfere with their practice of medicine.

Butler Depo. at 175:15-176:6. Hill testified that, at times, she has to conduct personal business

during work hours and that, when that happens, sometimes she has to make up work outside of normal business hours. See Hill Depo. at 40:19-41:1. See Memorandum ¶ 14, at 4 (setting forth that personal calls during business hours are not uncommon); Response at 3-4 (not controverting this fact).

R. Bhandari used the hospital cellular telephone to make calls to Florida to tend to his property that had been damaged by hurricanes. See, e.g., R. Bhandari Depo. at 173:9-21. R. Bhandari testified:

> Q. Did you have any rental properties from which you derived income?
>
> A. They were properties that I had stayed in as a resident, as a growing physician with a growing family. And these residences, I never sold them because I -- I just didn't sell them. And they just produced very limited amount of income because the real estate tax is so very high. . . . And they were not businesses til the year before I -- the year I left, when I was advised by my attorney to form an L.L.C. to cover slips and falls. So it was not really a business.
>
> . . . .
>
> Q. All right. You were generating income from those rental properties prior to 2002.
>
> A. Not all of them.
>
> Q. All right.
>
> A. Actually, there was only just three of them that had some income coming, which was practically eaten away by the real estate taxes and by -- directly there was a loss on each of them.

R. Bhandari Depo. at 20:2-21:3.

These were properties that produced no profit for R. Bhandari. See R. Bhandari Depo. at 20:21-21:3 (testifying that there were three rental properties that "had some income coming, which was practically eaten away by the real estate taxes and by -- directly there was a loss on each of them"). R. Bhandari's Agreement does not specifically state that he cannot manage rental houses,

-27-

and it "allow[s] him to do orthopedic medicine-related activities with the written consent of the hospital." Hill Depo. at 127:2-20.

There is a genuine issue of fact whether R. Bhandari spent a significant amount of time managing outside business interests during his work hours at AGH. There is evidence that R. Bhandari frequently used his AGH-issued cellular telephone for his personal use at work to conduct business regarding his rental properties. Although the Agreement does not specifically state that R. Bhandari cannot manage rental houses and allows R. Bhandari to do orthopedic medicine-related activities with AGH's consent, it also requires R. Bhandari to devote his full, undivided professional time and attention exclusively to practicing medicine and/or surgery for AGH and to use his best efforts in doing so. There is evidence that R. Bhandari did not devote his full, undivided professional time and attention to practicing medicine at AGH, because there is evidence that R. Bhandari frequently used his AGH-issued cellular telephone while he was working at AGH. There is thus a genuine issue of material fact whether R. Bhandari breached the Agreement by spending a significant amount of time managing outside business at work. The Court will therefore deny R. Bhandari's request that it grant summary judgment on the Defendants' breach-of-contract claim on this ground.

**C.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER R. BHANDARI BREACHED THE AGREEMENT BY BEING EXCESSIVELY ABSENT FROM WORK.**

R. Bhandari asserts he did not breach his Agreement by being excessively absent, because he had AGH's approval to travel and had accrued paid time off at the time of his termination.

R. Bhandari had approved leave from AGH to travel. See, e.g., Randall Depo. at 116:11-16 (stating that he sent a memorandum to R. Bhandari and R. Bhandari's wife, C. Bhandari, on August 9, 2006, confirming that he gave them ninety-six hours off); Randall Depo. at 118:9-12; id. at 163:3-

164:13 (reviewing a request for leave regarding R. Bhandari, which Randall signed, and which states that R. Bhandari's request for leave is granted); id. at 212:15-23.  R. Bhandari had accrued PTO at the time he was terminated.  See R. Bhandari Depo. at 212:9-23 (stating that, as of September 26, 2006, R. Bhandari had accumulated PTO and that, as of September 26, 2006, R. Bhandari had ninety-six hours of PTO in his account).

The Defendants did not direct the Court's attention to, and the Court has not found, evidence in the summary-judgment record which creates a genuine issue of fact that R. Bhandari was excessively absent from work.  Instead, there is evidence that AGH approved R. Bhandari's request for leave to travel and that R. Bhandari had accumulated PTO at the time of his termination. The Court therefore finds that there is no genuine issue of fact whether R. Bhandari was excessively absent from work, and there is thus no genuine issue of fact whether R. Bhandari breached the Agreement because of his excessive absence from work.  The Court will therefore grant summary judgment on the Defendants' breach-of-contract claim which is based on these grounds.

### D.   THE AGREEMENT DOES NOT PROVIDE THAT TERMINATION OF THE AGREEMENT IS THE ONLY REMEDY FOR A BREACH OF THE AGREEMENT.

R. Bhandari argues that, even if he breached the Agreement, termination of the Agreement was the Defendants' only remedy.  The Defendants argue that there is nothing in the Agreement that limits the remedies available to the Defendants for R. Bhandari's breach of contract or provides that termination is the sole remedy.  The Defendants argue that Agreement instead provides for either party to recover attorneys fees and court costs if it must enforce the Agreement.

The Agreement states that it may be terminated for cause.  See Agreement at 5.  The Agreement also states: "If either party is required to enforce any of its rights under this Agreement, the prevailing party shall be entitled to receive from the other party all attorney's fees, court costs

and other expenses incurred by the prevailing party in connection with the enforcement of those

rights." Agreement at 7.

In <u>Nearburg v. Yates Petroleum Corp.</u>, 123 N.M. 526, 535, 943 P.2d 560, 569 (Ct. App.

1997), the Court of Appeals of New Mexico stated:

> Although the district court is correct that the operating agreement does not expressly state that an election, once made, cannot be changed, it does not follow that the operating agreement is ambiguous on this point or that the district court can read into the operating agreement a provision that is inconsistent with the remainder of the operating agreement.

123 N.M. at 535, 943 P.2d at 569 (citing <u>Lyon Dev. Co. v. Bus. Men's Assurance Co. of America</u>,

76 F.3d 1118, 1124 (10th Cir.1996)(silence on a subject does not create ambiguity); <u>Continental</u>

<u>Potash, Inc. v. Freeport-McMoran, Inc</u>., 115 N.M. 690, 704, 858 P.2d 66, 80 (1993) (court cannot

imply covenants which are inconsistent with express provisions)).  "A court cannot change contract

language for the benefit of one party to the detriment of another."  <u>Nearburg v. Yates Petroleum</u>

<u>Corp.</u>, 123 N.M. at 535, 943 P.2d at 569 (citing <u>Yankee Atomic Elec. Co. v. New Mexico & Ariz.</u>

<u>Land Co.</u>, 632 F.2d 855, 858 (10th Cir.1980); <u>Smith v. Price's Creameries</u>, 98 N.M. 541, 545, 650

P.2d 825, 829 (1982)). "In the absence of ambiguity, a court must interpret and enforce the clear

language of the contract and cannot make a new agreement for the parties."  <u>Nearburg v. Yates</u>

<u>Petroleum Corp.</u>, 123 N.M. at 535, 943 P.2d at 569 (citing <u>Montoya v. Villa Linda Mall, Ltd.</u>, 110

N.M. 128, 129, 793 P.2d 258, 259 (1990); <u>Alvarez v. Sw. Life Ins. Co.</u>, 86 N.M. 300, 302, 523 P.2d

544, 546 (1974); <u>Great W. Oil & Gas Co. v. Mitchell</u>, 326 P.2d 794, 798 (Okla. 1958)).

The Agreement does not expressly state that remedies are limited to termination of the

Agreement.  The Agreement's silence on this subject does not create an ambiguity.  Given the

Agreement's language regarding awards of costs and attorneys' fees for a party who is required to

enforce its rights under the Agreement, the Court will not read into the Agreement a limitation of

remedies.  See Nearburg v. Yates Petroleum Corp., 123 N.M. at 535, 943 P.2d at 569 ("In the absence of ambiguity, a court must interpret and enforce the clear language of the contract and cannot make a new agreement for the parties.").  The Court therefore will deny R. Bhandari's request that it grant summary judgment on the Defendants' breach-of-contract claim on the grounds that the Agreement does not provide the Defendants the ability to sue R. Bhandari for a breach of contract and provides the Defendants only with the ability to terminate the Agreement.

## II.    THE COURT WILL GRANT SUMMARY JUDGMENT ON THE DEFENDANTS' FRAUD CLAIM.

R. Bhandari argues that the Defendants have not adduced evidence from which a jury could reasonably conclude that R. Bhandari defrauded them.  R. Bhandari argues that, to prove their claim, the Defendants must prove that, at the time of entering into the Agreement, R. Bhandari knowingly made a representation of fact that was not true with the intent to deceive and induce the Defendants into entering the contract.  R. Bhandari argues that the Defendants have no evidence to show that R. Bhandari made a false representation with intent to deceive and induce the Defendants into entering the contract, and therefore the Defendants' claim of fraud fails.  R. Bhandari further argues that the economic-loss rule bars the Defendants' pursuit of the claim, because their claim of fraud is not separate from the contractual relationship.

The Defendants argue that a fraud cause of action may be based on an allegation that a person may be liable if he signs a written contract intending not to perform the promises contained therein.  The Defendants argue that, in their Answer and Counterclaims, they alleged that R. Bhandari never intended to perform his duties under the Agreement.  They argue that the evidence establishes a genuine issue regarding R. Bhandari's lack of intent to perform and thus his liability for fraud, because it establishes that R. Bhandari refused to perform his duties under the Agreement,

refused to work to develop AGH's surgical practice, did not disclose that he suffered symptoms from carpal tunnel syndrome before executing the Agreement, and conducted separate business during his working hours at AGH.  The Defendants argue that the economic-loss rule does not bar their fraud claim.  They argue that their fraud claim is essentially based on fraud in entering into the Agreement with the intent not to perform, and thus their fraud claim involves R. Bhandari's intent at the time of entering into the Agreement, while its breach-of-contract claims involve his performance or lack of performance after its effective date.  The Defendants argue that the fraud claim is thus based on actions that are separate and apart from those which form the bases for their breach-of-contract claim, and that the two causes of action may proceed concurrently.

The Court of Appeals of New Mexico adopted the economic-loss rule in Utah International, Inc. v. Caterpillar Tractor, Co., 108 N.M. 539, 775 P.2d 741 (Ct. App. 1989).  See Utah Int'l, Inc. v. Caterpillar Tractor, Co., 108 N.M. at 542-43, 775 P.2d at 745-46; In re Consol. Vista Hills Retaining Wall Litig., 119 N.M. 542, 550, 893 P.2d 438, 446 (1995).  In Utah International, Inc. v. Caterpillar Tractor, Co., the Court of Appeals held:

> [I]n commercial transactions, when there is no great disparity in bargaining power of the parties, economic losses from injury of a product to itself are not recoverable in tort actions; damages for such economic losses in commercial settings in New Mexico may only be recovered in contract actions. We so hold in order to allow commercial parties to freely contract and allocate the risk of defective products as they wish.

108 N.M. at 542, 775 P.2d at 744 (internal citation omitted).  "The purpose of the economic-loss rule . . . is to preserve the bedrock principle that contract damages be limited to those within the contemplation and control of the parties in framing their agreement."  In re Consol. Vista Hills Retaining Wall Litig., 119 N.M. at 550, 893 P.2d at 446 (internal quotation marks omitted)(citations omitted).  The Supreme Court of New Mexico has declined to overrule Utah International, Inc. v.

Caterpillar Tractor, Co., stating that, if it did, "contract law would be subsumed by strict liability and negligence."  In re Consol. Vista Hills Retaining Wall Litig., 119 N.M. at 550, 893 P.2d at 446.  The Supreme Court stated it would retain the rule

> to preserve the bedrock principle that contract damages be limited to those within the contemplation and control of the parties in framing their agreement. The law of contract allows parties to bargain and allocate the risk that the product will self-destruct. As a matter of policy, the parties should not be allowed to use tort law to alter or avoid the bargain struck in the contract. The law of contract provides an adequate remedy. If we overrule Utah International, contract law would be subsumed by strict liability and negligence. In order to preserve the line between contract law and tort law, we decline to overrule Utah International.

In re Consol. Vista Hills Retaining Wall Litig., 119 N.M. at 550, 893 P.2d at 446 (internal quotation marks and citations omitted).  The Supreme Court went on to hold the economic-loss rule inapplicable to indemnity claims. The Supreme Court held that the rule was not meant to prevent recovery, but to prevent recovery in tort, and "it would be unjust not to allow indemnification." 119 N.M. at 551, 893 P.2d at 447.

This Court has recognized that, "[w]hile the Supreme Court of New Mexico has endorsed the economic-loss rule, the contours of the rule are uncertain."  Wheeler Peak, LLC v. L.C.I.2, Inc., No. CIV 07-1117 JB/WDS, 2008 WL 6045576, at *5 (D.N.M. Oct. 29, 2008)(Browning, J.).  The Honorable William P. Lynch, United States Magistrate Judge, has found that "[l]egal precedent in New Mexico indicates that the economic loss rule extends beyond the limited context of products liability law and applies to service contracts," reasoning that the "legal and policy considerations that motivated New Mexico courts to adopt the economic loss rule in the products liability context apply equally to service contracts."  Farmers Alliance Mut. Ins. Co. v. Naylor, 452 F. Supp. 2d 1167, 1173 (D.N.M. 2006)(citations omitted).

> New Mexico decisions applying the economic loss rule to products liability cases emphasize that the rule "preserve[s] the line between contract law and tort law." In

re Consol. Vista Hills Retaining Wall Litig., 893 P.2d at 446.  The legal and policy considerations that motivated New Mexico courts to adopt the economic loss rule in the products liability context apply equally to service contracts.  See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503, 514 (1994)("The policy interest supporting the ability to comprehensively define a relationship in a service contract parallels the policy interest supporting the ability to comprehensively define a relationship in a contract for the sale of goods.").  In the products liability context, the economic loss rule enables parties in a commercial setting to establish their expectations as part of the bargain.  As the New Mexico Court of Appeals in Utah International observed, "[t]he buyer may bargain for additional warranties from the seller and pay a higher price, or may forego warranty protection entirely in order to obtain a lower purchase price." 775 P.2d at 744.  New Mexico courts have adopted the economic loss rule to the products liability context "in order to allow commercial parties to freely contract and allocate the risk of defective products as they wish." Id.  Similarly, parties to service contracts realize the same commercial benefits from the economic loss rule as parties to contracts for the sale of goods.  The economic loss rule enables parties to a service agreement to freely contract, allocate risk based on the contractual agreement, and obtain a purchase price that reflects the contractual bargained-for exchange.

Additionally, New Mexico decisions emphasizing the clear distinction between tort and contract law indicate that New Mexico courts would apply the economic loss rule to service contracts.  New Mexico has "long followed the rule that 'the difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law.' " Kreischer v. Armijo, 118 N.M. 671, 884 P.2d 827, 829 (Ct.App.1994)(quoting Tamarac Dev. Co. v. Delamater, Freund & Assoc., P.A., 234 Kan. 618, 675 P.2d 361, 363 (1984)).  In Kreischer, the plaintiff brought a claim for gross negligence arising out of the defendant's "grossly willful, wanton, and negligent" construction work.  Id.  The Court of Appeals of New Mexico, in upholding the lower court's dismissal of the plaintiff's claim for gross negligence, observed that "[t]he obligation to properly construct the house [ ] was created by the contract and was not an obligation imposed by law." Id.; see Congregation of the Passion, Holy Cross Province, 201 Ill.Dec. 71, 636 N.E.2d at 514 ("Just as a seller's duties are defined by his contract with a buyer, the duties of a provider of services may be defined by the contract he enters into with his client. When this is the case, the economic loss doctrine applies to prevent the recovery of purely economic loss in tort.").  Although the court did not invoke the economic loss rule, the decision illustrates New Mexico courts' commitment to the distinction between tort and contract law.  Applying the economic loss rule to service contracts reflects this commitment.  In light of this state law precedent, I conclude that under New Mexico law, when the parties to an agreement are sophisticated commercial entities, the economic loss rule applies both to contracts for services as well as to contracts for the sale of goods.

-34-

452 F. Supp.2d at 1173-74.   In Farmers Alliance Mut. Ins. Co. v. Naylor, Judge Lynch also concluded, based on New Mexico state law, that although the economic-loss rule "applies to service contracts, the rule does not bar tort claims arising from an independent duty of care."  452 F. Supp. 2d at 1174.  A case note interpreting the existing law in New Mexico, has stated that it appears that New Mexico's economic-loss rule "precludes recovery of economic loss": (i) "when there is no great disparity in bargaining power between commercial parties to a contract for the sale of goods and the damages arise from injury of a product to itself";  and (ii) "when the parties to a service contract are sophisticated commercial entities and the tort claim is not based on an independent duty of care."  Daniel M. Alsup, Note, New Mexico's Economic Loss Rule, Unconscionability Doctrine, and the Gap Between Them: Concepts, Realities, and How to Mend the Gap, 38 N.M. L. Rev. 483, 497 (2008).

Although the economic-loss rule originated in the context of products liability, some courts have recently extended the rule to the service contract context.  See, e.g., Rochester-Genesee Regional Trans. Authority v. Cummins Inc., No. 09-CV-6370-MAT, 2010 WL 2998768, at* (W.D.N.Y. July 28, 2010)("Where the parties are under a contractual relationship, recovery of economic loss is not available regardless of whether the contract is for the provision of goods or of services." (citations omitted)); AFM Corp. v. S. Bell Tel. & Tel. Co., 515 So. 2d 180, 180-82 (Fla. 1987)(concluding that purchaser of services could not "recover economic losses in tort without a claim for personal injury or property damage," and that "there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses"), receded from by Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 542 (Fla. 2004); Anderson Elec. v. Ledbetter Erection Corp., 503 N.E.2d 246 (Ill. 1986)(addressing situation where the plaintiff entered into a contract with the defendant to perform electrical work and stating that a "plaintiff

seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract").

In <u>Terracon Consultants W., Inc. v. Mandalay Resort Group</u>, 206 P.3d 81 (Nev. 2009), the Supreme Court of Nevada stated:

> The economic loss doctrine is a judicially created rule that primarily emanates from products liability jurisprudence. <u>Calloway v. City of Reno</u>, 116 Nev. 250, 257, 993 P.2d 1259, 1263 (2000), <u>overruled on other grounds by</u> <u>Olson v. Richard</u>, 120 Nev. 240, 241-44, 89 P.3d 31, 31-33 (2004).   This court has explained that "'[t]he economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby [generally] encourages citizens to avoid causing physical harm to others.'"   <u>Id.</u> at 256, 993 P.2d at 1263 (quoting Sidney R. Barrett, Jr., <u>Recovery of Economic Loss in Tort for Construction Defects:</u> <u>A Critical Analysis</u>, 40 S.C. L.Rev. 891, 894-95 (1989)).   Applying the economic loss doctrine to accomplish its general purpose, this court has concluded that the doctrine bars unintentional tort actions when the plaintiff seeks to recover "purely economic losses."   <u>See</u> <u>Local Joint Exec. Bd. v. Stern</u>, 98 Nev. 409, 411, 651 P.2d 637, 638 (1982).

206 P.3d at 85-86. In <u>Hasse Const. Co., Inc. v. Gary Sanitary Dist. Bd. of Comm'rs</u>, No. 2:06-CV-322-PRC, 2008 WL 2169000 (N.D. Ind. May 23, 2008), the United States District Court for the Northern District of Indiana stated:

> The Indiana economic loss doctrine provides that contract is the sole remedy for the failure of a product or service to perform as expected.   Explained further, contract is the only available remedy 'where the loss is solely economic in nature, as where the only claim of loss relates to the product's [or service's] failure to live up to expectations, and in the absence of damage to other property or person.

2008 WL 2169000, at *5-6 (internal quotation marks omitted)(alteration in original)).[5]

Other courts have held that the economic-loss rule does not apply to service contracts.  In

---

[5] Although some courts have expanded the economic-loss rule to include most contractually acquired services, "there is considerably less uniformity among jurisdictions, particularly with respect to the growing number of exceptions courts have carved out, when applied to services."   <u>In re StarLink Corn Products Liability Litigation</u>, 212 F. Supp. 2d 828, 839 n.6 (N.D. Ill. 2002).

Insurance Co. of North America v. Cease Electric Inc., 688 N.W.2d 462, (Wis. 2004), the Supreme

Court of Wisconsin stated:

> The significance of the economic loss doctrine is that it "requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort." Digicorp, Inc. v. Ameritech Corp., 2003 WI 54, ¶ 34, 262 Wis.2d 32, 662 N.W.2d 652. In general, tort offers a broader array of damages than contract. The economic loss doctrine precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies.
>
> There is a split among the jurisdictions as to whether the economic loss doctrine applies to contracts for services. As one treatise noted, "[t]he judiciary remains hopelessly divided on whether the doctrine should be extended to services . . . ." Philip L. Brunner and Patrick J. O'Connor, Jr., Construction Law § 19:10, at n. 14 (May 2004). This court has not yet addressed whether the doctrine covers such claims.
>
> . . . .
>
> The genesis of the economic loss doctrine lies in products liability cases.
>
> . . . .
>
> The application of the economic loss doctrine in the abovementioned cases is not surprising given the protections afforded by the Uniform Commercial Code (U.C.C.). Adopted by the legislature in 1963, the U.C.C. sets forth the rights and remedies that govern a transaction between two commercial parties of relatively equal bargaining power. Id. at 916, 437 N.W.2d 213. It provides a "'comprehensive system for compensating consumers for economic loss arising from the purchase of defective products.'" State Farm Mut. Auto. Ins. Co. v. Ford Motor Co., 225 Wis.2d 305, 342, 592 N.W.2d 201 (1999) (quoting Alloway v. General Marine Ind., 149 N.J. 620, 695 A.2d 264, 268 (1997)).
>
> . . . .
>
> It is the existence of these rights and remedies that serves as one of the critical rationales underlying the economic loss doctrine. After all, if a commercial purchaser were allowed to sue in tort to recover solely economic loss, the U.C.C. provisions designed to govern such disputes could be circumvented entirely. In that event, the U.C.C. would be rendered meaningless and "contract law would drown in a sea of tort." East River, 476 U.S. at 866, 106 S.Ct. 2295.
>
> . . . .

Here, Cease Electric asks this court to extend the economic loss doctrine to contracts for services. It maintains that allowing Cold Spring to escape the confines of its agreement would permit a classic "end run," eviscerating the doctrine altogether. Cease Electric asserts that when a commercial party suffers a failure in the performance of a contract and the loss sustained is solely economic, the doctrine should apply.

The major problem with Cease Electric's argument is that it assumes that contract law is better suited than tort law for dealing with purely economic loss in the context of service agreements. It is not. Unlike contracts for products or goods, which enjoy the benefit of well-developed law under the U.C.C., no such benefit exists for contracts for services. This is because the U.C.C. does not apply to service contracts. Wis. Stat. § 402.102. Van Sistine v. Tollard, 95 Wis.2d 678, 684, 291 N.W.2d 636 (1980). As a result, the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services.

Given the inapplicability of the U.C.C. to service contracts, we decline to extend the economic loss doctrine in this case. We note that we are not alone in this regard. See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse, 71 F.3d 545, 550 (6th Cir. 1995) (citing the U.C.C. and stating that the economic loss doctrine "is associated with 'transactions in goods,' and not with transactions in services"); McCarthy Well Co., Inc. v. St. Peter Creamery, Inc., 410 N.W.2d 312, 315 (Minn.1987) (explaining that the rationale behind the economic loss rule is that "a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, i.e., when the U.C.C. does not apply, there is no reason for the [economic loss] rule to apply").

. . . .

In Daanen this court identified three policies as a basis for application of the economic loss doctrine to tort actions: (1) to maintain the fundamental distinction between tort and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss to assume, allocate, or insure against that risk.

. . . .

Even though the distinctions between tort and contract law at times may seem blurred, they differ in the interests that each protects. Tort principles protect not only the individuals harmed but also demonstrate a public policy to protect society against the unreasonable risk of harm from accidental and unexpected injury. Christopher J. Faricelli, Wading Into The "Morass": An Inquiry Into the Application of New Jersey's Economic Loss Rule To Fraud Claims, 35 Rutgers L.J. 717, 723 (Winter 2004).

On the other hand, an operating principle behind contract law is that bargaining parties to a contract will allocate the risks of non-performance. Id. at 722. The disappointed party to the contract is protected against non-performance by the benefit of the bargain. Id. at 722-23. Thus, when a contract is broken, the breaching party is liable for restoring the non-breaching party to the position he or she would have been in, regardless of negligence or intent. Michelle Kristin Hart, Tort or Contract?: New Jersey's Simultaneous Expansion and Dilution of Contract Theory, 26 Rutgers L.J. 495, 496 (1995).

As noted above, contract law is not better suited than tort law for dealing with negligently provided services. Tort law provides an incentive generally to guard against negligent conduct in the provision of services. If tort law is avoided, the ability to deter certain activity is impaired because contract remedies and warranties may be easily disclaimed. Tort principles address more than merely a private interest between two commercial companies; they also address society's interest in minimizing harm by deterring negligent conduct.

Admittedly, contract law also advances a societal interest in seeing that bargained for promises are performed. The fundamental premise in the application of contract law is that the bargaining parties will allocate the risks and remedies. As the facts demonstrate in this case, however, this fundamental premise simply is not at work with many service contracts.

Often the circumstances surrounding service contracts are simple and informal (e.g., electricians, plumbers, lawn care providers, etc.). In light of the societal interests behind the application of tort principles, and the inapplicability of the fundamental premise supporting contract law, the policy of maintaining the distinction between tort and contract law does not warrant the invocation of the economic loss doctrine here.

Likewise, the second policy consideration of protecting the parties' freedom to allocate economic risk by contract is not implicated. Certainly, parties to service contracts, oral or written, can by means of contractual provisions allocate risk and limit remedies. Yet given the informality of such agreements, few parties actually address the allocation of risk or the limitation of remedies.  They neither discuss it themselves nor hire attorneys to draft written agreements.

. . . .

Finally, we examine the third policy that the party in the best position to assess the risk of economic loss should be encouraged to assume, allocate, or insure against the risk.  The requirement of pre-negotiated agreements seems to presuppose that each party to the service contract can negotiate the terms with an identical level of bargaining power.  In many service contract relationships, the information disparities between the parties do not support such a presupposition.

-39-

688 N.W.2d at 468-71.  See Quest Diagnostics, Inc. v. MCI WorldCom, Inc., 656 N.W.2d 858, 862-

63 (Mich. App. 2002)("[T]he economic loss doctrine in Michigan has been applied in the context

of various transactions for goods or products to bar recovery in tort when damages are recoverable

under the [U.C.C.]. . . . .  This Court has declined to apply the economic loss doctrine where the

claim emanates from a contract for services.").

        The Court declines to follow Judge Lynch's thoughtful opinion on why the economic-loss

rule should apply to service contracts.  If the Court were allowed to choose the best legal doctrine,

it might be inclined to follow his lead.  The federal Court sitting in diversity, however, must, under

Wade v. Emcasco Ins.Co., 483 F.3d 657, 665-66 (10th Cir. 2007), make a prediction how the

Supreme Court of New Mexico would decide the issue, and the Court is not convinced the Supreme

Court of New Mexico would follow Judge Lynch.  The Court concludes that the Supreme Court of

New Mexico would not apply the economic-loss rule to the context of service contracts.  Judge

Lynch relied on the line between contract and tort law, and the argument that applying the

economic-loss rule to service contracts would allow parties to service contracts to freely contract

and allocate risk.  As the Supreme Court of Wisconsin in Insurance Co. of North America v. Cease

Electric Inc. recognized, however, in light of the societal interest in application of tort principles --

protecting individuals and society from harm -- and the inapplicability of the fundamental premise

of contract law -- that the bargaining parties will allocate the risks and remedies -- to many service

contracts, this principle does not warrant invoking the economic-loss rule in service contracts

context.  The Court believes that the Supreme Court of New Mexico would conclude similarly,

based upon its emphasis in New Mexico jurisprudence of tort principles.  See Doe v. Santa Clara

Pueblo, 141 N.M. 269, 279-80, 154 P.3d 644, 654-55 (2007)("Issues of safety, law, and public

policy play a significant role in tort suits. . . .  Tort law is . . . one of a number of ways in

contemporary American society aimed at creating incentives for safety or at providing compensation for loss or both." (internal citations omitted)). Moreover, as the Supreme Court in Insurance Co. of North America v. Cease Electric Inc. recognized, the policy consideration of protecting the contracting parties' freedom to allocate economic risk does not indicate that a court should apply the economic-loss rule in the context of service contracts, because given the informality of most service agreements, few of the parties to these agreements actually address allocating risk or limiting remedies or hire attorneys to draft the agreements. Furthermore, New Mexico law does not always draw a bright-line distinction between contract and tort law . For example, New Mexico courts allow recovery in contract and recovery in tort for breach of the covenant of good faith and fair dealing. See Clayton v. Vanguard Car Rental U.S.A., Inc., No. CIV 09-0188 JB/ACT, 2010 WL 5476787, at *25-26 (D.N.M. Dec. 9, 2010)(Browning, J.)(discussing New Mexico law regarding the implied covenant of good faith and fair dealing). See also State Farm Gen. Ins. Co. v. Clifton, 86 N.M. 757, 758-59, 527 P.2d 798, 758-59 (1974)(stating that, to recover damages in a tort action in an insurance case, there must be evidence of bad faith). The Court also believes that the Supreme Court of New Mexico would not expand the economic-loss rule given the inapplicability of the U.C.C. to service contracts. See Ins. Co. of N. Am. v. Cease Elec. Inc., 688 N.W.2d at 470. For these reasons, the Court does not believe that the Supreme Court of New Mexico would expand the economic-loss rule to service contracts. Because the Court finds that New Mexico courts would not apply the economic-loss rule to service contracts, the Court finds that the economic-loss rule does not bar the Defendants' fraud claim.

Even if the economic-loss rule applied to service contracts, however, the Court would find that the rule would not bar the Defendants' fraud claim. Although the Court has not found a case from New Mexico discussing whether the economic-loss rule precludes a fraud claim, other courts

have discussed this issue.  Some courts have found that the economic-loss rule does not bar a fraud

claim that arises independently of the breach of contract.  See United Int'l Holdings, Inc. v. Wharf

(Holdings) Ltd., 210 F.3d 1207, 1226-27 (10th Cir. 2000)(applying Colorado law to find that the

economic-loss rule did not bar the plaintiff's fraud claim and noting that the fraud claim, "although

premised on representations made in the course of contractual negotiations, . . . arose independently

of the contract"); Audiotext Commc'ns Network, Inc. v. U.S. Telecom, Inc., 156 F.3d 1243, at *4-5

(10th Cir. 1998)(applying Florida law and holding that, "[b]ecause the fraud is distinct from the

substance of the IP contracts [ -- the promises in the contract --], the [fraud] claim was not barred

by the economic loss doctrine"); Wilkins v. Wachovia Corp., No. 5:10-CV-00249-D, 2011 WL

902031, at *11 (E.D.N.C. Feb. 28, 2011)(finding that the economic-loss rule did not bar plaintiffs'

claims for common-law fraud and fraud in the inducement when the plaintiffs' allegations "go

beyond Defendants simply failing to perform under the contract and, therefore, the fraud claims are

not barred by the economic loss rule"); Reese v. JPMorgan Chase & Co., 686 F. Supp. 2d 1291,

1302 (S.D. Fla. 2009)(stating that, if the fraud alleged relates to the performance of the agreement,

then the economic-loss rule will "limit the parties to their contractual remedies," but if the alleged

fraud relates to pre-contract representations, the economic-loss rule will not bar the fraud claim).

The Defendants' fraud claim is based on their allegations that R. Bhandari's intent in entering into

the Agreement; they have directed the Court's attention to evidence that goes beyond the evidence

that they have set forth in support of their breach-of-contract claim, under which they allege only

that R. Bhandari did not perform under the Agreement.  See R. Bhandari Depo. at 7:7:5-22, 33:21-

34:5 (testifying that he has suffered from symptoms related to carpal tunnel syndrome for years and

that he had "the problems with carpal tunnel syndrome");  The New Mexico Statewide Application

for Physician/Practitioner Appointment at 1-3 (showing that R. Bhandari answered no to the

-42-

question "Do you know of any reason why you cannot perform the essential duties of the clinical privileges/functions for which you are requesting with or without a reasonable accommodation according to acceptable standards of professional performance and without posing a direct threat to patients?").  Because the Defendants' allegations of fraud go beyond allegations that R. Bhandari failed to perform under the contract, the Court finds that the economic-loss rule does not bar the Defendants' fraud claim.  See Wilkins v. Wachovia Corp., 2011 WL 902031, at *11 (finding that the economic-loss rule did not bar plaintiffs' claims for common law fraud and fraud in the inducement when the plaintiffs' allegations "go beyond Defendants simply failing to perform under the contract and, therefore, the fraud claims are not barred by the economic loss rule").[6]

---

[6] In his Reply, R. Bhandari, for the first time, also alleges that the Defendants cannot pursue their fraud claim in this case, because the election-of-remedies doctrine requires that, "when one remedy depends on affirmance of a contract, and another remedy depends on the opposite, the remedies are inconsistent; and the party seeking relief must elect one of them."  Reply at 9 (quoting Smith v. Galio, 95 N.M. 4, 10, 617 P.2d 1325, 1329 (Ct. App. 1980)).  R. Bhandari argues that the Defendants attempt to enforce their rights as a matter of contract law, but that they also seek to rescind the Agreement through their fraud claim.  He argues that, therefore, the Court should dismiss the Defendants' fraud claim, because they have elected to pursue their rights under the Agreement.  A party generally may not raise an issue for the first time in a reply brief.  See M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 768 n.7 (10th Cir. 2009)("Because the general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief, we grant Kerr-McGee's motion to strike." (citing Wheeler v. Comm'r, 521 F.3d 1289, 1291 (10th Cir.2008) ("[I]ssues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived.")).  Because R. Bhandari has raised this issue for the first time in his Reply, the Court finds that R. Bhandari waived the argument.

Even if R. Bhandari had raised this argument in his Memorandum, the doctrine would not bar the Defendants' fraud claim.  If the Court does not address the issue here, it may see it at trial, and have to deal with it in a more pressured, time-sensitive environment, so the Court will address the issue.  New Mexico adheres to the election-of-remedies doctrine.  See Three Rivers Land Co. v. Maddoux, 98 N.M. 690, 693, 652 P.2d 240, 243 (1982), overruled on other grounds by Universal Life Church v. Coxon, 105 N.M. 57, 728 P.2d 467 (1986).  In Three Rivers Land Co. v. Maddoux, the Supreme Court of New Mexico explained the doctrine of election of remedies:

> [W]here two inconsistent or alternative rights or claims are presented to the choice of a party, by a person who manifests the clear intention that he should not enjoy both, then he must accept or reject one or the other; and so, in other words, that one

A fraud cause of action may be based on the allegation that a person may be liable if he or she contracts intending not to perform the promises contained therein. In Telman v. Galles, 63 P.2d 1049 (N.M. 1936), the Supreme Court of New Mexico stated:

> We therefore hold if there is substantial evidence to prove that at the time appellant agreed to pay the debt due appellee by the New Mexico Motor Corporation, he had the present intention to not keep such promise, then the judgment of the district court [in favor of the plaintiff upon a charge of fraud and deceit] must be affirmed.

63 P.2d at 1052-53. See Solomon v. Pendaries Props., Inc., 623 F.2d 602, 605 (10th Cir.1980)("New Mexico follows the well-settled rule[ ] that a representation of future events is not actionable fraud except when there is a misstatement of present intent."); McKinney v. Gannet Co., Inc., 660 F. Supp. 984, 994 (D.N.M. 1981)(Campos, J.)("The specie of fraud upon which parol evidence is admissible is that Gannett entered into the merger intending not to perform the promises

---

cannot take a benefit under an instrument and then repudiate it.

98 N.M. at 693, 652 P.2d at 243 (quoting Peters v. Bain, 133 U.S. 670, 695 (1890) (internal quotation marks omitted)). For example, it is "plainly inconsistent to permit a party seeking avoidance of a contract on grounds of fraud to retain the consideration received for entering into that contract which would have the effect of affirming that agreement." Branch v. Chamisa Dev. Corp. Ltd., 147 N.M. 397, 402, 223 P.3d 942, 947 (Ct. App. 2009). The Defendants are the masters of their counterclaims. In their Answer and Counterclaims, the Defendants allege that, as a result of R. Bhandari's fraud, they "suffered compensable economic losses," and that their "business reputation and standing in the community were damaged by the ill-will that Plaintiff generated through his steadfast refusal to perform his duties under the Employment Agreement." Answer and Counterclaims ¶ 132, at 12. The Court has not found, and the parties have not directed the Court's attention to factual allegations in the Answer and Counterclaims which indicate that the Defendants are seeking rescission of the Agreement. There is no mention of rescission in the Answers and Counterclaims, and no indication that the Defendants are seeking rescission. It appears that the Defendants are seeking only monetary damages for the alleged fraud. The Defendants' fraud claim is thus not plainly inconsistent with their breach-of-contract claim. See Branch v. Chamisa Dev. Corp. Ltd., 147 N.M. at 402, 223 P.3d at 947 (stating that " it is plainly inconsistent to permit a party seeking avoidance of a contract on grounds of fraud to retain the consideration received for entering into that contract which would have the effect of affirming that agreement"). Furthermore, the Court will grant summary judgment on the Defendants' fraud claim, because it finds that the evidence is not sufficient to establish that R. Bhandari did not intend to perform the Agreement when he entered into it.

contained in the written documents, specifically the Employment Agreement. This type of fraud is recognized as actionable in New Mexico."). In <u>Telman v. Galles</u>, the defendant promised to pay the plaintiff's claim against the corporation of which the defendant was the president and principal stockholder if the plaintiff would not file the claim with the receiver who had been appointed to wind up the corporation's affairs. See 63 P.2d 1051.

> [The plaintiff's] action is based upon the proposition that there was an actual fraudulent intent on the part of [the defendant] to not pay the debt due him by the motor corporation at the time [the defendant] promised to pay it. Such intent, if it existed, removed this case from the general rule that fraud must relate to a present or pre-existing fact and cannot ordinarily be predicated on unfulfilled promises or statements as to future events.
>
> . . . .
>
> "As stated in 51 A.L.R. 49, 'The general rule, which is supported by numerous decisions in almost all jurisdictions, is that fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events'. This text continues and at page 63 [of 51 A.L.R.] states a general exception to the aforesaid rule, as follows: 'According to the weight of authority, if the person making the promise or statement as to a future event is guilty of an actual fraudulent intent, and makes the promise or misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud may, under many circumstances, be predicated thereon, notwithstanding the future nature of the representations.' In support of this general exception, cases are cited from the United States Supreme Court, from the courts of thirty-four states, and from Hawaii, including Witt v. Cuenod, 9 N.M. 143, 50 P. 328 (1897).
>
> . . . .
>
> The contention, that the promise to pay money in the future with the present intent to not keep the promise is not actionable fraud, is, we believe, not supported by appellant's authorities. It is true it is said in Brooks v. Pitts et al., 24 Ga.App. 386, 100 S.E. 776, cited by appellant to support his contention: "Ordinarily the breach of a promise to perform some act in the future, <u>especially a promise to pay money, is not of and within itself</u>, sufficient to establish fraud in legal conception." But the reference is to the quantum of proof to establish the intent and not to any rule to the effect that such deceit is not actionable. This is shown by a decision of the same court in Donnelly Co. v. Milligan, 37 Ga. App. 530, 140 S.E. 918, in which it was held that the purchaser of merchandise on a credit made just prior to filing a petition

in bankruptcy was evidence of an intent existing at the time of purchase to not pay the purchase price, though promised.  Also see Donaldson v. Farwell, 93 U.S. 631, 23 L.Ed. 993.

We therefore hold if there is substantial evidence to prove that at the time [the defendant] agreed to pay the debt due appellee by the New Mexico Motor Corporation, he had the present intention to not keep such promise, then the judgment of the district court must be affirmed; for acting on this promise and believing [the defendant's] promise would be redeemed, [the plaintiff] refused to file his claim; whereby his debt was barred by the order of the court and lost, unless [the defendant] is responsible for his wrongful act.  Blackburn v. Morrison et al., 29 Okl. 510, 118 P. 402, Ann.Cas. 1913A, 523; 12 R.C.L. title Fraud and Deceit, § 28, p. 261; 26 C.J. title Fraud, § 26, p. 1093; Foster v. Dwire, 51 N.D. 581, 199 N.W. 1017, 51 A.L.R. 21.

63 P.2d at 1052-53 (emphasis in original).

In this case, there is evidence that, during his employment at AGH, R. Bhandari maintained a residence in Florida and managed at least three rental properties in Florida.  See, e.g., R. Bhandari Depo. at 174:5-176:6.  R. Bhandari did not maintain a personal cellular telephone while at AGH; he frequently used his AGH-issued cellular telephone, and he used his AGH-issued cellular telephone for personal use to call Miami regarding management of several rental properties. See, e.g., Bhandari Depo. at 173:9-176:7.  R. Bhandari used the hospital cellular telephone to make calls to Florida to tend to his property that had been damaged by hurricanes.  See, e.g., R. Bhandari Depo. at 173:9-21; Memorandum ¶ 15, at 4 (setting forth this fact); Response at 3-4 (not controverting this fact).  On the other hand, after he moved to Artesia, R. Bhandari joined the Kiwanis Club, became the Vice President, joined the Lyons club, and did community introductions. See, e.g., R. Bhandari at 51:8-52:2; Memorandum ¶ 21, at 5 (setting forth this fact); Response at 3-4 (not controverting this fact).

Salgado testified that R. Bhandari was unavailable at times when orthopedic cases were coming through the emergency room or through a referral process from other physicians.

See Salgado Depo. at 16:1-17, 20:24-21:8, 25:22-26:23, 39:20-24; Response at 4-5 (setting forth this fact); Reply (not controverting this fact).  According to Salgado, R. Bhandari was "unavailable at times."  Salgado Depo. at 110:18-21.  See Response at 5 (setting forth this fact); Reply (not controverting this fact).  Randall testified that R. Bhandari did not follow up on referrals that were sent to him.  See, e.g., Randall Depo. at 104:10-12 ("[T]here w[ere] referrals being sent to Dr. Bhandari which were not being followed up on.").  Randall testified that R. Bhandari was "not focused on developing a practice" and "did not attempt to develop a practice."  Randall Depo. at 198:11-13, 294:13-21.  See Response at 6 (setting forth this fact); Reply (not controverting this fact).

R. Bhandari testified that he has suffered from symptoms related to carpal tunnel syndrome for years and that he had "the problems with carpal tunnel syndrome" before he went to Artesia, but that the problems did not interfere with his work.  R. Bhandari Depo. at 7:7:5-22, 33:21-34:5.  See Response at 7 (setting forth this fact); Reply (not controverting this fact).  R. Bhandari answered no to the question "Do you know of any reason why you cannot perform the essential duties of the clinical privileges/functions for which you are requesting with or without a reasonable accommodation according to acceptable standards of professional performance and without posing a direct threat to patients?" on his employment application.  The New Mexico Statewide Application for Physician/Practitioner Appointment at 1-3, filed January 19, 2011 (Doc. 124-10).  See Response at 7 (setting forth this fact); Reply (not controverting this fact).

The evidence is not such that a fact finder could reasonably find that, at the time R. Bhandari was negotiating the Agreement and entering into the Agreement, he  never intended to perform under the Agreement.  There is no direct evidence that R. Bhandari never intended to perform under the Agreement at the time he entered into the Agreement.  Although a jury may "infer the requisite intent from circumstantial evidence, the inference must be reasonable."  Eckhardt v. Charter Hosp.

-47-

of Albuquerque, Inc., 124 N.M. 549, 562, 953 P.2d 722, 735 (Ct. App. 1997). There is not sufficient evidence from which a fact-finder could reasonably infer that R. Bhandari never intended to perform under the Agreement when he entered into it. Although the Defendants argue that R. Bhandari failed to disclose a debilitating carpal tunnel syndrome when the Agreement was negotiated and executed, the evidence in the record demonstrates only that R. Bhandari had symptoms related to carpal tunnel syndrome at the time, but the problems did not interfere with his work, and that he represented that there were no reasons why he could not perform the essential duties of the position. Because the symptoms did not interfere with R. Bhandari's work, this is not evidence that, at the time he entered into the Agreement, R. Bhandari did not intend to perform the Agreement. The Defendants also argue that the evidence shows that R. Bhandari did not intend to perform under the Agreement when he entered into it, because he refused to provide care to patients, refused to develop AGH's practice, and kept homes in Florida and conducted separate business interests during working hours. Although there is evidence that R. Bhandari was unavailable at times, used the AGH-issued cellular telephone to manage his rental properties in Florida, and was not focused on developing a practice, "the breach of a promise to perform some act in the future, . . . *is not of and within itself,* sufficient to establish fraud in legal conception." Telman v. Galles, 63 P.2d at 1052 (citation omitted). This evidence that R. Bhandari breached the Agreement is not, without more, sufficient to establish that R. Bhandari did not intend to perform the Agreement when he entered into it. The Court will therefore grant summary judgment on the Defendants' fraud claim.

**IT IS ORDERED** that the Counter-Defendant's Motion for Summary Judgment, filed January 5, 2011 (Doc. 114), is granted in part and denied in part. The Court will not grant summary judgment on the Defendants' breach-of-contract claim insofar as the claim is based on R. Bhandari's unavailability, his refusal to see patients, and his spending time managing his other business. The

Court will grant summary judgment on the Defendants' breach-of-contract claim insofar as the claim is based on R. Bhandari's excessive absence.  The Court will grant summary judgment on the Defendants' fraud claim.



_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Gregory L. Denes
Juno Beach, Florida

-- and --

Michelle L. Gomez
Brownstein Hyatt Farber Schreck, LLP
Denver, Colorado

-- and --

Eric R. Burris
Adam E. Lyons
Brownstein Hyatt Farber Schreck, P.C.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Matthew P. Holt
Blaine T. Mynatt
Brad Springer
Holt, Babington & Mynatt
Las Cruces, New Mexico

   *Attorneys for Counter-defendant*

William C. Madison
Madison, Harbour & Mroz, P.A.
Albuquerque, New Mexico

-- and --

Mary Olga-Lovett
Paul J. Brown
Greenberg Traurig, LLP
Houston, Texas

*Attorneys for the Defendants*